UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

TERRELL A. BERRY,

                              Plaintiff,

v.                                                          9:20-CV-177
                                                            (DNH/TWD)

CORRECTIONAL OFFICER C. TREMBLAY,
SGT. FINNEL,
                              Defendants.
_____

APPEARANCES:                              OF COUNSEL:

TERRELL A. BERRY
Plaintiff, *pro se*
19-A-2478
Franklin Correctional Facility
P.O. Box 10
Malone, New York 12953

HON. LETITIA JAMES                        NICHOLAS LUKE ZAPP
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendant
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

Terrell A. Berry ("Plaintiff"), an inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), commenced this *pro se*

action pursuant to 42 U.S.C. § 1983, asserting his constitutional rights were violated at Franklin

Correctional Facility ("Franklin C.F."). (Dkt. No. 1.)  The Honorable David N. Hurd, United

States District Judge, reviewed the complaint in accordance with 28 U.S.C. § 1915, and found

Plaintiff's First Amendment retaliation claims against Correctional Officer C. Tremblay

("Tremblay") and Sgt. Finnel ("Finnel") (collectively, "Defendants") required a response.  (Dkt. No. 14.)

Generally, Plaintiff alleges Defendants retaliated against him for filing a grievance against Tremblay.  (Dkt. No. 1.)  Rather than answering Plaintiff's complaint, Defendants now move to dismiss the action for failure to state a claim.  (Dkt. No. 22.)  This motion was referred to this Court for a Report-Recommendation.  For the reasons that follow, the Court recommends granting Defendant's motion without prejudice and with leave to amend.

I.      DISCUSSION

     A.      Background

On September 14, 2019, Plaintiff alleges Tremblay issued a false misbehavior report accusing Plaintiff of violating a direct order, creating a disturbance, and harassment.  (Dkt. No. 1 at 6.)  On that same day, Plaintiff was placed on "full bed," meaning he could not leave his cube. *Id.*  Shortly thereafter, Plaintiff asked Tremblay for a grievance and Tremblay refused.  *Id.* at 7.  According to Plaintiff, Tremblay told Plaintiff he would "be in for it" if he filed a grievance against him.  *Id.*  Plaintiff asserts he wrote a grievance despite Tremblay's threat.  *Id.*

Plaintiff contends Finnel came to his dorm and called him to the "sally port" on September 26, 2019, or September 27, 2019.  *Id.* at 7-8.  Finnel allegedly showed Plaintiff the grievance he wrote against Tremblay.  *Id.* at 8.  Finnel told Plaintiff "before you have to grieve my man again talk to me first," and he said he would talk to Tremblay about the issue and take care of it.  *Id.*

Then, on September 28, 2019, Plaintiff asserts Tremblay issued another false misbehavior report for violating a direct order in retaliation for the grievance Plaintiff filed against him.  *Id.* at

8-9, 11.  At the conclusion of the hearing regarding the misbehavior report, the hearing officer dismissed the ticket because Tremblay's testimony did not substantiate the charge.  *Id*. at 11.

On October 3, 2019, while Plaintiff was speaking with a lieutenant about the grievance he filed against Tremblay, Finnel interrupted and began verbally harassing Plaintiff and threatened to remove him from the facility.  *Id*. at 13.  The next day, Plaintiff was moved to a different dormitory within Franklin C.F.  *Id*.

As noted above, in its initial review, the District Court construed Plaintiff's complaint as alleging First Amendment retaliation claims against Tremblay and Finnel.  (Dkt. No. 14.) Defendants now move to dismiss the complaint because they contend Plaintiff has failed to allege sufficient facts to state a claim against them.  (Dkt. No. 22.)  Specifically, Defendants argue Plaintiff failed to allege any causal connection between Finnel's conduct and threats to move Plaintiff and his protected speech.  *Id*. at 6.  Defendants also assert an inmate transfer to a different dormitory does not constitute adverse action for the purpose of maintaining a First Amendment retaliation claim.  *Id*.  Similarly, Defendants contend Tremblay's alleged false misbehavior report is not adverse action because it was ultimately dismissed.  *Id*. at 7.

Plaintiff responded, asserting he plausibly alleged his transfer was initiated in response to his grievance against Tremblay.  (Dkt. No. 31.)  Moreover, Plaintiff asserts movement to a different dorm can cause anxiety and other problems and that the false misbehavior report has been covered up and it should constitute adverse action.  *Id*. at 4-6.

### B.     Standard of Review

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal

Rules of Civil Procedure.  To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . .  [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief."  *Id*. at 679 (internal citation and punctuation omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears there are not "enough facts to state a claim to relief that is plausible on its face."  *Id*. at 570.  While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation."  *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).  In other words, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice.  *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they

4

suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*).  Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id*.

    **C.**    **Analysis**

    "To prevail on a First Amendment retaliation claim, an inmate must establish '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action.'" *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).  The plaintiff must establish that "the protected conduct was a substantial or motivating factor" behind the retaliatory action. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  The Second Circuit has warned that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)). This is true because given the nature of a retaliation claim they are "easily fabricated" and as a result "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d at 491.

Here, Plaintiff claims Defendants took two retaliatory actions against him: (1) transferring him to a different dormitory at Franklin C.F.; and (2) the issuance of a false misbehavior report.  Under the applicable standards, this Court finds neither allegation constitutes adverse action and thus Plaintiff has failed to allege a viable retaliation claim.

In the first instance, Plaintiff has not alleged that his transfer from one dormitory to another caused any injury.[1]  Though he alleges that there was no basis for the transfer absent retaliation, he has not alleged that such a transfer resulted in any adverse change in his circumstance.  To the contrary, he notes in his complaint that he has had no issues while residing in his new dormitory.  (Dkt. No. 1 at 14.)  Though Plaintiff argues in his response to Defendants' motion that prisoners can suffer anxiety and fear when they are moved to different locations, he did not make those assertions in his complaint and, regardless, conclusory allegations such as those are insufficient to establish an adverse action.  In short, Plaintiff has not demonstrated that his transfer would have "deter[red] a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  *Dawes*, 239 F.3d at 493 (citations omitted); *Warren v. Goord*, No. 99 CV 296, 2006 WL 1582385, at *15 (W.D.N.Y. May 26, 2006) (since complaint was "devoid of any allegations that the transfer [of inmate plaintiff to infirmary], by itself, resulted in any additional deprivation of privileges as required to support a finding that Warren's transfer resulted in some cognizable injury to Warren's First Amendment rights," transfer "d[id] not, as a matter of law, constitute action 'that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights,' and, thus, d[id] not provide

---

[1]  Defendants also argue Plaintiff failed to allege a causal connection between his transfer to another dormitory and any protected action.  (Dkt. No. 22 at 6.)  However, the Court liberally construes the complaint as alleging a causal connection because Plaintiff notes Finnel's involvement in the relevant grievance and the context behind the transfer appears related to Finnel's frustration with Plaintiff's grievance.  (Dkt. No. 1 at 13-14.)

the requisite 'adverse action' necessary to support the second prong of a First Amendment retaliation claim" (citation omitted)).  Accordingly, the Court recommends dismissing his retaliation claim against Finnel.

Nor can Plaintiff establish an adverse action related to the issuance of the misbehavior report.  In the context of inmate retaliation claims, adverse action is viewed objectively and requires the Court to ask whether the action taken with respect to the inmate "would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).  Courts have long recognized that if the alleged retaliation is not something that would deter an individual from exercising their rights, the alleged conduct is *de minimis* and "outside the ambit of constitutional protection." *McFadden v. Friedman*, No. 9:12-CV-685, 2015 WL 5603433, at *9 (N.D.N.Y. Sept. 23, 2015).

Courts in this district have routinely found the mere filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action.  *Gilmore v. Blair*, No. 9:18-CV-463, 2020 WL 5792467, at *6 (N.D.N.Y. June 30, 2020), *report and recommendation adopted*, 2020 WL 5775203 (N.D.N.Y. Sept. 28, 2020) (finding that a misbehavior report that resulted in the charges being dismissed did not constitute adverse action); *Bartley v. Collins*, No. 95 Civ. 10161, 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding misbehavior report that resulted in plaintiff's temporary loss of privileges did not amount to adverse action but misbehavior report that resulted in keeplock confinement for ten days did).  "Typically, courts require a showing of additional punishment above the filing of a misbehavior report to find an adverse action." *Vidal v. Valentin*, 16-CV-5745, 2019 WL 3219442, at *8 (S.D.N.Y. July 17, 2019); *see also Flynn v. Ward*, No. 15-CV-1028, 2018 WL

3195095, at *10-11 (N.D.N.Y. June 7, 2018), *report and recommendation adopted*, 2018 WL 3193201 (N.D.N.Y. June 28, 2018) (same).  Thus, the filing of a false misbehavior report must result in some form of punishment to constitute adverse actions.  *See, e.g.*, *Reed v. Doe No. 1*, 9:11-CV-250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (finding that the "filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 373 (N.D.N.Y. 2010) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action).

In this case, the charges against Plaintiff were dismissed after a hearing.  (Dkt. No. 1 at 11.)  Thus, even construing Plaintiff's complaint liberally, there are no allegations that he suffered any adverse consequence in the form of lost privileges or restricted confinement because of the misbehavior report.  He, therefore, cannot show and indeed has not alleged an adverse action from the issuance of the misbehavior report.  Accordingly, the Court recommends dismissing his retaliation claim against Tremblay.

## II.  CONCLUSION

After carefully considering the record, the Court finds Plaintiff failed to plausibly allege he suffered adverse action in retaliation for his protected speech.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant's motion to dismiss the complaint (Dkt. No. 22), be **GRANTED** without prejudice and with leave to replead; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[2]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:  April 22, 2021
Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[2]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by   Alston v. District of Columbia,   D.D.C.,   June 19,
2008

2006 WL 1582385
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Gregory WARREN, Plaintiff,

v.

Glenn S. GOORD, Commissioner of the Department
of Correctional Services, Charles Brunelle,
Superintendent, Wende Correctional Facility,
Sue Post, Deputy Superintendent of Health
Services, Walter R. Kelly, Superintendent, Attica
Correctional Facility, James Conway, Dep.
Superintendent of Securiy, Doctor David O'Connell,
Regional Medical Director, Doctor Robert Takos,
Medical Director, Sergeant Dougherty, Sergeant
Kaufman, Correctional Officer Mike Specks,
J. Rupoda, Correctional Officer, and James
Berbary, First Dep. Superintendent, Defendants.

No. 99 CV 296F.
|
May 26, 2006.

**Attorneys and Law Firms**

Kevin M. Kearney, Buffalo, New York, for Plaintiff.

Eliot L. Spitzer, Attorney General, State of New York, Kim
S. Murphy, Assistant Attorney General, Buffalo, New York,
for Defendants, of counsel.

DECISION and ORDER

FOSCHIO, Magistrate J.

*JURISDICTION*

**\*1** The parties to this action consented to proceed before
the undersigned, pursuant to 28 U.S.C. § 636(c), on April
21, 2000. The matter is presently before the court on remand
from the Second Circuit for further proceedings, as well

as on Plaintiff's motion for leave to file a second amended
complaint (Doc. No. 72), filed October 18, 2004.

*BACKGROUND*

Plaintiff Gregory Warren ("Warren") commenced this civil
rights action *pro se,* on April 28, 1999, while incarcerated
at Attica Correctional Facility ("Attica"). Defendants to this
action include New York State Department of Correctional
Services ("DOCS") Commissioner Glenn S. Goord, former
Wende Correctional Facility ("Wende") Superintendent
Charles Brunelle, Wende Regional Medical Unit Deputy
Superintendent of Health Services Sue Post, former Attica
Superintendent Walter R. Kelly, Attica First Deputy
Superintendent James Berbary, Attica Deputy Superintendent
of Security James Conway, DOCS Regional Medical Director
Dr. David O'Connell, Attica Medical Director Dr. Robert
Takos, Attica Sergeants Dougherty and Kaufman, and Attica
Corrections Officers ("C.O.") Mike Specks and James
Rugoda, all sued in both their individual and official
capacities.

In the original complaint, filed April 28, 1999 (Doc.
No. 1) ("the Complaint"), Plaintiff sought relief, including
compensatory and punitive damages, under 42 U.S.C.
§ 1983 based on Defendants' alleged violations of his
rights under Title II of the Americans with Disabilities
Act of 1990, 42 U.S.C. § 12131 *et seq.* ("the ADA"), the
Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* ("the
Rehabilitation Act"), and the Equal Protection Clause of the
Fourteenth Amendment, and also asserts pendent state claims
based on alleged violations of state constitutional law.[1]
On October 4, 1999, the court denied Plaintiff's motion for
appointment of counsel and dismissed the complaint pursuant
to 28 U.S.C. § 1915(e)(2)(B) for failing to include the
necessary allegations regarding his equal protection, ADA
and Rehabilitation Act claims. Plaintiff was further advised
that unless he filed an amended complaint which set forth
the requisite allegations, the action would be dismissed with
prejudice.

On November 18, 1999, Plaintiff filed an amended complaint
("the Amended Complaint") against Defendants, in both
their individual and official capacities, alleging violations
of his civil rights under 42 U.S.C § 1983, predicated on
allegations that Defendants violated his rights under the ADA,

the Rehabilitation Act, the Fourteenth Amendment's Equal Protection Clause, and pendant state claims. Specifically, Plaintiff asserted twelve causes of action including alleged violations of (1) the Equal Protection Clause of the Fourteenth Amendment (First, Sixth, Seventh and Twelfth Causes of Action); (2) the ADA (Second, Fifth, Eighth and Eleventh Causes of Action); (3) the Rehabilitation Act (Third and Ninth Causes of Action); and (4) New York State Constitution Art. I, § 11 (Fourth and Tenth Causes of Action).

**\*2** On February 22, 2000, Defendants moved to dismiss the Amended Complaint for failing to state a claim (Doc. No. 10). While the motion to dismiss was pending, Plaintiff, on May 3, 2000, moved for a Temporary Restraining Order ("TRO") (Doc. No. 23) seeking, *inter alia,* an order directing Defendants transfer Plaintiff from Attica to Wende, and that Defendants cease engaging in the conduct on which Plaintiff's claims are based. In a Decision and Order filed March 26, 2001, *Warren v. Goord,* Slip. Op. 99-CV-296F, (Doc. No. 31) ("March 26, 2001 Decision and Order), the undersigned granted in part and denied in part Defendants' motion to dismiss, and denied Plaintiff's motion seeking injunctive relief. [2]

In particular, Plaintiff's Second, Fifth, Eighth and Eleventh Causes of Action asserting claims under Title II of the ADA were dismissed against Defendants in their official capacity as state actors because Defendants had invoked Eleventh Amendment immunity, and against Defendants in their individual capacity as the ADA does not provide for liability against individuals. Plaintiff's Third and Ninth Causes of Action asserting claims under the Rehabilitation Act, 29 U.S.C. § 794(a), were dismissed against Defendants in their official capacity as state actors on the basis that Congress had not abrogated New York's sovereign immunity under § 504 of the Rehabilitation Act, and against Defendants in their individual capacity as the Rehabilitation Act does not provide for liability against individuals. Plaintiff's First, Sixth, Seventh and Twelfth Causes of Action asserting violations of his right to Equal Protection under the Fourteenth Amendment were dismissed as against all Defendants in their official capacity, and as against Defendants Brunelle, Post, Kelly, Berbary, Conway, Dr. Takos, Dougherty, Kaufman, Specks and Rugoda in their individual capacity, but not as against Defendants Goord and Dr. O'Connell in their individual capacity. Plaintiff's Fourth and Tenth Causes of Action asserting violations of his equal protection rights under the New York Constitution, Art. 1, § 11, were

dismissed as against all Defendants in both their official and individual capacities. Further, although not set forth as a separate cause of action, the court construed Plaintiff's Amended Complaint as attempting to raise a retaliation claim based on an alleged denial of equal protection under the Fourteenth Amendment. Nevertheless, as the Second Circuit does not recognize retaliation claims based on equal protection violations but, rather, only under the First Amendment and Title VII, *see Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 143 (2d Cir.1993), for which Plaintiff had not alleged a factual basis, the court dismissed the retaliation claim. The motion was also denied as to Plaintiff's request for punitive damages against Defendants Goord and Dr. O'Connell. Accordingly, the action was permitted to proceed only as to the First, Sixth, Seventh and Twelfth Causes of Action asserting violations of Plaintiff's equal protection rights under the Fourteenth Amendment, and for punitive damages, as against Defendants Goord and Dr. O'Connell in their individual capacity. Answers to the Amended Complaint were filed on April 10, 2001, by Defendants Goord and Dr. O'Connell (Doc. Nos. 32 and 33).

**\*3** On February 28, 2002, Defendants Goord and Dr. O'Connell moved for summary judgment insofar as the action continued against them, in their individual capacity, on Plaintiff's First, Sixth, Seventh and Twelfth Causes of Action and for punitive damages. On May 23, 2002, Plaintiff filed a cross-motion for summary judgment. In a Decision and Order filed September 30, 2002 (Doc. No. 68), the undersigned granted Defendants' motion for summary judgment, denied Plaintiff's cross-motion for summary judgment, and directed the Clerk of the Court to close the file. Judgment was entered in favor of Defendants and the case was closed on September 30, 2002.

Plaintiff timely filed an appeal and, on December 2, 2003, the Second Circuit affirmed in part, and vacated and remanded in part the judgment dismissing Plaintiff's claims for failure to state a claim and on summary judgment. *Warren v. Goord,* 81 Fed. Appx. 400 (2d Cir.2003) (table) (*"Warren"* ). In particular, the Second Circuit remanded the matter for consideration of three issues, including (1) whether New York has waived its sovereign immunity under the Rehabilitation Act during the period of the dispute that DOCS accepted federal funds, *i.e.,* 2001 and 2002; (2) whether Plaintiff validly pleaded a First Amendment retaliation claim; and (3) whether an ADA retaliation claim may be brought against Defendants in their official or individual capacity. *Warren, supra,* at 401. The Second Circuit affirmed

the dismissal of Plaintiff's ADA discrimination claims, equal protection discrimination claims against Defendants in their individual and official capacities, New York state constitutional discrimination claims, and Plaintiff's remaining equal protection claims. *Warren, supra,* at 401-02. Finally, the Second Circuit ordered that Plaintiff be appointed counsel with regard to the remanded issues. *Id.* at 402.

On October 18, 2004, Plaintiff filed a motion for leave to file a second amended complaint. The proposed second amended complaint ("proposed amended complaint") was attached as an exhibit to the Notice of Motion, and the motion was supported by an affidavit (Doc. No. 73) ("Plaintiff's Affidavit"). By Order dated December 22, 2004, Kevin M. Kearney, Esq., was appointed to represent Plaintiff, *pro bono,* in this action.

A pretrial scheduling conference was conducted on January 24, 2005, at which the parties proposed a briefing schedule for consideration of the issues remanded by the Second Circuit, as well as for consideration of Plaintiff's proposed amended complaint which Defendants opposed on the basis such proposed amended complaint consisted of 74 handwritten, illegible pages. The court's order, dated January 25, 2005, established March 11, 2005 as the deadline for Plaintiff to file a memorandum of law on the remanded issues and in support of his motion to amend, April 15, 2005 as the deadline for filing Defendants' response, and May 6, 2005, as the deadline for filing Plaintiff's reply, if any.

 **\*4** On March 11, 2005, in support of the remanded issues and the motion for leave to file a second amended complaint, Plaintiff filed the Declaration of Kevin M. Kearney, Esq. (Doc. No. 77) ("Kearney Declaration"), and a Memorandum of Law in Support of Issues Remanded by the Second Circuit (Doc. No. 78) ("Plaintiff's Memorandum"). To alleviate the legibility issue Defendants raised with regard to Plaintiff's proposed amended complaint, Mr. Kearney had Plaintiff's handwritten proposed amended complaint read and typed by a secretary at Mr. Kearney's law firm, and attached the typed proposed amended complaint as Exhibit B to the Kearney Declaration. Defendants requested, and were granted, extensions of time to file responses. On July 22, 2005, Defendants filed a Memorandum of Law Addressing Issues Remanded by the Second Circuit and in Response to Plaintiff's Motion to Amend (Doc. No. 81) ("Defendants' Response"). On August 18, 2005, Plaintiff filed a Reply Memorandum of Law in Support of Issues Remanded by

the Second Circuit (Doc. No. 82) ("Plaintiff's Reply"). Oral argument was deemed unnecessary.

Based on the following, Plaintiff's motion for leave to file a second amended complaint (Doc. No. 72) is DENIED. Additionally, upon consideration of the issues remanded by the Second Circuit for further proceedings in connection with the earlier dispositive motions, the court finds that (1) New York had not waived its sovereign immunity under the Rehabilitation Act during the period of the dispute that DOCS accepted federal funds; (2) Plaintiff has failed to articulate a cognizable First Amendment retaliation claim; and (3) no retaliation claim may be brought under Title V of the ADA against Defendants in either their official or individual capacities and, in any event, Plaintiff has failed to plead the necessary elements of such claim.

*FACTS*[3]

Plaintiff Gregory Warren ("Warren"), claims he is a "functional quadriplegic" in that he cannot walk and has limited use of his arms and legs despite the complete absence of any medically diagnosed physical or medical cause of such condition. Warren alleges that while housed in the hospital unit at Attica ("Attica's infirmary" or "hospital ward"), and in DOCS's Regional Medical Unit ("RMU") at Wende, he was subjected to disparate treatment, including the denial of privileges available to inmates housed in the infirmary and regional medical units of other correctional facilities within New York's Department of Corrections system. In contrast to a correctional facility hospital ward or infirmary, DOCS's RMUs provide intensive and long term medical care which cannot be delivered at a prison infirmary and objective medical criteria must be satisfied before an inmate is admitted to an RMU.

Specifically, Warren alleges he was housed in a single room in Attica's infirmary from May 9, 1997 until September 1997, when he was moved to another single room, also in the infirmary, where he was permitted to have a personal television, but where his commissary and package privileges were limited. Warren remained in Attica's infirmary until August 3, 1998, when he was transferred to Wende's Regional Medical Unit ("Wende's RMU"), where he was denied use of certain personal property, including use of a personal television, commissary privileges and legal materials based on space considerations in the rooms in Wende's RMU. Warren filed administrative grievances

concerning the restricted privileges in Wende's RMU, but the grievances were denied.

**\*5** On September 17, 1998, Warren contacted John Beck, a prisoners' rights attorney, regarding the restrictions placed on inmates' privileges in Wende's RMU. One Dwight A. Grant ("Grant"), another inmate housed in Wende's RMU, also spoke with Mr. Beck concerning the same issues. Approximately thirty minutes after placing the call to Mr. Beck, both Warren and Grant were placed in keeplock confinement in preparation for transfer to another correctional facility. On September 18, 1998, Warren and Grant were transferred back to Attica's infirmary where Warren was placed in a four-man room and denied use of a personal television. [4] Although Warren's request to be transferred to a single room within Attica's infirmary, where he could, as before, have a personal television, was denied, Warren was permitted to watch television in the infirmary's television room available to all inmates housed in the infirmary. Warren further alleges Defendants transferred him to a four-man room within Attica's infirmary to retaliate against him for complaining, including contacting an outside attorney, about the denial of certain privileges while housed in Wende's RMU. Defendants, however, attribute the transfer to the fact that Warren, who has been observed using his arms in attending to his personal needs, including combing his hair and brushing his teeth, as well as wiggling his toes, was determined not to have a sufficiently severe medical condition to warrant care in an RMU. Affidavit of Robert Takos, M.D. ("Dr.Takos"), Director of Attica's Medical Unit (Doc. No. 26) ¶¶ 5-9.

In October 1998, another inmate housed at Attica gave Warren a personal television which was taken to Attica's package room for processing. On November 26, 1998, Warren filed a grievance challenging Attica's policies prohibiting inmates confined to the infirmary from possessing personal televisions and participating in full commissary and package privileges. Warren's grievances were either dismissed or denied. On November 29, 1998, Warren was permitted to sign for his personal television; however, upon signing, Warren was informed that he would not be permitted to use the television in the infirmary and the television was placed in storage.

Upon receiving a food package containing cookies on January 4, 1999, C.O. Speck informed Warren that the package would have to be returned in accordance with hospital policy. Warren refused to comply and filed a grievance challenging

as unlawful discrimination, in violation of federal laws, Attica infirmary's policy against use of a personal television and full commissary and package privileges. On January 12, 1999, DOCS Sergeant Kaufman spoke with Warren regarding the allegations and, on January 20, 1999, Warren was notified that C.O. Rugoda had destroyed the food package at the direction of Attica's First Deputy Superintendent James Conway.

Warren alleges that the challenged policies in effect at both Wende's RMU and Attica's infirmary overtly discriminate against "significantly impaired" inmates. According to Warren, inmates housed in the RMUs at DOCS's Coxsackie and Walsh Correctional Facilities, or in the infirmaries at DOCS's Greenhaven, Clinton and Sing-Sing Correctional Facilities, are permitted full commissary and package privileges. Warren further claims that inmates housed in Clinton's infirmary are permitted full personal television privileges. Warren additionally contends that the alleged denial of certain privileges while in Attica's infirmary was intended to retaliate against him for participating in constitutionally protected activities, specifically, Warren's conduct in opposing and grieving the alleged discriminatory policies at Wende's RMU and by contacting civil rights attorney Mr. Beck, and that all Defendants failed to take steps to correct the alleged constitutional and statutory violations.

**\*6** On July 26, 2001, Warren was transferred from Attica to DOCS's Five Points Correctional Facility. As originally filed by Warren, the proposed amended complaint consisted of 74 handwritten pages, containing 386 separately enumerated paragraphs, and asserting a total of 34 causes of action, including the same 12 causes of action as the Amended Complaint, and 22 new causes of action. Most of proposed amended complaint's newly asserted facts and causes of action claim unlawful actions were taken against Warren after being transferred to Five Points Correctional Facility ("Five Points") in retaliation for the instant litigation. The proposed amended complaint also seeks to add as defendants Wende Medical Director Angel Gutierrez ("Gutierrez"), DOCS Supervisor of Utilization Management and Quality Improvement Joan Smith ("Smith"), and six Five Points employees, including Medical Director Dr. Dobies ("Dr.Dobies"), Nurse Administrator Nancy O'Conner ("O'Conner"), Superintendent Poole ("Poole"), Registered Nurse Helen Katt ("Katt"), Registered Nurse C. Baker ("Baker"), and Psychiatrist William Goodman ("Goodman"). Because large portions of the handwritten version of the proposed amended complaint are illegible, as noted, Mr. Kearney had a staff member of his law firm prepare a

typewritten version of the document, and the resultant typed version of the proposed amended complaint was attached as Exhibit B to the Kearney Declaration.

*DISCUSSION*

1. Motion to Amend

As stated, on October 18, 2004, Warren filed a motion pursuant to Fed.R.Civ.P. 15(a) ("Rule 15(a)") for leave to file a second amended complaint comprised of 74 handwritten, illegible pages. In addition to the 12 causes of action asserted in the Amended Complaint, Warren's proposed amended complaint asserts 22 new causes of action, for a total of 34 causes of action, the new claims largely pertaining to incidents allegedly occurring after the Second Circuit remanded the action for further proceedings, primarily at Five Points Correctional Facility where Warren was transferred on July 26, 2001.

Defendants object to the motion to amend on the basis that Plaintiff seeks to add new allegations of events occurring outside the applicable limitations period which do not arise out of the same transactions or occurrences set forth in the Amended Complaint. Defendants' Response at 12-14. Defendants further maintain that insofar as Warren seeks to add new defendants, such defendants would be prejudiced from the delay in adding them, and there is no basis on which to find that such proposed defendants knew or should have known that but for a mistake concerning the identity of the proper party, the action, as pleaded in the Amended Complaint, would have been brought against the proposed defendants, as Rule 15(a) requires. *Id.* at 10-11.

Warren argues, in further support of the motion to amend, that the proposed amended complaint alleges that same violations of his civil rights, *i.e.,* unlawful discrimination and retaliatory conduct by prison officials and employees as alleged in the Amended Complaint, and although the alleged later misconduct occurred at different correctional facilities and involved different employees, such misconduct nevertheless was part of the same pattern of violations as stated in the Amended Complaint. Plaintiff's Reply at 1. Warren further maintains that as the proposed new defendants are also DOCS employees, such defendants would not be prejudiced in maintaining a defense. *Id.* at 1-2. Finally, Warren argues that none of his proposed claims are time-barred as all relate back to the filing of his original complaint as recognized by Rule 15(c). *Id.* at 2.

**\*7** According to the Federal Rules of Civil Procedure, "a party may amend the party's pleading *once* as a matter of course at any time before a responsive pleading is served...." Fed. R Civ. P. 15(a) (italics added). Because Warren has already filed an amended complaint to which Defendants Goord and Dr. O'Connell have filed answers, Warren is not permitted to file a further amended complaint as a matter of right, even though Defendants Goord and Dr. O'Connell are the only Defendants who have answered the Amended Complaint. *Glaros v. Perse,* 628 F.2d 679, 686 (1st Cir.1980) (holding plaintiff not entitled to amend his civil rights complaint as of right because some defendants had yet to file responsive pleadings and plaintiff had already amended complaint once); *Perlmuter Printing Co. v. Bermuda Star Line, Inc.,* 1994 WL 577728, * 3 (S.D.N.Y. Oct. 19, 1994) (holding plaintiff not entitled to file second amended complaint as a matter of course pursuant to Fed.R.Civ.P. 15(a)). As such, Warren must obtain the court's leave to file a second amended complaint.

Rule 15(a) provides that leave to amend a pleading "shall be freely granted when justice so requires." Fed.R.Civ.P. 15(a). Thus, an amended pleading may be filed pursuant to Rule 15(a) where the new allegations do not unduly prejudice an opponent, are not the result of undue delay or bad faith, and are not futile. *Foman v. Davis,* 371 U.S. 178, 181 (1962). Absent a showing that significant additional discovery burdens will be incurred or that the trial of the matter will be significantly delayed, amendment should be permitted. *Block v. First Blood Associates,* 988 F.2d 344, 350 (2d Cir.1993). Where, however, an amendment is futile, "it is not an abuse of discretion to deny leave to amend" to the moving party. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993). A determination that a proposed claim is futile is made under the same standards that govern a motion to dismiss under Fed.R.Civ.P. 12(b) (6). *A.V. By Versace, Inc. v. Gianni Versace, S.p.A.,* 160 F .Supp.2d 657, 666 (S.D.N.Y.2001). An amendment is futile "if the proposed amended complaint would be subject to 'immediate dismissal' for failure to state a claim or on some other ground." *Coniglio v.. The Andersons, Inc.,* 2004 WL 1228393, *2 (Jun. 3, 2004 W.D.N.Y.) (quoting *Jones v. New York Div. of Military & Naval Affairs,* 166 F.3d 45, 55 (2d Cir.1999)).

In the instant action, because the proposed amended complaint is futile insofar as it fails to comply with the requirement of Fed.R.Civ.P. 8 ("Rule 8") of a short and plain statement of the claims and fails to demonstrate compliance with the *Foman* factors applicable under Rule 15(a), Warren's motion seeking leave to file a second amended complaint is DENIED.

"The function of pleadings under the Federal Rules is to give fair notice of the claim asserted. Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of *res judicata,* and identify the nature of the case so it may be assigned the proper form of trial." '
*Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) (quoting 2A Moore's Federal Practice ¶ 8.13, at 8-58 (2d ed.1994); *see also* *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial."). As such, a complaint is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Further, each allegation must be "concise and direct." Fed.R.Civ.P. 8(e)(1).

**\*8** When a complaint does not comply with Rule 8's requirements, the district court may, either on motion or *sua sponte,* dismiss the complaint or strike such parts as are redundant or immaterial. *Simmons, supra,* at 86 (citing *Salahuddin, supra,* at 42). "Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin, supra.* Further, upon dismissing a complaint for failing to comply with Rule 8, the plaintiff generally should be given leave to amend, especially "when the complaint states a claim that is on its face nonfrivolous." *Simmons, supra,* at 87. Nevertheless, the court retains the "power to dismiss a prolix complaint without leave to amend in extraordinary circumstances." *Salahuddin, supra,* at 42. Circumstances held sufficiently extraordinary to deny leave to further amend include where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible, *see, e.g., Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972), *cert. denied,* 411 U.S. 935 (1973), or where the substance of the claim pleaded is frivolous on its face. *Moorish Science Temple v. Smith,* 693 F.2d 987, 990 (2d Cir.1982).

Here, Warren's proposed amended complaint fails to comply with Rule 8's "short and plain statement" requirement. In particular, the typed version of the proposed amended complaint consists of 384 paragraphs over 82 pages constituting an overabundance of factual allegations. Although the proposed amended complaint is not completely incomprehensible, its potentially excessive length and detail requires a herculean effort to discern Warren's precise claims, the majority of which involve new defendants and pertain to incidents occurring at Five Points where Plaintiff was transferred on July 26, 2001, well after the alleged incidents set forth in the Amended Complaint and which have been the subject of this litigation since it was commenced in 1999. Moreover, although Warren commenced this action *pro se,* he has been represented by *pro bono* counsel since December 22, 2004. Indeed, after the parties discussed the legibility issue presented on the face of the original handwritten version of the proposed amended complaint, at the January 24, 2005 pretrial status conference, it was Mr. Kearney, Warren's appointed counsel, who had Warren's handwritten proposed amended complaint typed by a staff member of his firm, thereby (helpfully) negating the requirement, Haines v. Kerner, 404 U.S. 519, 520 (1972) to liberally construe the proposed amended complaint in light of its *pro se* origin. Having the proposed amended complaint typed, however, did not, and cannot, obviate the document's continued prolixity and other manifest deficiencies as a pleading.

Significantly, the new allegations and causes of action set forth in the proposed amended complaint are also beyond the purview of the issues remanded by the Second Circuit. Moreover, the proposed amended complaint is also futile on its face insofar as the incidents of which Plaintiff complains do not support claims for retaliation under either the First Amendment or the ADA, as discussed below. Discussion, *infra,* at 25-30 (First Amendment), and 39-40(ADA).

**\*9** Furthermore, the proposed amended complaint fails to comply with the factors articulated by the Supreme Court requiring that the new allegations of an amended pleading cause no undue prejudice to an opponent, result from undue delay or bad faith, or be futile. *Foman, supra,* at 181. Here, permitting Warren to file a further amended complaint, even assuming, *arguendo,* one that complied with Rule 8, would nevertheless cause Defendants undue prejudice, would result in undue delay in the resolution of the instant case, and would be futile insofar as many of the claims would be subject to dismissal for failure to state a claim or as time barred.

Whether the filing of an amended complaint creates undue prejudice depends on whether the asserted new claims "would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.' " *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 284 (2d Cir.2000) (quoting *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993)). According to the Second Circuit, courts are "most hesitant to allow amendment where doing so unfairly surprises the non-movant and impedes the fair prosecution of the claim." *Monahan, supra,* at 284 (citing *Block, supra,* at 350-51). Significantly, in *Monahan, supra,* the Second Circuit affirmed the lower court's decision permitting the defendants to amend the pleadings to assert for the first time on summary judgment the defense of *res judicata* because the plaintiffs were aware of the details of a stipulation underlying the *res judicata* defense at least 12 months before the summary judgment motion was filed. *Monahan, supra,* at 284. Similarly, in *Block, supra,* the defendants were permitted to amend the pleadings to assert for the first time on summary judgment, filed four years after the complaint, a new affirmative defense because the plaintiffs had knowledge of the facts giving rise to the affirmative defense. *Block, supra,* at 351.

In the instant case, nothing indicates that Defendants, assigned to Attica and Wende, were aware of the vast majority of the newly asserted facts and claims, propounded by the proposed amended complaint, before Warren moved to file a second amended complaint, largely because such facts and claims pertain to incidents occurring at and involving persons who work at Five Points Correctional Facility where Warren was transferred on July 26, 2001, after both the original and Amended Complaint were filed respectively, on April 28, 1999 (Doc. No. 1), and November 18, 1999 (Doc. No. 8). As such, even granting the possibility of some imputed or shared knowledge within the DOCS administration, Defendants cannot reasonably be said to have been aware of the plethora of facts and incidents giving rise to the new allegations, claims and parties contained in Warren's proposed amended complaint. Also, although the factual allegations newly presented in the proposed amended complaint occurred during 2001 and 2002, Warren, for reasons unknown, waited until October 18, 2004, more than two years after the date of the latest alleged incident,[5] to move to file a further amended complaint. Thus, Defendants' opportunity to investigate the

proposed new claims was delayed more than two years until Warren filed the instant motion. Furthermore, although many of the proposed new claims would be time-barred under the applicable limitations periods, if Warren attempted to commence a new action regarding such claims, because, as discussed below, all the issues remanded from the Second Circuit are being dismissed, no claims remain to which the proposed new claims can relate back and, as such, many of the proposed new claims are dismissable as time-barred in the instant action under the ADA (300-day statute of limitations), and § 1983 (three-year statute of limitations). Accordingly, permitting Warren to file the proposed amended complaint would unduly prejudice Defendants and would be futile insofar as many of the claims would be subject to dismissal for failure to state a claim or are time barred.

**\*10** In short, the present circumstances, as applicable to Warren's proposed amended complaint, are sufficiently extraordinary to warrant denial of the request for leave to file the proposed amended complaint based on Warren's failure to comply with Rule 8, and without leave to further amend. Plaintiff's motion for leave to file a second amended complaint is therefore DENIED.

### 2. Remanded Issues

#### A. Sovereign immunity under the Rehabilitation Act
As noted, the Second Circuit remanded the matter for consideration of whether New York DOCS, by accepting federal funds during the period of dispute, waived its sovereign immunity pursuant to the Eleventh Amendment which it is otherwise entitled to assert in response to claims under the Rehabilitation Act.[6] Plaintiff maintains that DOCS has waived its right to sovereign immunity under the Eleventh Amendment insofar as DOCS accepted federal funds after September 25, 2001, *i.e.,* the date the Second Circuit decided

*Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn,* 280 F.3d 98 (2d Cir.2001), holding that Eleventh Amendment immunity does not shield states from liability from suit in federal court for violating § 504 of the Rehab Act.[7] *Garcia, supra,* at 113-14. Plaintiff's Memorandum at 7-11. In particular, Plaintiff points to the fact that his proposed amended complaint contains many allegations pertaining to incidents occurring after February 21, 2001, the date of a Supreme Court decision that arguably gave Defendants a basis to suspect that, by DOCS's acceptance of federal funds, Defendants waived their right to Eleventh Amendment

immunity as to claims brought under the Rehabilitation Act. *Id.* at 10-11 & n. 42 (citing *Board of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356 (2001)). In opposition, Defendants contend that all claims that occurred prior to February 21, 2001 should be dismissed on the basis of sovereign immunity, thus conceding that only the Amended Complaint's Third and Seventh Causes of Action, alleging claims against the Attica Defendants, for actions after February 21, 2001, remain viable. Defendants' Response at 15-16. Defendants further concede that insofar as Warren may be permitted to file the proposed amended complaint, the Eleventh Amendment would not shield Defendants from liability with regard to the newly asserted claims pertaining to events transpiring after February 21, 2001. *Id.* Defendants do, however, assert, as discussed, Discussion, *supra,* at 17-19, other reasons as to why Warren should not be permitted to proceed on the proposed amended complaint's claims. *Id.*

The Amended Complaint's Third and Ninth Causes of Action allege Defendants, in their official capacity, violated Warren's rights under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.* As relevant, however, the Eleventh Amendment provides

> [t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State....

**\*11** U.S. Const. amend. XI.

Although Warren does not sue New York as a "citizen of another state," the Supreme Court has, for more than a century, confirmed "the significance of the Eleventh Amendment is not what it provides in its text, but the larger 'background principle of state sovereign immunity' that it confirms." *Garcia, supra,* at 107 (citing *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 72 (1996)). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Garrett, supra,* at 363 (citing *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 73 (2000)).

A state's sovereign immunity, however, is not absolute; rather, it "is 'a personal privilege which it [a state] may waive at pleasure.' " *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* 527 U.S. 666, 675 (1987) (quoting *Clark v. Barnard,* 108 U.S. 436, 447 (1883)). Because a state's decision to waive its sovereign immunity is "altogether voluntary," the test for determining whether a state has waived its sovereign immunity is "a stringent one." *College Savings Bank, supra,* at 675 (internal quotations omitted). Also, Congress may abrogate the immunity "when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.' " *Garrett, supra,* at 363 (quoting *Kimel, supra,* at 73). For example, Congress may require states to waive their immunity from suit as a condition to receiving federal funds. *See South Dakota v. Dole,* 483 U.S. 203, 207 (1987) (holding Congress may, as a condition to receiving federal funds, require a state to agree to act in a specified manner); *Garcia v. S.U.N.Y. Health Sciences Center,* 280 F.3d 98, 113 (2d Cir.2001) ("When providing funds from the federal purse, Congress may require as a condition of accepting those funds that a state agree to waive its sovereign immunity from suit in federal court.").

As relevant to this discussion, the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of ... his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C. § 294. The Rehabilitation Act was amended in 1986 to provide that "a state shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973." 42 U.S.C. § 2000d-7. The Second Circuit has observed that "this provision constitutes a clear expression of Congress's intent to condition acceptance of federal funds on a state's waiver of its Eleventh Amendment immunity," although the Second Circuit declined to find that New York, by accepting federal funds, actually waived its sovereign immunity against suit under § 504 of the Rehabilitation Act because

**\*12** [a]t the time that New York accepted the conditioned funds, Title II of the ADA was reasonably understood to abrogate New York's sovereign immunity under Congress's

Commerce Clause authority. Indeed, the ADA expressly provided that "[a] State shall not be immune under the eleventh amendment [*sic* ] to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation...." 42 U.S.C. § 12202. Since, as we have noted, the proscriptions of Title II and § 504 are virtually identical, a state accepting conditioned federal funds could not have understood that in doing so it was actually abandoning its sovereign immunity from private damages suits, since by all reasonable appearances state sovereign immunity had already been lost [based on the presumed, albeit erroneous, belief that Congress's Commerce Clause power had such effect].

*Garcia, supra,* at 114 (citing *College Savings Bank, supra,* at 682, and *Kilcullen v. New York State Department of Labor,* 205 F.3d 77, 82 (2d Cir.2000)) (bracketed text added).

Nevertheless, by accepting federal funds after *Garcia* was decided, *i.e.,* September 25, 2001, New York knowingly waived its Eleventh Amendment immunity against suit on Rehabilitation Act claims insofar as such claims "are based on post-*Garcia* events." *Blasio v. New York State Dep't of Correctional Services,* 2005 WL 2133601, *3 (W.D.N.Y. Aug. 31, 2005) (citing *Denmeade v. King,* 2002 WL 31018148, *3 (W.D.N.Y. Aug. 1, 2002), and *Cardew v. New York State Dep't of Corr. Servs.,* 2004 WL 943575, *8 (S.D.N.Y. Apr. 20, 2004)). Defendants do not contend otherwise.

Here, since Warren's Rehabilitation Act claims arise from events occurring *prior* to September 25, 2001, as well as prior to February 21, 2001, as New York State cannot be said to have waived its Eleventh Amendment immunity as to Plaintiff's Amended Complaint, such claims are barred by New York State's Eleventh Amendment immunity and are DISMISSED on that basis.

**B. First Amendment Retaliation Claim**

As explained, Warren argues that Defendants retaliated against him by transferring Warren from Wende's RMU to Attica's infirmary, where Warren was placed in a four-person room and denied use of a personal television, shortly after he sought legal assistance and filed grievances against Defendants challenging as unnecessary the denial of certain personal property and privileges, particularly use of a personal television set, allegedly available to inmates housed in the hospital wards and regional medical units

of other DOCS correctional facilities within New York. Plaintiff's Memorandum at 2, 12-15. Defendants argue in opposition that transferring Warren to Attica, regardless of the motivation for doing so, does not rise to the level of adverse action necessary for a First Amendment retaliation claim. Defendants' Response at 17-19. Warren replies that Defendants' alleged misconduct sufficiently establishes the adverse action and causation elements necessary for a First Amendment retaliation claim. Plaintiff's Reply at 7-9.

**\*13** Prisoner retaliation claims are properly viewed "with skepticism and particular case," because "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). Further, conclusory allegations or denials are insufficient to avoid dismissal of a retaliation claim. *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

"[T]o state an actionable claim for retaliation, [Warren] 'must advance non-conclusory allegations establishing (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Morales v. Mackaim,* 278 F.3d 126, 131 (2d Cir.2002) (quoting *Dawes, supra,* at 492).

In the instant case, as the filing of prison grievances is a constitutionally protected activity, Warren satisfies the first element of the test. *Davis v. Goord,* 320 F.3d 346, 352-53 (2d Cir.2003) (citing *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996), and *Friece v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)). Warren also satisfies the third element requiring causation between the adverse action and an actual constitutional injury. In particular, the "temporal proximity" between Warren's filing of grievances and the alleged retaliatory transfer provides circumstantial evidence of the requisite causal connection between the constitutionally protected activity and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 138 (2d Cir.2003) (citing cases). See also *Morales, supra,* at 121 (holding 22 day time frame between

plaintiff inmate's filing of prison grievance and plaintiff's transfer to psychiatric facility sufficiently short to support inference of defendants' retaliatory motive). Nevertheless, the second element, requiring a legally sufficient adverse action, is not satisfied by the allegations of the Amended Complaint.

"To adequately plead an adverse action, a plaintiff must allege that defendants subjected him to 'conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." ' *Morales, supra* (quoting *Dawes, supra*, at 493 ("Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation.... Otherwise the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection.")). Stated another way, the alleged adverse action must be action "that would deter a prisoner of ordinary firmness from vindicating his or her constitutional rights through the grievance process and the courts." *Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004).

**\*14** In support of his First Amendment retaliation claim, Warren relies on *Morales, supra*, Plaintiff's Memorandum at 13-14, where the Second Circuit held that an inmate plaintiff's allegation that he was transferred to another correctional facility, three weeks after pursuing prison grievances regarding an asserted denial of medical care sufficiently alleged an adverse action to support a First Amendment retaliation claim. *Morales, supra*, at 132 (holding the inmate plaintiff "should have the opportunity to develop facts that would demonstrate that the prospect of confinement in a psychiatric facility would deter a reasonable inmate from pursuing grievances."). *Morales, supra,* is, however, factually distinguishable insofar as in Morales, the inmate plaintiff, who had filed grievances alleging defendants denied him medical care for serious medical needs relating to a blood sugar condition and failed to provide an adequate medical diet intended to control his blood sugar, was transferred from a correctional facility in which the plaintiff was housed in the general prison population to a psychiatric facility where the plaintiff allegedly was told there was nothing wrong with him and denied requested medical care for his conceded medical needs. *Morales, supra*, at 129-30. Under the circumstances, the Second Circuit held that the plaintiff's allegations that he was transferred to a psychiatric facility was to be construed as an adverse action. *Id.* at 132. It is significant that the cases cited by the Second Circuit in support of that conclusion also concerned the transfer of inmates housed in the general

prison population to administrative segregation, *i.e.,* a prison environment that is more restrictive than the inmates' previous placements. *See Morales, supra,* at 130 (citing *Allah v. Seiverling,* 229 F.3d 220, 224-25 (3d Cir.2000) (indicating that placement in administrative segregation could be an adverse action); and *Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir.1997) (emphasizing "desirability of fact-finding before determining whether a prisoner has a liberty interest in remaining free from segregated confinement.")).

In contrast, in the instant case, Warren alleges that he was transferred to Attica's infirmary from Wende's RMU to retaliate against Warren's utilization of the inmate grievance process, including filing prison grievances and speaking with a civil rights attorney about Warren's previous complaints, and that the transfer process began when Warren was placed in keeplock confinement in preparation for the transfer to Attica's infirmary, allegedly half an hour after Warren spoke with the civil rights attorney. Amended Complaint ¶¶ 45-48. Such claims, even if true, fail to establish that Warren's transfer actually injured Warren. Rather, Warren alleges that while housed in Wende's RMU, Warren was deprived use of a personal television and subjected to restricted package and commissary privileges. Amended Complaint ¶¶ 36, 38-44. Upon being transferred to Attica's infirmary, however, Warren continued to be denied use of a personal television and subjected to restricted package and commissary privileges. Amended Complaint ¶¶ 48-56. Accordingly, Warren fails to allege that the conditions of his confinement while housed in Attica's infirmary upon being transferred from Wende's RMU significantly differed from the conditions of Warren's confinement while housed in Wende's RMU, such that the prospect of being confined in Attica's infirmary, rather than in Wende's RMU, "would deter a reasonable inmate from pursuing grievances." *Morales, supra,* at 130.

**\*15** The court's research reveals only one other case in which the Second Circuit held that the transfer of inmates to other correctional facilities supported an inference of adverse action sufficient to state a claim for First Amendment retaliation. Specifically, in *Meriwether v. Coughlin,* 879 F.2d 1037 (2d Cir.1989), a group of outspoken prisoners housed in the general prison population at a DOCS's maximum security correctional facility alleged they were transferred to a number of other of DOCS's maximum security correctional facilities in retaliation for corresponding with state officials and public interest organizations about problems at the correctional facility and attending a meeting

at which media contact was demanded. *Meriwether, supra,* at 1045-46. The district court, following a jury trial, entered judgment notwithstanding the verdict on the retaliation claim, thereby accepting the defendants' explanation that the inmate plaintiffs were transferred because of ties to an alleged violent insurrection plan. *Id.* at 1045-46. On appeal, the Second Circuit held that, as the plaintiffs denied any such ties, no weapons were discovered in their cells and had never been disciplined for any such activity, a reasonable jury could disbelieve the defendants' proffered argument and reversed the district court's entry of judgment notwithstanding the verdict. *Id.* at 1046. The Second Circuit thus recognized a First Amendment retaliation claim based on an alleged retaliatory transfer where the conditions of confinement at the correctional facilities to which the plaintiff inmates were transferred were not necessarily any more restrictive than those at the previous correctional facilities.

*Meriwether* is nevertheless factually distinguishable from the instant case on one relevant and important point. In particular, the *Meriwether* plaintiffs, prior to the challenged transfers, had met and collaborated about their complaints regarding problems at their correctional facility. Thus, by transferring the plaintiff inmates to different facilities, the defendants interfered with the plaintiffs' ability to continue to collaborate on plaintiffs' grievances. *Meriwether, supra,* at 1040. In contrast, here, both Warren and Grant, whom Warren alleges also spoke to Mr. Beck regarding an asserted disparity in privileges between inmates housed in the general prison population and those housed in Wende's RMU, Amended Complaint ¶¶ 43-46, were placed in keeplock confinement and transferred together to Attica's infirmary. Amended Complaint ¶¶ 47-48. As such, the challenged transfer back to Attica's infirmary did not deprive Warren of any ability to collaborate with Grant in further pursuing their issues with Wende's RMU and Attica's infirmary policies, and Warren does not allege otherwise.

The Amended Complaint is thus devoid of any allegations that the transfer, by itself, resulted in any additional deprivation of privileges as required to support a finding that Warren's transfer resulted in some cognizable injury to Warren's First Amendment rights. Accordingly, the decision to transfer Warren from Wende's RMU to Attica's infirmary does not, as a matter of law, constitute action "that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," and, thus, does not provide the requisite "adverse action" necessary to support

the second prong of a First Amendment retaliation claim. *Dawes, supra,* at 493.

**\*16** Moreover, Warren, by failing to allege the transfer to Attica's infirmary resulted in any deprivation of privileges over and above the privilege restrictions Warren encountered in Wende's RMU, or resulting in an inability to work with Grant in pursuing the grievances, has also failed to demonstrate he suffered any actual injury sufficient to confer standing. It is basic that, where the right at issue is not provided directly by the Constitution or federal law, a prisoner has standing to assert a deprivation of the right only if the denial of such right produces an "actual injury." *See, Benjamin v. Fraser,* 264 F.3d 175, 185 (2d Cir.2001) (holding that when the Constitution or federal law directly provides for the right at issue, a prisoner has standing to assert the right even if the denial of that right has not produced an actual injury). Here, a prisoner's right to assert a First Amendment claim derives from constitutional caselaw applied to the special circumstances pertaining to prison life. Further, the differences between Warren's access to personal television privileges to which he was subjected while housed in Wende's RMU and Attica's infirmary are *de minimis non curat lex.* Accordingly, Warren's First Amendment retaliation claim is DISMISSED both for failure to state a claim and for lack of standing.

### C. ADA Title V Claim

The Second Circuit further remanded the action for consideration as to whether a claim may be brought, pursuant to Title V of the ADA, prohibiting retaliation against a qualified individual with a disability for engaging in conduct protected under the ADA, against Defendants in their official or individual capacity.[8] *Warren, supra,* at 401. Warren, however, has not directly addressed this question, arguing instead that although the Eleventh Amendment ordinarily shields state officials acting in their official capacity, Eleventh Amendment immunity does not similarly bar Title II claims against state officials where the alleged Title II violation was motivated either by discriminatory animus or ill will based on the plaintiff's disability. Plaintiff's Memorandum at 15-16. Plaintiff further argues that he has sufficiently stated an unspecified ADA claim against the individual Defendants in their official capacity. *Id.* 12-17. Defendants concede that state actors may be liable for retaliation claims in violation of Title V of the ADA insofar as the state actors acted in their official, but not in their individual, capacities. Defendants' Memorandum at 20. Defendants, however, point

to no authority in support of this incorrect concession. Warren, in further support of his position, asserts, without further explanation, that "Warren has stated claims against the defendants for unlawful discrimination and retaliation under the Rehabilitation Act, the First Amendment, and the ADA." Plaintiff's Reply at 9.

To assist in understanding the cases discussed on whether Defendants' concession is erroneous, a brief review of the protections afforded under the various titles of the ADA is required. Specifically, discrimination on the basis of a disability is proscribed by Title I in the context of employment, by Title II in the context of the provision of public services, including incarceration, and by Title V as a prohibition against retaliation. As stated, the instant action is before the court on remand from the Second Circuit for consideration as to whether an ADA Title V retaliation claim may be brought against Defendants, all state actors, in their official or individual capacity. *Warren, supra,* at 401. [9]

 **\*17**  It is now settled that the protections of Title II of the ADA apply to state prisons and correctional facilities, *see*

*Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206, 209 (1998) (holding Congress intended Title II of the ADA to apply to prisons), although Title II of the ADA does not recognize a cause of action for discrimination by private individuals but, rather, only by public entities. *See*

42 U.S.C. § 12132 (prohibiting denial of benefits of or discrimination by a "public entity"). ADA retaliation claims, however, are governed by Title V which provides that "[n]o *person* shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 28 U.S.C. § 12203(a) (emphasis added). [10]

Although the Second Circuit has not remanded for consideration of whether Warren's retaliation claim under Title V of the ADA is barred by the Eleventh Amendment insofar as Defendants are sued in their official capacity, and Defendants concede that Title V provides for liability for discriminatory acts undertaken by defendants, acting in their official capacity, to retaliate against a plaintiff for exercising his rights under the ADA, at least one district court within the Second Circuit has held that ADA Title V retaliation claims pursuant to  42 U.S.C. § 12203(a) and (b) do not apply to states (and, *a fortiori,* persons acting in their official capacities) as permitting such claims would unlawfully abrogate the states' Eleventh

Amendment sovereign immunity. *Salvador v. Lake George Park Commission,* 2001 WL 1574929, \*3 (N.D.N.Y. Apr. 26, 2001), aff'd sub nom., *Salvador v. Adirondack Park Agency of the State of New York,* 35 Fed. Appx. 7 (2d Cir.) (Table), *cert. denied,* 537 U.S. 1002 (2002). Furthermore, § 5 of the Fourteenth Amendment authorizes Congress to abrogate states' sovereign immunity only upon examining whether there was "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne v. Flores,* 521 U.S. 507, 519-20 (1997). The Supreme Court has held, after reviewing legislative history of Title I of the ADA, that Congress had failed to identify a pattern of unconstitutional discrimination by the states against the disabled to warrant abrogating states' Eleventh Amendment immunity as to Title I claims. *Garrett, supra,* at 374-76. Significantly, several courts considering whether states' sovereign immunity has been abrogated as to Title V claims have held that nothing in the ADA's legislative findings demonstrates that Title V was enacted in response to a pattern of discrimination by states against persons opposing practices unlawful under the ADA as required to support abrogation of the states' Eleventh Amendment immunity. *See Salvador, supra,* at \*3 (holding sovereign immunity barred ADA Title V claim against state and individual defendants in their official capacity); *Shabazz v. Texas Youth Commission,* 300 F.Supp.2d 467, 473 (N.D.Tex.2003) (holding Congress exceeded its enforcement authority under Fourteenth Amendment in attempting to abrogate states' Eleventh Amendment immunity from Title V retaliation claims). As such, despite Defendants' concession that an ADA Title V retaliation claims may be maintained against Defendants in their official capacity, the court finds to the contrary, and accordingly Warren's Title V claims as against Defendants in their official capacity are DISMISSED. The court next considers whether Title V provides for liability for retaliatory acts undertaken by state actor defendants in their individual capacity.

 **\*18**  As stated, although Defendants argue that Title V does not provide for liability against Defendants for retaliatory acts undertaken in their individual capacity, Warren fails to address this issue. Furthermore, with the exception of a single, unreported case, on which the undersigned does not rely, the Second Circuit has not addressed this issue. [11] Consideration of this question turns on the meaning of the word "person" as that term is used in Title V. In particular, although the word "person" is not defined within Title V, [12]  42 U.S.C. § 12203, the ADA's retaliation provision, states, as relevant,

(a) Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act.

(b) Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Act.

42 U.S.C. § 12203(a) and (b).

"Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well." *United States v. Gayle,* 342 F.3d 89, 92 (2d Cir.2003). "At the same time, 'we must interpret a specific provision in a way that renders it consistent with the tenor and structure of the whole act or statutory scheme of which it is a part.' " *Bechtel v. Competitive Technologies, Inc.,* 448 F.3d 469, 2006 WL 1148501, *1 (2d Cir. May 1, 2006) (quoting *United States v. Pacheco,* 225 F.3d 148, 154 (2d Cir.2000) (additional internal citation omitted)). Another canon of statutory construction is that a statute's text should be construed so as to give effect to all its provisions and to avoid rendering any part inoperative, superfluous, void or insignificant. *APWU v. Potter,* 343 F.3d 619, 626 (2d Cir.2005). *See Cooper Industries, Inc. v. Aviall Services, Inc.,* 543 U.S. 157, 166-68 (2004) (courts are "loathe" to read a statute in such manner as to render part of it superfluous and must, if possible construe a statute so as to give every word some operative effect, and it is ultimately the provisions of law, rather than the legislators' principal concerns, which govern).

This court has held that individual liability exists for retaliatory conduct in violation of Title V of the ADA, 42 U.S.C. § 12203. *See Smith v. University of the State of New York,* 1997 WL 800882, *6 (W.D.N.Y. Dec. 31, 1997) (Elfvin, J.). In *Smith,* the court observed that the word "person" as used in 42 U.S.C. § 12203(a) "is implicitly more expansive that the terms 'covered entity'-used in Title I-and 'public entity'-

used in Title II." *Smith, supra,* at *8. As such, the court held that

**\*19** [h]ad Congress intended that "person" did not include individuals it could readily have said so. While subsection (b), making it unlawful to "coerce, intimidate, threaten, or interfere," does not contain the word "person," this Court finds that such subsection was similarly intended to apply to individuals. Therefore, this Court finds that individual liability exists for violations of section 12203.

*Id.*

In other words, in *Smith, supra,* the court implicitly found the term "person" to be unambiguous and its statutory construction analysis ended there.

In contrast, at least one other court considered the use of the term "person" in the context of the remedies provision of Title V and held that ADA Title V does not provide for a cause of action against individuals because the remedies available for a Title V violation do not include any remedy against individuals. *Baird v. Rose,* 192 F.3d 462, 471-72 (4th Cir.1999). Specifically, 42 U.S.C. § 12203(c) provides

(c) Remedies and procedures. The remedies and procedures available under sections 12117 [employment], 12133 [public services], 12188 [public accommodations] of this title shall be available to aggrieved persons for violations of subsections (a) and (b) of this section, with respect to subchapter I, subchapter II and subchapter III of this chapter, respectively.

42 U.S.C. § 12203(c) (bracketed text added).

As relevant to the instant case, 42 U.S.C. § 12117 makes applicable to actions under the ADA the remedies available under Title VII which permits actions against an "employer, employment agency, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs." 42 U.S.C. § 2000e-5(b). Because Title VII does not provide for any remedy against individual defendants who do not qualify as an employer, employment agency, labor organization or joint labor-management committee, Title VII does not provide a remedy against individual persons for retaliatory conduct in violation of ADA Title V. *See Baird, supra,* at 472 (holding the ADA does not permit action against individual defendants for retaliating against disabled individuals for engaging in conduct protected under the ADA, as such remedies are limited to those remedies available under Title VII). This court therefore finds the Fourth Circuit's analysis more persuasive insofar as it held § 12203(c) limits the remedies available under § 12117 which, in turn, relies on the remedies available under Title VII, *i.e.,* 42 U.S.C. § 2000e-5(b), which decidedly does not apply to individual persons.

Similarly, 42 U.S.C. § 12133 makes applicable to actions under 42 U.S.C. § 12132, proscribing discrimination against a qualified individual with a disability on the basis of such disability with regard to services, programs or activities provided by a public entity, the "remedies, procedures and rights" available under § 505 of the Rehabilitation Act of 1973, 29 U.S.C. § 794a. It is significant that the ADA's prohibitions as provided in Title II against excluding disabled persons from government programs have been held applicable to state prison programs under ADA Title II, *Yeskey, supra,* at 209-10, which applies, by definition, only to public entities and not to individual actors. 42 U.S.C. § 12132 (prohibiting denial of benefits of or discrimination by a "public entity"). Nevertheless, 29 U.S.C. § 794a provides only for remedies as to "any employee or applicant for employment." 29 U.S.C. § 794a(a)(1). Nowhere within the instant record does Warren assert any claim alleging disability-based discrimination against him as an "employee or applicant for employment." As such, given Warren's allegations, § 505 of the Rehabilitation Act does not authorize any remedy against individuals, regardless of the capacity in which sued, for retaliatory conduct in violation of ADA Title V.

**\*20** Finally, 42 U.S.C. § 12188 makes applicable to actions under 42 U .S.C. § 12181 *et seq.,* proscribing discrimination against a qualified individual with a disability in the context of public accommodations and services operated by private entities, "[t]he remedies and procedures set forth in section 204(a) of the Civil Rights Act of 1964 (42 U.S.C. § 2000a-3(a))." 42 U.S.C. § 12188(a). [13] Warren, however, does not allege, in contrast to his retaliation claim based solely on First Amendment protection, that he was subjected to disability-based discrimination by any Defendant in the context of Warren's accessing or attempting to access public accommodations, including his places of confinement, and services operated by private entities. Moreover, nothing in the record indicates that any of the relevant correctional facilities, even if considered as public accommodations, are operated by private entities. Rather, the record establishes the relevant correctional facilities are operated by DOCS, a state, and thus public, entity. Section 204(a) of the Civil Rights Act of 1964 thus does not provide for any remedy against individuals for retaliatory conduct in violation of ADA Title V under the circumstances presented here.

Accordingly, none of the remedies incorporated by reference into 42 U.S.C. § 12203(c) provides for any relief for any of the retaliation violations Warren alleges against the individual Defendants in the instant case. The failure to so provide for a remedy is consistent with the fact that nowhere within the ADA's statutory scheme is there any provision for a cause of action against an individual defendant, regardless of capacity, for any substantive violation of ADA Titles I, II or III. Thus, construing Title V in light of the ADA's complete statutory scheme, as discussed, *supra,* establishes that Title V similarly does not provide for a claim for retaliation against an individual defendant. Nevertheless, regardless of whether an ADA retaliation claim may be brought against state officials acting in either their official or individual capacities, Warren has failed to state such a claim.

To plead a *prima facie* case for retaliation in violation of the ADA, a plaintiff must show (1) he engaged in activity protected under the ADA; (2) the defendant was aware of the activity; (3) the defendant took an adverse action against the plaintiff; and (4) a causal connection between the protected activity and the alleged adverse action. *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002). Furthermore,

a plaintiff's burden at the pleadings stage is *de minimus. Id.* (citing *Richardson v. New York State Dept. of Correctional Servs.,* 180 F.3d 426, 444 (2d Cir.1999)).

In the instant case, as to the first element, there is no question that Warren, by filing grievances and consulting an attorney regarding the perceived disparate treatment inmates confined to Wende's RMU received as compared to inmates within the general prison population, especially the denial of certain privileges, engaged in activity protected by Title V of the ADA. As to the second element, although Warren fails to allege that any of the Defendants were aware that Warren had engaged in the protected activity, that such activity included filing grievances against some of the named Defendants establishes that some of the Defendants must have known of Warren's activity. Further, to establish the fourth element, Warren must show that the alleged adverse action occurred under circumstances from which a reasonable jury could infer retaliatory intent. *Tregla, supra,* at 720. Here, the relatively short period of time that elapsed between Warren's participation in the protected activity and Warren's transfer to Attica's infirmary is circumstantial evidence of a causal connection between the two. *Tregla, supra,* at 720 ("We have held that a close temporal relationship between a plaintiff's participation in protected activity and [a defendant's] adverse actions can be sufficient to establish causation."). Warren has thus alleged facts supporting three of the four elements of a *prima facie* case of retaliation under the ADA.

**\*21** As to the third element requiring an adverse action, although an inmate has no constitutionally protected liberty interest in remaining at a particular correctional facility, "prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights." *Davis, supra,* at 920. As discussed in connection with Warren's First Amendment retaliation claim, Discussion, *supra,* at 25-30, the Amended Complaint fails to allege any facts from

which it may be reasonably construed that Warren's transfer to Attica's infirmary from Wende's RMU resulted in any additional cognizable deprivation of privileges. As such, the challenged transfer did not constitute an adverse action as the third element of an ADA retaliation claims, pursuant to Title V, requires. Moreover, because Warren has not alleged he suffered any palpable constitutional injury as a result of the transfer, he also has failed to allege he has standing to pursue his ADA retaliation claim.

Accordingly, Warren's ADA retaliation claim is DISMISSED for failure to state a claim and for lack of standing.

### *CONCLUSION*

Based on the foregoing, Plaintiff's motion for leave to file a second amended complaint (Doc. No. 72) is DENIED. Upon reconsideration of the issues remanded by the Second Circuit for further proceedings in connection with the earlier dispositive motions, the court finds that (1) New York had not waived its sovereign immunity under the Rehabilitation Act during the period of the dispute that DOCS accepted federal funds; (2) Plaintiff has failed to sufficiently articulate a First Amendment retaliation claim; and (3) no retaliation claim may be brought under Title V of the ADA against Defendants in either their official or individual capacities and, in any event, Plaintiff has failed to state any such claim. As such, all claims against all Defendants are DISMISSED. The Clerk of the Court is directed to close the file.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1582385

---

### Footnotes

1    Insofar as Plaintiff seeks relief pursuant to 42 U.S.C. § 1983 for violations of the ADA and the Rehabilitation Act, as both the ADA and the Rehabilitation Act provide for private causes of action, Plaintiff need not rely on § 1983 for such relief. Significantly, Plaintiff may not attempt to recast his substantive ADA claim as § 1983 claims in order so as to obtain the benefit of the three year limitations period applicable to § 1983 claims, *Curto v. Edmunson,* 392 F.3d 502, 504 (2d Cir.2004) (observing New York's three-year limitations

period applicable to personal injury actions, N.Y. Civ. Prac. L. & R. § 214(5), applies to civil rights actions under 42 U.S.C. § 1983), in contrast to the 300-days limitations period for claims under the ADA, *Harris v. City of New York,* 186 F.3d 243, 247-48 (2d Cir.1999) (observing ADA claims must be filed within 300 days of alleged discriminatory occurrence to be actionable, citing 42 U.S.C. §§ 2000e-5(e) and 12117(a)).

Because actions under the Rehabilitation Act are also subject to a three year limitations period, *M.D. v. Southington Bd. of Educ.,* 334 F .3d 217, 224 (2d Cir.2003) ("all actions under § 504 of the Rehabilitation Act are governed by the state statute of limitations applicable to personal injury actions"), no benefit is gained by invoking § 1983 as the basis for asserting a Rehabilitation Act claim.

2     Because Plaintiff requested relief more consistent with a motion seeking injunctive relief, the court, in light of Plaintiff's then *pro se* status, construed the motion as seeking a preliminary injunction under Fed.R.Civ.P. 65(a), rather than a TRO pursuant to Fed.R.Civ.P. 65(b). March 26, 2001 Decision and Order at 23.

3     Taken from the pleadings and motion papers filed in this action.

4     Warren does not further specify Grant's placement in Attica's infirmary.

5     The latest specific date of any new factual allegation is February 20, 2002 (Doc. No. 77) ¶ 277.

6     Defendants neither concede nor deny that DOCS, in fact, received such funds.

7     Warren, by restricting his waiver of sovereign immunity argument to incidents occurring after February 21, 2001, impliedly concedes that the Rehabilitation Act allegations set forth in the Amended Complaint, filed on November 18, 1999, as based on prior events, are barred by the Eleventh Amendment.

8     Despite a dearth of any evidence suggesting Warren, in fact, suffers from a disabling condition sufficient to render Warren entitled to the ADA's protections, *see* 42 U.S.C. § 12102(2) (defining "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment"), Defendants have not argued otherwise. As such, the court assumes Warren's alleged condition falls within the ADA for the purpose of this discussion.

9     The Second Circuit has not remanded for consideration of whether Warren's retaliation claim under Title V of the ADA is barred by the Eleventh Amendment insofar as Defendants are sued in their official capacity, an issue not raised in the Amended Complaint and, in fact, no party has raised the issue in the instant case. As such, the court has not previously addressed this issue, nor is the issue reached here.

10    Suits against state officials in their official capacity are deemed suits against the state for which the officials are entitled to invoke Eleventh Amendment immunity. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) (citing *Kentucky v. Graham,* 473 U.S. 159, 166-67 (1985)). Significantly, the Supreme Court has held that 42 U.S.C. § 12202, the ADA provision abrogating states' Eleventh Amendment immunity, was not a valid enactment of Congressional constitutional authority and thus, states are immune under the Eleventh Amendment from suits under Title I of the ADA, which pertains to discrimination in the employment context. *Garrett, supra,* at 368-70. Nevertheless, the Supreme Court has held that Title II of the ADA, "as it applies to the class of cases implicating the fundamental right of access to the court, constitutes a valid exercise of Congress' [*sic*] § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Tennessee v. Lane,* 541 U.S. 509, 533-34 (2004)). As such, *Garrett, supra,* does not stand for the proposition that the Eleventh Amendment affords public officials any protection against liability for suits under *all* provisions of the ADA.

11    The Second Circuit dismissed a prisoner's attempt to recast as ADA Title V retaliation claims, claims originally asserted under the First and Fourteenth Amendments alleging defendant prison officials retaliated against the prisoner plaintiff for filing inmate grievances because "the ADA does not protect individuals from the actions of state officials undertaken in their individual capacities ." *Gill v. Calescibetta,* 157 Fed. Appx. 395, 396 n. 2 (2d Cir.2005) (Table) (citing *Garcia v. S.U.N.Y. Health Sci. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001)). In the *Gill* case, the Second Circuit did not explain how *Garcia, supra,* supported its holding given

that *Garcia* dealt only with disability discrimination claims under Title II of the ADA, rather than retaliation claims under Title V of the ADA.

12   "The definition of 'person' found in Title I of the ADA is explicitly limited to application within such Title."

*Smith v. University of the State of New York,* 1997 WL 800882, *7 n. 10 (W.D .N.Y. Dec. 31, 1997) (citing

42 U.S.C. § 12111(7)).

13   42 U.S.C. § 12188(a)(2) provides for injunctive relief for violations of 42 U.S.C. § 12182(b)(2)(A)(iv) (pertaining to architectural and communication barriers that are structural in nature), and 42 U.S.C. § 12183(a) (pertaining to new construction and alterations in public accommodations and new facilities), neither of which are at issue in the instant case.

---

**End of Document**                                                            © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5603433
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Reggie McFADDEN, Plaintiff,

v.

J. FRIEDMAN, Corr. Officer; Eastern Corr. Facility;
B. Leifeld, Sergeant, Eastern Corr. Facility; Geisler,
Corr. Officer, Eastern Corr. Facility; Filkins,
Corr. Officer, Eastern Corr. Facility; William
Brown, Superintendent, Eastern Corr. Facility;
and Brian Fischer, Comm'r, Doccs, Defendants.

No. 9:12–CV–0685 (GTS/CFH).
|
Signed Sept. 23, 2015.

**Attorneys and Law Firms**

Reggie Mcfadden, Attica, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Ryan W. Hickey, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Reggie McFadden ("Plaintiff")
against the six above-captioned New York State correctional
employees ("Defendants") pursuant to 42 U.S.C. §
1983, are Defendant's motion for summary judgment and
United States Magistrate Judge Christian F. Hummel's
Report–Recommendation recommending that the motion for
summary judgment be granted. (Dkt.Nos.66, 100.) For the
reasons set forth below, the Report–Recommendation is
accepted and adopted in its entirety, and Defendant's motion
for summary judgment is granted.

**I. RELEVANT BACKGROUND**
Because this Decision and Order is intended primarily for
the review of the parties, the Court will not summarize
the claims and factual allegations asserted in Plaintiff's
Amended Complaint, which are accurately recited in the

Report–Recommendation. (Dkt. No. 100.) Nor will the Court
summarize the findings and conclusions rendered in the
Report–Recommendation, for the same reason; rather, the
Court will respectfully refer the reader to the Report–
Recommendation. (Dkt. No. 66.)

**II. STANDARD OF REVIEW**
When a *specific* objection is made to a portion of a magistrate
judge's report-recommendation, the Court subjects that
portion of the report-recommendation to a *de novo* review.
Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be
"specific," the objection must, with particularity, "identify
[1] the portions of the proposed findings, recommendations,
or report to which it has an objection and [2] the basis for
the objection." N.D.N.Y. L.R. 72.1(c). [1] When performing
such a *de novo* review, "[t]he judge may ... receive further
evidence...." 28 U.S.C. § 636(b)(1). However, a district
court will ordinarily refuse to consider evidentiary material
that could have been, but was not, presented to the magistrate
judge in the first instance. [2] Similarly, a district court will
ordinarily refuse to consider argument that could have been,
but was not, presented to the magistrate judge in the first
instance. *See Zhao v. State Univ. of N.Y.,* 04–CV–0210,
2011 WL 3610717, at *1 (E.D.N.Y. Aug.15, 2011) ("[I]t is
established law that a district judge will not consider new
arguments raised in objections to a magistrate judge's report
and recommendation that could have been raised before the
magistrate but were not.") (internal quotation marks and
citation omitted); *Hubbard v. Kelley,* 752 F.Supp.2d 311, 312–
13 (W.D.N.Y.2009) ("In this circuit, it is established law that
a district judge will not consider new arguments raised in
objections to a magistrate judge's report and recommendation
that could have been raised before the magistrate but were
not.") (internal quotation marks omitted).

When only a *general* objection is made to a portion of a
magistrate judge's report-recommendation, the Court subjects
that portion of the report-recommendation to only a *clear
error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b),
Advisory Committee Notes: 1983 Addition; *see also Brown
v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y.
Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without
opinion,* 175 F.3d 1007 (2d Cir.1999). Similarly, when an
objection merely reiterates the *same arguments* made by
the objecting party in its original papers submitted to the
magistrate judge, the Court subjects that portion of the report-
recommendation challenged by those arguments to only a

*clear error* review.[3] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*[4]

**\*2** After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

### III. ANALYSIS

In his lengthy Objection to the Report–Recommendation, Plaintiff objects to virtually every finding and conclusion rendered by Magistrate Judge Hummel. (Dkt. No. 101.) The problem is that Plaintiff never states the *basis* for his objections. (*Id.*) As explained above in Part II of this Decision and Order, to lodge a specific objection (sufficient to trigger a *de novo* review), a litigant must not only identify the portion of the Report–Recommendation to which he or she has an objection but the *basis* for that objection.[5] As a result, only a clear-error review of the Report–Recommendation is required under the circumstances.

After carefully reviewing the relevant filings in this action, the Court can find no clear error in the thorough Report–Recommendation: Magistrate Judge Hummel employed the proper legal standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report–Recommendation for the reasons stated therein. (Dkt. No. 100.) To those reasons, the Court adds only three brief points.

First, regarding the findings rendered by Magistrate Judge Hummel on pages 16 and 17 of his Report–Recommendation, the Court notes that it rejects Plaintiff's personal-photographs argument on the alternative ground that any declaration testimony that Plaintiff offers to support his allegation that he possessed personal photographs (that were taken by Defendant Friedman) is at odds with both Defendant Friedman's testimony on the subject and the entirety of the record evidence, thus putting the Court in the inescapable position of having to make a credibility determination, which it does, against Plaintiff based on the evidence.[6]

Second, regarding the findings rendered by Magistrate Judge Hummel on pages 19 through 22 of his Report–Recommendation, the Court concludes that the three injuries Plaintiff allegedly suffered are not substantial enough to constitute an adverse action for purposes of a First Amendment retaliation claim, regardless of whether the Court considers those injuries separately *or together,* which is the standard.[7]

Third, regarding the findings rendered by Magistrate Judge Hummel on page 20 of his Report–Recommendation, the Court acknowledges that, while it may make eminent sense to consider as a factor that Plaintiff indeed filed a grievance immediately after he allegedly suffered adverse action in deciding whether the adverse action would have chilled similarly situated inmates of ordinary firmness (the class of which presumably includes Plaintiff), it is not permissible to do so under Second Circuit precedent. *See, e.g.,* Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir.2004) ("[T]he objective test [that governs a First Amendment retaliation claim] applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits."). However, the Court finds, for the other reasons stated by Magistrate Judge Hummel, that Plaintiff has failed to show that Defendant Friedman's alleged taking of his personal fan constituted adverse action for purposes of the First Amendment.

**\*3 ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Hummel's Report–Recommendation (Dkt. No. 100) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 66) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 38) is ***DISMISSED*** in its entirety; and it is further

**ORDERED** that the Clerk of the Court shall enter Judgment for Defendants and close this action.

### REPORT–RECOMMENDATION AND ORDER[1]

**CHRISTIAN F. HUMMEL**, United States Magistrate Judge.

Plaintiff *pro se* Reggie McFadden, an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that: (1) defendant Jill Friedman denied him access to the commissary, issued him false misbehavior reports, conducted unauthorized cell searches, and took or destroyed his property, in violation of the First Amendment (Dkt. No. 38 ("Amended Compl.") at 8–11); (2) defendant Berndt Leifeld issued false misbehavior reports in retaliation for plaintiff filing grievances, in violation of the First Amendment (*id.* at 12–13); (3) defendant Daniel Geisler issued a false misbehavior report in retaliation for plaintiff's filing grievances, in violation of the First Amendment (*id.* at 14); (4) defendant Keith Filkins harassed and threatened plaintiff by issuing a false misbehavior report to plaintiff in retaliation for plaintiff filing a grievance against defendant Leifeld and other correctional staff, in violation of the First Amendment (*id.* at 14–15); and (5) defendants William Brown and Brian Fischer are liable as supervisors for the misconduct of defendants Friedman, Leifeld, Geisler, and Filkins (*id.* at 19–31, 32–34, 42–53, 55–57).

At all relevant times, plaintiff was an inmate at Eastern Correctional Facility ("Eastern"). Plaintiff commenced this action on April 25, 2012, seeking $2.7 million dollars in compensatory and punitive damages, together with attorneys' fees and costs. Dkt. No. 1 at 20. Plaintiff filed a motion to amend his complaint on August 30, 2013. Dkt. No. 32. The Court granted plaintiff's motion as to some claims, denied the motion as to others, and directed that the amended complaint supersede and replace the previously-filed complaint. Dkt. No. 37 at 16–17. Plaintiff filed an amended complaint on January 17, 2014. Dkt. No. 38. Presently pending is defendants' first motion for summary judgment pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ .P.") 56(a). Dkt. No. 66. Plaintiff opposed the motion. Dkt. Nos. 78, 85.

### I. Background

#### A. July 1, 2009 Commissary Buy

On July 1, 2009, plaintiff was placed on a one-day medical confinement due to a minor medical condition. Amended Compl. at 8. Plaintiff's medical confinement status allowed him to receive meals in his cell and also excused him from attending recreation activities and his assigned program. *Id.* Plaintiff's July 1, 2009 medical excuse permit for did not specify any additional changes or restrictions. *Id.*

**\*4** Defendant Friedman conducted final rounds at the conclusion of her shift on July 1, 2009 at approximately 2:30 p.m. Declaration of Jill Friedman ("Friedman Decl.") ¶ 6. At that time, plaintiff demanded to be taken to the commissary. *Id.* ¶ 7. Friedman states that plaintiff asked if "keep-lock" inmates were allowed to go to the commissary. *Id.* ¶ 9. She informed plaintiff that inmates placed on a disciplinary keep-lock lose their commissary privileges. *Id.* She was not aware at the time that plaintiff was keep-locked on the orders of medical staff. *Id.* Plaintiff alleges that Friedman told him that she was not allowing him to go to the commissary because he had written a grievance complaint on her "home girl," Officer Jamil. [2] Amended Compl. at 9.

An inmate on a medical keep-lock may not leave his cell to go to the commissary, but may request a "make-up" commissary buy for another time. Friedman Decl. ¶¶ 10–11. Plaintiff never requested a "make-up" commissary buy day. *Id.* ¶ 12. Plaintiff filed a grievance complaint against Friedman on July 3, 2009. Amended Compl. at 9. A hearing on the July 3, 2009 grievance complaint took place on July 14, 2009. *Id.* Plaintiff alleges that he appealed the matter to defendant Brown on July 17, 2009 and July 20, 2009. *Id.* at 19–20. Brown responded to plaintiff's appeal on August 25, 2009. *Id.* Plaintiff also claims that he appealed the matter to defendant Fischer on August 20, 2009, and Fischer responded on or about September 23, 2009. *Id.* at 42.

#### B. July 14, 2009 Misbehavior Report and Contraband Receipt

On July 14, 2009, defendant Friedman was conducting regular rounds when she heard a radio playing loudly from plaintiff's cell. Friedman Decl. ¶¶ 15–16. Upon inspection, Friedman saw that plaintiff was not in his cell. *Id.* ¶ 16. Eastern's facility policy dictates that inmates must turn off and unplug their radios while they are not present in their cells. *Id.* ¶ 17. Previously, Friedman had counseled plaintiff regarding this policy and had instructed him to turn off his radio when he left his cell. *Id.* ¶ 18. Friedman issued plaintiff a misbehavior report for violation of Standards of Inmate Behavior 104.13 (Creating a Disturbance) and 106.10 (Refusing a Direct Order). *Id.* ¶ 19, Exh. A. Friedman also confiscated plaintiff's radio, issued him a contraband receipt,

and placed the radio in the West Wing Court Office. *Id.* ¶¶ 19–20, Exh. B.

Plaintiff claims that Friedman's July 14, 2009 misbehavior report is false because he did not leave his radio playing loudly that day. Amended Compl. at 9–10. He also claims that Friedman stole two of his family photographs from his cell and did not note the photographs on the contraband receipt issued to him. *Id.* at 10. Plaintiff alleges that Friedman issued the false misbehavior report, and confiscated plaintiff's photographs, in retaliation for the grievance complaint that plaintiff filed against her on July 3, 2009. *Id.* at 910. Friedman denies that she confiscated any photographs from plaintiff's cell. Friedman Decl. ¶ 23.

**\*5** Plaintiff was found guilty of violating Standard of Inmate Behavior 104.13 (Creating a Disturbance) at his Tier I Disciplinary Hearing regarding the July 14, 2009 misbehavior report. Friedman Decl. ¶ 22; Declaration of Berndt Leifeld ("Leifeld Decl.") ¶ 32. Leifeld, who served as a hearing officer at plaintiff's disciplinary hearing, counseled and reprimanded plaintiff on Eastern's policy on radio use. Friedman Decl. ¶ 22; Leifeld Decl. ¶ 33, Exh. C. Plaintiff alleges that he appealed this matter to defendant Brown on both July 17, 2009 and July 20, 2009, and Brown responded to the appeals on August 25, 2009. Amended Compl. at 20–21. Plaintiff also alleges that Brown responded to his appeal on July 20, 2009. *Id.* at 23. Plaintiff sent a letter regarding the incident to defendant Fischer on August 20, 2009, and Fischer responded on September 23, 2009. *Id.* at 44.

### C. October 8, 2009 Contraband Receipt

On October 8, 2009, plaintiff alleges that Friedman conducted an "unauthorized search" of plaintiff's cell and "stole" his personal fan. Amended Compl. at 10–11. He also alleges that Friedman vandalized his cell, pouring "soap powder, coffee, sugar, water, and ... mayonnaise all over everything" in his cell. *Id.* at 10. Plaintiff alleges that Friedman acted in retaliation for the grievance complaints he had previously filed against her. *Id.*

Friedman states that she was conducting regular rounds at 1:50 p.m. on October 8, 2009 when she observed a lamp and linens hanging from a clothesline in plaintiff's cell. Friedman Decl. ¶ 26. According to Eastern's facility policy, inmates may not hang their clotheslines until after 4:00 p.m. and may not hang lamps from their clotheslines. *Id.* ¶ 27. Therefore,

Friedman confiscated the clotheslines and the linens and issued a contraband receipt to plaintiff. *Id.* ¶ 28. Friedman states that her actions were performed based on "facility policy and protocol[,]" and that she "did not threaten, harass, or retaliate against Plaintiff in any way at any time." *Id.* ¶ 29. Plaintiff alleges that the contraband receipt is false because he never owned a clothesline during his time at Eastern. Amended Compl. at 11.

Plaintiff alleges that he sent a "grievance letter" to defendant Brown on October 8, 2009, complaining about Friedman's conduct. Amended Compl. at 21. After plaintiff sent the letter to Brown, an investigation took place on October 19, 2009. *Id.* at 22. Plaintiff also alleges that he sent a letter regarding the incident to defendant Fischer on October 8, 2009, and Fischer responded on February 17, 2010. *Id.* at 46. Brown received plaintiff's letter and forwarded it to subordinate staff for investigation. Declaration of William Brown ("Brown Decl.") ¶ 15. On December 31, 2009, Brown's office sent plaintiff a copy of defendant Leifeld's response to the grievance regarding the October 8, 2009 incident. *Id.*

### D. October 20, 2009 Misbehavior Report

**\*6** On October 20, 2009, plaintiff alleges that defendant Leifeld issued a false misbehavior report against him, claiming that Leifeld had searched plaintiff's cell and confiscated a pair of stolen headphones. Amended Compl. at 12. Plaintiff alleges that the misbehavior report is false because Leifeld did not conduct a search and, further, plaintiff did not own any headphones at the time of the alleged search. *Id.*

Leifeld states that, on October 20, 2009, plaintiff gave him a pair of broken headphones and accused another officer of cutting one of the wire leads on the headphones. Leifeld Decl. ¶ 5. Leifeld inspected the headphones, along with facility records, and found that (1) the headphones were the "Unitone digital" brand; (2) the headphones were identical to the type of headphones sold in Eastern's commissary; (3) there was no identification number on the headphones; (4) plaintiff did not have a permit for the headphones; and (5) there were no records of plaintiff's purchase of the headphones from Eastern's commissary. *Id.* ¶¶ 8–11. Inmates must have a property permit for headphones pursuant to Directive 2733. *Id.* ¶ 6. Accordingly, Leifeld determined that plaintiff possessed the headphones illegally and issued him a misbehavior report for violating Standards of Inmate

Behavior 116.13 (Possession of Stolen Property). *Id.* ¶ 12. Leifeld also determined that plaintiff's claim that an officer had damaged the headphones was meritless and placed the headphones in the West Wing Court Contraband Locker. *Id.* ¶¶ 13–14. Leifeld states that his actions were based on "facility policy and protocol." *Id.* ¶ 15.

Plaintiff states that he filed a grievance complaint regarding the headphones incident on October 23, 2009, and sent the grievance complaint to defendants Brown and Fischer. Amended Compl. at 24. Brown assigned Captain L. Pingotti to investigate the incident, and Captain Pingotti issued a memorandum regarding his investigation on December 5, 2009 *Id.* at 24–25. Plaintiff alleges that Brown never responded to plaintiff's October 23, 2009 grievance. *Id.* at 24. Plaintiff also alleges that he appealed the incident to Fischer on December 17, 2009. *Id.* at 48.

Defendant Fischer received a letter regarding this incident on November 3, 2009. Declaration of Brian Fischer ("Fischer Decl.") ¶ 8. The letter was addressed to defendant Brown, with a copy addressed to Fischer. *Id.* ¶ 8, Exh. B. Deputy Commissioner Leclaire responded to the letter on November 12, 2009, referring plaintiff to the grievance office at Eastern to resolve his complaint. *Id.*

### E. December 5, 2009 Misbehavior Report

On December 5, 2009, plaintiff alleges that he dropped "his electrical trimmers[,]" causing the battery from the trimmers to roll outside of his cell. Amended Compl. at 55. He then placed a mirror outside of his cell bars in order to locate the battery. *Id.* Plaintiff alleges that defendant Filkins walked by, "snatch[ed]" the mirror from his hand, called plaintiff a racial slur, threatened him for filing grievances against other officers, and stated, "we skin heads are not going to stand for it." *Id.* at 55–56.

 **\*7** Officer Filkins states that, on December 5, 2009, he observed a mirror propped up against a book outside of plaintiff's cell door. Declaration of Keith Filkins ("Filkins Decl.") ¶ 6. According to Standards of Inmate Behavior Rule 116.11, inmates are not allowed to alter their personal property to extend outside of their cell doors. *Id.* ¶ 7. As Filkins approached plaintiff's cell, plaintiff disassembled the mirror and book set-up and moved the mirror inside his cell. *Id.* ¶ 8. Filkins ordered plaintiff to give him the mirror four times, and plaintiff refused. *Id.* ¶¶ 9–10. After the fourth

refusal, Filkins told plaintiff that he was keep-locked and gave plaintiff a fifth order directing him to hand over the mirror. *Id.* ¶ 10. Plaintiff refused again, at which point Filkins told plaintiff that he would continue making his rounds and would return after to confiscate the mirror. *Id.* ¶ 11. As Filkins walked away from plaintiff's cell, plaintiff placed the mirror outside of his cell, and Filkins confiscated it and placed it in the West Wing Court Office. *Id.* ¶ 12.

Filkins notified the Area Sergeant of the incident, and issued plaintiff a misbehavior report for violating Standards of Inmate Behavior Rules 106.10 (Refusal to obey a direct order), 107.10 (Interference with an employee), and 116.11 (Tampering with personal property). Filkins Decl. ¶ 13. Filkins states that he issued the misbehavior report based on "policy and protocol[,]" and denies that he retaliated against plaintiff for grievances filed against other DOCCS staff. *Id.* ¶¶ 14, 16. He also denies threatening or harassing plaintiff. *Id.* At a Tier II disciplinary hearing, plaintiff pleaded guilty to violating Standards of Inmate Behavior Rule 116.11 (Tampering with personal property). *Id.* ¶ 15.

Plaintiff sent a grievance regarding this incident to defendant Brown on or about December 6, 2009. Amended Compl. at 33. Plaintiff also alleges that he appealed the matter to defendant Fischer on January 13, 2010, and Fischer responded on March 3, 2010. *Id.* at 56.

### F. December 27, 2009 Misbehavior Report

On December 27, 2009, plaintiff alleges that defendant Leifeld told him to move to a different area at Eastern without providing him with an institutional pass or an escort officer. Amended Compl. at 12. Plaintiff contends that Leifeld's order violated Eastern's movement regulations and effectively forced plaintiff to disobey the regulations. *Id.* at 12–13. Officer Geisler found plaintiff in the bathroom and issued him a misbehavior report. *Id.* at 14. Plaintiff alleges that Leifeld and Geisler's misbehavior report is false because it states that plaintiff refused to return to his housing unit at Geisler's direction. *Id.* He claims that Leifeld ordered him to a different area of the prison for the purpose of issuing him a false misbehavior report for his movement outside of Eastern's regulations, and that he did not immediately obey Geisler because he was using the bathroom. *Id.* at 13–14. He further claims that Leifeld acted in retaliation for past grievances filed against him and other staff members. *Id.* at 13.

**\*8** Leifeld claims that, on December 27, 2009, he asked Geisler to instruct plaintiff to meet Leifeld in the West Wing Court. Leifeld Decl. ¶ 17. Leifeld states that he asked plaintiff to report to the West Wing Court during an "open movement" period, during which inmates are allowed to move about the facility without passes or escorts. *Id.* ¶¶ 18, 20. On December 27, 2009, there was an open movement period immediately after breakfast, lasting from approximately 8:20 a.m. to 8:35 a.m. *Id.* ¶¶ 19, 22. Plaintiff failed to report to the West Wing Court during the open movement period despite the fact that Mess Hall # 1, where plaintiff ate breakfast, and the West Wing Court "are about a two-minute walk apart." *Id.* ¶¶ 21, 23. After searching other areas of Eastern for plaintiff, Leifeld instructed Geisler to search for plaintiff. *Id.* ¶¶ 23–24. Geisler located plaintiff in the shower area at approximately 8:45 a.m and reported to Leifeld that plaintiff refused to be escorted back to his housing unit, and only complied after Geisler signaled other officers for assistance. *Id* . ¶¶ 24–25. Plaintiff was escorted back to his housing unit and placed on keep-lock status. *Id.* ¶ 26. Leifeld issued plaintiff a misbehavior report for violations of Standards of Inmate Behavior 106.10 (Refusal to obey a direct order); 109.10 (Out of place); 107.10 (Interference); and 109.12 (Staff direction to movement). *Id.* ¶ 27.

Plaintiff alleges that he sent a letter to defendants Brown and Fischer regarding the allegedly false misbehavior report on December 29, 2009. Amended Compl. at 26. Plaintiff claims that neither Brown nor Fischer have responded to that letter. *Id.* Plaintiff also filed a grievance on December 31, 2009. *Id.* at 28. Brown replied to the grievance on January 14, 2010. *Id.*

Following a Tier II disciplinary hearing held on January 14, 2010, plaintiff was found guilty of violating Standard of Inmate Behavior 106.10 (Refusal to obey a direct order). Leifeld Decl. ¶ 28. Brown states that he received both the original grievance and the appeal of the disciplinary hearing determination and forwarded both to the Deputy Superintendent of Security. Brown Decl. ¶¶ 11–14. The Deputy Superintendent of Security affirmed the hearing officer's finding on January 15, 2010. Leifeld Decl. ¶ 29.

## II. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it is supported by affidavits or other suitable evidence, and the moving party

is entitled to judgment as a matter of law. FED.R.CIV.P. 56(a), (c). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

**\*9** The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223–24 (2d Cir.1994).

Where, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191–92 (2d Cir.2008).

**B. First Amendment Retaliation Claims**

Plaintiff argues that: (1) defendant Friedman denied plaintiff access to the commissary, issued plaintiff false misbehavior reports, conducted unauthorized cell searches, verbally threatened plaintiff, and took or destroyed plaintiff's property in retaliation for plaintiff filing grievances in violation of the First Amendment; (2) defendant Leifeld issued plaintiff false misbehavior reports in retaliation for plaintiff's filing grievances, in violation of the First Amendment; (3) defendant Geisler issued plaintiff a false misbehavior report in retaliation for plaintiff's filing grievances, in violation of the First Amendment; and (4) defendant Filkins harassed and threatened plaintiff, and issued a false misbehavior report to plaintiff in retaliation for plaintiff's filing grievances, in violation of the First Amendment. Amended Compl. at 9–15.

Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " *See,* e.g., *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (quoting *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds by Swierkiewicz v. Sorema, N. A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). A retaliation claim under section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *South Cherry St., LLC v. Hennessee Group LLC,* 573 F.3d 98, 110 (2d Cir.2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (quoting *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir .2004), *overruled on other grounds by Swierkiewicz,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *See Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). In order to prove an adverse action, a plaintiff must show that the defendant's " 'retaliatory conduct ... would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.... Otherwise, the retaliatory act is simply *de minimis,* and therefore outside the ambit of constitutional protection.' " *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 366 (S.D.N.Y.2011) (quoting *Dawes,* 239 F.3d at 292–93).

**1. Friedman**

**a. July 1, 2009 Commissary Buy**

**\*10** Plaintiff claims that, on July 1, 2009, Friedman prevented him from traveling to the commissary on his scheduled day and stated to plaintiff: "this is only the beinning [sic] of your sorrows, because you wrote a grievance complaint on my home girl[.]" Amended Compl. at 9. Where plaintiff refers to Friedman's "home girl," he means corrections officer Jamil. *Id.*

Plaintiff has shown that he engaged in constitutionally protected conduct insofar as he claims to have filed a grievance against Jamil. *See Graham v. Henderson,* 89 F.3d 75, 80 (1996). However, he has failed to show that he suffered an adverse action, and he has also failed to show a causal connection between his protected speech and the alleged adverse action.

At the outset, "it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden,* No. 09 Civ. 3135(RWS), 2011 WL 1453789, at \*4 (S.D.N.Y. Apr.14, 2011) (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009)). Plaintiff must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." *Graham,* 89 F.3d at 81. Here, plaintiff does not allege that he filed any grievances or complaints against Friedman. Although he claims that Friedman did not allow him to go to

the commissary because he had previously filed a grievance against Officer Jamil, Friedman states in her affidavit that July 1, 2009 was the first day she encountered plaintiff, and that she had no knowledge of any previous grievances filed by him against Officer Jamil. Friedman Decl. ¶ 14. As plaintiff has provided no evidence establishing why Friedman would file a false misbehavior report against him on Jamil's behalf beyond a conclusory belief that the two officers are friends, he has failed to present a genuine issue of material fact as to a causal connection between his protected speech and being denied his commissary buy day. *See Ciaprazi v. Goord,* No. 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at *9 (N.D.N.Y. Dec.22, 2005) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff); *see also Alicea v. Maly,* No. 9:12–cv–203 (MAD/TWD), 2015 WL 4326114, at *14 (N.D.N.Y. July 14, 2015); *Guillory v. Ellis,* No. 9:11–CV–600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug.29, 2014). Even if the Court were to find that a causal connection did exist, plaintiff's claim would still fail because the loss of one visit to the commissary is *de minimis* and does not amount to an adverse action. *See Gantt v. Lape,* No. 9:10–CV–0083 (GTS/TWD), 2012 WL 4033729 (N.D.N.Y. July 31, 2012) (finding no adverse action where the plaintiff lost commissary privileges for thirty days).

Accordingly, there is no genuine issue of material fact as to Friedman's actions on July 1, 2009, and it is recommended that defendants' motion on this ground be granted.

### b. July 14, 2009 Misbehavior Report and Contraband Receipt

**\*11** Plaintiff alleges that he filed a grievance against Friedman on July 3, 2009, in response to her actions on July 1, 2009. Amended Compl. at 10. He claims that Friedman performed an unauthorized search of his cell, stole two photographs, and issued a false misbehavior report and contraband receipt. *Id.*

Plaintiff's grievance against Friedman is constitutionally-protected conduct. *See Graham,* 89 F.3d at 80. As to the second prong, whether the conduct complained of amounts to an adverse action, routine cell searches are "an integral part of prison life[.]" *Jones v. Harris,* 665 F.Supp.2d 384, 394 (S.D.N.Y.2009) (citing *Hudson v. Palmer,* 468 U.S. 517,

527–28, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). As such, "neither the United States Suprem e Court nor the Second Circuit has ever held that a cell search can be the basis of a First Amendment retaliation claim." *Id.* at 398. Further, any property seized during cell searches or disarray caused by the search must be "unusually punitive" or "out of the ordinary" in order to show that a plaintiff has suffered more than a *de minimis* injury. *Id.* at 398. A plaintiff must show that a prison official " 'intentionally' " or " 'deliberately' lost or destroyed his property[.]" *Key v. Toussaint,* 660 F.Supp.2d 518, 525 (S.D.N.Y.2009) (quoting *Gill v. Frawley,* No. 9:02–CV–1380, 2006 WL 1742738, at *5 & nn. 25–26 (N.D.N.Y. June 22, 2006)).

Friedman states that she took a radio from plaintiff's cell because she had discovered the radio playing while plaintiff was not present in his cell, which is a violation of Eastern's policy. Friedman Decl. ¶¶ 17, 19. She denies taking any personal photographs from plaintiff's cell, *id.* ¶ 23, and plaintiff has not set forth any proof to show that she confiscated the photographs. Plaintiff attaches to his supplemental response to defendants' motion a form listing an inventory of his personal belongings he had upon his arrival at Eastern. Dkt. No. 83 at 28. Although plaintiff claims that the form lists his personal photographs, it does not. *See id.* at 9, 28. As plaintiff failed to show that Friedman intentionally lost or destroyed his photographs, he has failed to show that he suffered an adverse action.

Plaintiff has also failed to allege facts tending to establish a First Amendment retaliation claim based on Friedman's issuance of a misbehavior report based on plaintiff's improper use of his radio. Although plaintiff's filing of a grievance against Friedman is constitutionally-protected speech, plaintiff has failed to show that he suffered an adverse action insofar as he accuses Friedman of issuing a retaliatory false misbehavior.[3] " ' Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes adverse action for a claim fo retaliation.' " *Davis,* 320 F.3d at 353. At his Tier I hearing, plaintiff was "counseled and reprimanded" by the hearing officer. Leifeld Decl. ¶ 33. Plaintiff received no other penalty. *Id.* The penalty received by plaintiff is *de minimis,* and, therefore, is not an "adverse action." *See Monko v. Cusack,* No. 9:11–CV–1218 GTS/TWD, 2013 WL 5441724, at *11 (N.D.N.Y. Sept.27, 2013) (finding that the penalty of "counseling and reprimand" was insufficient to establish adverse action).

**\*12** Because plaintiff has failed to show that he suffered an adverse action on July 14, 2009, the undersigned need not determine whether there is a causal connection between plaintiff's protected conduct and Friedman's actions. Accordingly, there is no genuine issue of material fact as to Friedman's actions on July 14, 2009, and it is recommended that defendants' motion on this ground be granted.

### c. October 8, 2009 Contraband Receipt

Plaintiff alleges that, on October 8, 2009, in retaliation for "a number of grievances" filed against Friedman, Friedman performed an unauthorized search of plaintiff's cell, confiscated plaintiff's personal fan without issuing a contraband receipt, and issued a false contraband receipt claiming that plaintiff had a lamp hanging from a clothesline in his cell. Amended Compl. at 10–11. Plaintiff denies having a clothesline in his cell, and also alleges that, during Friedman's search of his cell, she "poured soap powder, coffee, sugar, water, and ... mayonnaise all over everything in [his] cell." *Id.* at 10–11. Friedman states that, on October 8, 2009 at approximately 1:50 p.m., while conducting regular rounds, she observed a clothesline in plaintiff's cell with linens and a lamp hanging from it. Friedman Decl. ¶ 26. Pursuant to Eastern's policies, inmates may not hang linens from clotheslines in their cells and, also, may not hang their clothesline until after 4:00 p.m. *Id.* ¶ 27. Thus, Friedman confiscated the clothesline and the linens and issued plaintiff a contraband receipt for those items. *Id.* ¶ 28.

As to the first prong of plaintiff's retaliation claim, plaintiff engaged in constitutionally protected activity insofar as he alleges that he had previously filed grievances against Friedman. *See Graham,* 89 F.3d at 80. As to the second prong, plaintiff claims that he suffered adverse actions by Friedman insofar as she confiscated his personal fan, vandalized his cell, and issued a false contraband receipt. None of the injuries alleged are substantial enough to amount to an adverse action for purposes of a First Amendment retaliation claim. Each alleged injury is considered in turn below.

As to the alleged confiscation of plaintiff's fan, this injury is not "substantial enough to deter legitimate grievances against prison officers." [4] *Salahuddin v. Mead,* No. 95 Civ. 8581(MBM), 2002 WL 1968329, at \*4 (S.D.N.Y. Aug.26,

2002); *c.f. Colon v. Coughlin,* 58 F.3d 865, 872–73 (2d Cir.1995) (finding adverse action where the plaintiff alleged that prison officials had planted contraband in his cell); *Johnson v. Schiff,* No. 9:11–CV–0531 (MAD/TWD), 2013 WL 5466218, at \*13 (N.D.N.Y. Sept.13, 2013) (Dancks, M.J.) (finding adverse action where defendants assaulted the plaintiff, denied him medical care and a legal phone call, and falsely accused him of making a verbal threat against an officer); *Smith v. City of New York,* No. 03 Civ. 7576(NRB), 2005 WL 1026551, at \*3 (S.D.N.Y. May 3, 2005) (finding adverse action where prison officials destroyed multiple legal papers and nine hundred dollars worth of the plaintiff's personal property). Moreover, the confiscation of a fan would not "[deter] 'a similarly situated individual of ordinary firmness from exercising his constitutional rights.' " *Davis,* 320 F.3d at 353 (quoting *Dawes,* 239 F.3d at 493). Further, plaintiff's inventory form listing all of the personal items he had upon his arrival to Eastern fails to show that he owned a fan. *See* Dkt. No. 83–1 at 28. Upon investigation of plaintiff's claim that Friedman had issued a contraband receipt without listing the fan allegedly seized, defendant Leifeld responded that, after a full investigation, he found plaintiff's letter contained "unsupported statements and embellishments. Brown Decl. Exh. E. Leifeld also cited plaintiff's "continue[d] disregard for [Eastern's] simple rules and regulations[.]" *Id.* Superintendent Brown responded to plaintiff's complaint letter stating that there was "no tangible evidence to support [plaintiff's] allegations or employee misconduct ." *Id.* Failure to issue a contraband receipt does not amount to a *per se* constitutional violation, as long as the disciplinary hearing that follows complies with due process. *See generally Cook v. Terwillegar,* No. 89 Civ. 0036(KTD), 1990 WL 303592, at \*3–4 (S.D.N.Y. Jan.3, 1990) (finding that the plaintiff "was given adequate opportunity" to state the reasons why he thought a contraband receipt was falsified). Plaintiff's claim that Friedman confiscated his personal fan without issuing a contraband receipt was fully investigated within the facility and that claim was found to lack merit. Further, Friedman's alleged confiscation of plaintiff's fan did not chill plaintiff's First Amendment rights, as he filed a grievance against Friedman that same day. As such, he has failed to show that he suffered an adverse action sufficient to amount to a constitutional violation insofar as he claims that Friedman took his personal fan in retaliation for grievances filed against her.

**\*13** As to Friedman's vandalizing of plaintiff's cell, prisoners are to understand that, as part of a cell search, there

may be "trashing" of their cells and seizure of their property. *See* Jones, 665 F.Supp.2d at 398 (finding no adverse action where the plaintiff failed to show that a random cell search, subsequent seizure of personal items, and "trashing" of the plaintiff's cell was not out of the ordinary). Still, the retaliatory destruction of a prisoner's personal property can be sufficient to establish an adverse action, Smith, 2005 WL 1026551, at *3, however, a plaintiff must show that the search was "unusually punitive" and "out of the ordinary." Jones, 665 F.Supp.2d at 398.

Plaintiff has shown that he had filed past grievances against Friedman. Amended Compl. at 4. He also claims that, approximately three months prior to the alleged destruction of his property, Friedman stated: "I am going to make you wish you never wrote a grievance on me." *Id.* at 9. He also presents a sworn affidavit from an inmate stating that plaintiff's cell looked as though a "hurricane" has come through and there were "food and clothes ... every where [sic], with stuff poured all over them." Dkt. No. 83–1 at 35. As a result of this alleged conduct, plaintiff filed a grievance against Friedman, and subsequently received a memorandum from defendant Leifeld, dated October 19, 2009, stating that he investigated plaintiff's complaint about Friedman's actions "found no tangible evidence to support [plaintiff's] accusations of employee misconduct." Dkt. No. 83–1 at 54. The memorandum also stated that plaintiff's letter regarding Friedman's actions contained "unsupported statements and embellishments." *Id.* Friedman states that she did not "threaten, harass, or retaliate against Plaintiff in any way" on October 8, 2009. Friedman Decl. ¶ 29. Plaintiff claims that Friedman performed a cell search and left his cell in a state of disarray. Because some level of disorder is to be expected in prison cell searches, plaintiff has failed to allege any facts by a reasonable fact-finder could conclude that Friedman's search was unusually punitive or out of the ordinary. *Cf.* Smith, 2005 WL 1026551, at *1–3 (finding that the plaintiff's claim that his legal papers and personal property were destroyed was sufficient to establish adverse action and defeat a summary judgment motion where "plaintiff lost his copies of numerous motions drafted by his lawyer, along with his copy of his grand jury minutes[,]" along with "nine hundred dollars worth of personal property.").

Finally, addressing plaintiff's allegation that Friedman issued a false contraband receipt relating to the clothesline, plaintiff fails to allege that he received any punishment or reprimand arising out of the seizure of contraband. As such, even if plaintiff were issued a false contraband receipt, the injury is *de minimis* and insufficient to show that he suffered an adverse action. *See* Pledger v. Hudson, No. 99 Civ.2167LTSTHK, 2005 WL 736228, at *5 (S.D.N.Y. Mar.31, 2005). Plaintiff further argues in his supplemental response that Friedman's statement that plaintiff hung his clothesline in a manner not comporting with Eastern's policies is false because Eastern does not have such a policy against hanging clotheslines prior to 4 p.m. Dkt. No. 83 at 16; *see* Friedman Decl. ¶ 27. He also claims that he never owned a clothesline, and that Friedman's issuance of the contraband receipt was merely a pretext for her to search and vandalize his cell. Dkt. No. 83 at 16. Such argument does not change the Court's analysis because the injuries alleged, however frustrating they may be, are *de minimis*.

**\*14** Because the undersigned has determined that plaintiff has failed to show that he suffered an adverse action arising out of Friedman's actions on October 8, 2009, the undersigned need not determine whether there is a causal connection between plaintiff's protected conduct and Friedman's actions. Accordingly, there is no genuine issue of material fact as to Friedman's cell search and issuance of a contraband receipt on October 8, 2009, and it is recommended that defendants' motion on this ground be granted.

### 2. Leifeld

#### a. October 20, 2009 Misbehavior Report

Plaintiff alleges that, on October 20, 2009, Leifeld issued to him a false misbehavior report stating that he found and confiscated a pair of stolen headphones from plaintiff's cell. Amended Compl. at 12. Plaintiff claims that Leifeld issued the false misbehavior report in retaliation for the grievances plaintiff had previously filed against officers Jamil and Friedman. *Id.* Leifeld states that on, October 20, 2009, plaintiff handed him a pair of broken headphones and stated that a corrections officer had broken them. Leifeld Decl. ¶ 5. Upon further investigation, Leifeld determined that the headphones plaintiff handed him were possessed illegally and issued plaintiff a misbehavior report for violating Standard of Inmate Behavior 116.13 (Possession of Stolen Property). *Id.* ¶¶ 6–12. [5]

Plaintiff meets the first prong of this First Amendment retaliation claim. *See* 📖 *Graham,* 89 F.3d at 80. The retaliatory conduct alleged by plaintiff is Leifeld's issuance of a false misbehavior report. Amended Compl. at 12. Plaintiff does not allege that he suffered any penalties or lost any privileges as a result of the misbehavior report. To the contrary, plaintiff provided a hearing disposition form stating that there was insufficient evidence to support the charge against him. Dkt. No. 83–1 at 52. The form also indicates that plaintiff did not receive any penalties. *Id.* at 51. Because plaintiff cannot direct the Court to any penalty or injury he suffered as a result of the misbehavior report, he has not shown that he suffered an adverse action. *See* 📖 *Bartley v. Collins,* No. 95 Civ. 10161(RJH), 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding no adverse action where misbehavior report resulted in a temporary loss of privileges).

Even if the Court were to find that plaintiff suffered an adverse action based on the misbehavior report, he has failed to demonstrate a causal connection between his protected activity and Leifeld's issuance of a misbehavior report. Plaintiff claims that Leifeld retaliated against him for grievances he had previously filed against Officers Jamil and Friedman. Amended Compl. at 12. As stated, where a prison official's only alleged motive for retaliatory conduct is grievances filed against other officers, it is difficult to establish retaliation. *See* 📖 *Wright,* 554 F.3d at 274; *Ciaprazi,* 2005 WL 3531464, at *8–9 (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff). Here, plaintiff's conclusory and speculative claims are insufficient to establish that Leifeld had a motive to retaliate against him for complaints filed against Jamil and Friedman.

**\*15** Accordingly, there is no genuine issue of material fact as to Leifeld's alleged violation of plaintiff's First Amendment rights arising out of his issuance of the October 20, 2009 misbehavior report, and it is recommended that defendants' motion on this ground be granted.

#### b. December 27, 2009 Misbehavior Report

Plaintiff claims that defendants Leifeld and Geisler issued a false misbehavior report on December 27, 2009 in retaliation for past grievances filed against defendant Leifeld and other corrections officers. Amended Compl. at 13.

The crux of plaintiff's retaliation claim against defendant Leifeld is that Leifeld ordered him to travel to a different part of Eastern without an institutional pass or an escort at a time where he would need one, thereby effectively forcing plaintiff to violate Eastern's regulations. Amended Compl. at 12–13. Plaintiff admits that he did not follow Geisler's direction and instead stopped to use the restroom while on his way to obtain an institutional pass. Dkt. No. 66–4 at 18 (Hickey Decl. Exh. A). Geisler found plaintiff in the shower area and issued a misbehavior report for violations of multiple Standards of Inmate Behavior, of which plaintiff was found guilty of only one: Standard of Inmate Behavior 106.10 (Direct Order). Leifeld Decl. ¶ 28. Plaintiff was also placed on keeplock status after Geisler escorted him back to his cell. *Id.* ¶ 26. If plaintiff disagreed with the order given, he "had the opportunity to exercise his First Amendment rights to criticize prison rules through other means than disobeying [the] direct order ..." *Cook,* 1990 WL 303592, at *4 (finding no adverse action where the alleged retaliatory misbehavior report averred that the plaintiff disobeyed a direct order). Because the misbehavior report issued by Leifeld and Geisler was not false, by plaintiff's own admission, it is not an adverse action. 📖⚠ *Brewer v. Kamas,* 533 F.Supp.2d 318, 329 (W.D.N.Y.2008) (finding that the plaintiff could not avoid summary judgment where he failed to establish that the misbehavior report issued to him was false).

Because plaintiff has failed to meet the second prong of his First Amendment retaliation claim against Leifeld regarding the December 27, 2009 misbehavior report, the undersigned need not reach the third prong in the analysis. Accordingly, there is no genuine issue of material fact as to Leifeld's alleged violation of plaintiff's First Amendment rights as to the December 27, 2009 misbehavior report, and it is recommended that defendants' motion on this ground be granted.

#### 4) Filkins

Plaintiff alleges that defendant Filkins subjected him to "harassment and retaliatory treatment" by filing a false misbehavior report against him. Amended Compl. at 15. Plaintiff claims that Filkins acted in retaliation for plaintiff's filing grievances against defendant Leifeld and other staff members. *Id.* at 14–15.

Plaintiff's filing of grievances against defendant Leifeld and other staff members at Eastern is constitutionally-protected conduct, and he therefore meets the first prong of his retaliation claim against Filkins. *See* *Graham,* 89 F.3d at 80.

**\*16** Plaintiff claims that he suffered an adverse action by Filkins filing a false misbehavior report against him. Amended Compl. at 15. However, plaintiff fails to establish the second and third prongs of his retaliation claim, which requires him to show: (1) that he suffered an adverse action, and (2) a causal connection between the protected conduct and the adverse action, for two reasons. *See* *Espinal,* 558 F.3d at 128. Where an inmate pleads guilty to the charges against him, he has failed to establish any evidence that the charges brought against him are false. *See* *Brewer,* 533 F.Supp.2d at 330 (granting summary judgment on retaliation claim where the plaintiff failed to set forth any evidence that the charges in the misbehavior report were false). Plaintiff pleaded guilty to violating Standard of Inmate Behavior 116.11, which prevents inmates from tampering with property. Filkins Decl. ¶ 15. As plaintiff has pleaded guilty to the conduct contained in the misbehavior report, plaintiff has failed to set forth any evidence demonstrating that a false misbehavior report was issued, and, therefore, has failed to establish that he suffered an adverse action. As to the third prong, plaintiff claims that the reason behind Filkins' issuance of the allegedly false misbehavior report is plaintiff's filing of grievances against Leifeld and other Eastern staff members, not Filkins. Grievances filed against officers other than the disciplining officer, in most circumstances, do not establish the requisite causal connection between the protected conduct and the alleged adverse action. *See* *Ciaprazi,* 2005 WL 3531464, at \*9 (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff). Because plaintiff has not provided any support for his claim that Filkins retaliated against him for his grievances against other officers, he has failed to show that there is a causal connection between his protected conduct and the misbehavior report.

Accordingly, there is no genuine issue of material fact as to Filkins' alleged violation of plaintiff's First Amendment rights as to the December 5, 2009 misbehavior report, and it is recommended that defendants' motion on this ground be granted.

### 5) Geisler

Plaintiff claims that defendant Geisler retaliated against him for grievances filed against defendant Leifeld and other staff members at Eastern by filing a false misbehavior report against him. Amended Compl. at 14.

Plaintiff meets the first prong of the analysis. *See* *Graham,* 89 F.3d at 80. Plaintiff alleges that Geisler performed an adverse action when he co-signed a misbehavior report with Leifeld. Amended Compl. at 14. As stated previously, the December 27, 2009 misbehavior report does not amount to an adverse action. *See* section II.2.b *supra.* Plaintiff also fails to present a genuine issue of material fact as to a causal connection between his filing grievances and Geisler's co-signing of the misbehavior report. In order to prove this third prong, plaintiff must show that his prior filing of grievances was a " 'substantial or motivating factor' " in Geisler's issuance of a misbehavior report. *See* *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002), 682 (quoting *Graham,* 89 F.3d at 79). It is difficult to establish a causal connection where the prior grievances cited by plaintiff as protected conduct did not implicate Geisler. *See* *Ciaprazi,* 2005 WL 3531464, at \*9. Here, plaintiff alleges that Geisler acted in retaliation for grievances filed against Leifeld and other staff members at Eastern. Amended Compl. at 14. However, plaintiff provided no evidence to suggest that Geisler knew of prior grievances filed against Leifeld or other officers, or that there was no legitimate reason for the filing of the misbehavior report. Further, plaintiff admitted during his deposition that he did not have any incidents or problems with Geisler prior to the December 27, 2009 incident. Dkt. No. 66–4 at 19. As such, he has failed to raise a genuine issue of fact as to a causal connection between the past grievances he filed and Geisler's co-signing of the December 27, 2009 misbehavior report. *See* *Ciaprazi,* 2005 WL 3531464, at \*9.

**\*17** Accordingly, there is no genuine issue of material fact as to Geisler's alleged violation of plaintiff's First Amendment rights in connection with the December 27, 2009 misbehavior report, and it is recommended that defendants' motion on this ground be granted.

### C. Allegations of Verbal Harassment and Threats

Plaintiff alleges that defendants Friedman and Filkins harassed and threatened him in retaliation for filing grievances. Amended Compl. at 9, 15. Defendants argue that plaintiff's claims of verbal threats and harassment are not actionable. Dkt. No. 66–1 at 21.

Verbal harassment or threats are generally not considered adverse action for the purpose of a First Amendment retaliation claim. *Marrero v. Kirkpatrick,* No. 08–CV–6237 (MAT), 2012 WL 2685143, at *7 (W.D.N.Y. July 6, 2012) (citing *Rosales v. Kikendall,* 677 F.Supp.2d 643, 648 (W.D.N.Y.2010)) (additional citation omitted). Further, verbal harassment and threats are generally not considered conduct " 'that would deter a similarly situation individual of ordinary firmness of exercising constitutional rights.' " *Cabassa v. Smith,* No. 9:08–CV–0480 (LEK/DEP), 2009 WL 1212495, at *7 (N.D.N.Y. Apr.30, 2009) (citing *Gill,* 389 F.3d at 380) (additional citation omitted). However, verbal threats may constitute adverse action for purpose of a First Amendment retaliation if the threat is sufficiently specific. *Barrington v. New York,* 806 F.Supp.2d 730, 746 (S.D.N.Y.2011); *see also Ford v. Palmer,* 539 F. App'x 5, 5 (2d Cir.2013) (summary order) (finding that a verbal threat constituted adverse action where corrections officer threatened to poison the plaintiff in retaliation for filing his grievances).

Here, Filkins allegedly stated to plaintiff on December 5, 2009, "you are a smart ass nigger, you think that you can go around and write officers up and nothing is going to happen to you, I don't think so we skin heads are not going to stand for it." Amended Compl. at 15. Such a statement is not sufficiently specific to constitute adverse action. *See Bartley,* 2006 WL 1289256, at *2–4 (finding no adverse action where a corrections officer tells a plaintiff that he is going to "get [him]" for filing a lawsuit); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) (finding no adverse action where a prison official told an inmate that he would "have to pay the consequences" for filing a grievance against her).

Friedman's statement is similar to Filkins' in that it lacks specificity. On July 14, 2009, two weeks after plaintiff filed a grievance against her, Friedman allegedly called plaintiff a racial slur, and stated, "I am going to make you wish you never wrote a grievance on me." Amended Compl. at 9. This threat

is also not sufficiently specific to establish adverse action. *See Bartley,* 2006 WL 1289256, at *2–4.*

Accordingly, it is recommended that defendants' motion on this ground be granted.

### D. Supervisor Liability

**\*18** " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 201 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) [T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319. 323–24 (2d Cir.1986)).

### 1. Brown

Plaintiff claims that he sent multiple appeals and complaint letters to defendant Brown regarding the actions of defendants Friedman, Leifeld, Geisler, and Filkins, and that defendant Brown has failed to remedy the constitutional violations alleged in the appeals and letters. *See* Dkt. No. 38 at 19–21, 24, 26, 33. Defendants argue that defendant Brown was

not personally involved in any of the constitutional violations alleged. Dkt. No. 66–1 at 18.

Writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Further, where a plaintiff's sole accusation against a superintendent is that the superintendent affirmed the denial of plaintiff's grievance, it "is insufficient to establish personal involvement[.]" *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). Also, it is within the purview of a superior officer to delegate responsibility to others. *See Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation.") (citing *Ortiz–Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007)).

Plaintiff alleges that his complaints regarding the July 1, 2009 and July 14, 2009 incidents with defendant Friedman were consolidated in an appeal sent to Brown on July 17, 2009. Dkt. No. 83 at 39. Brown responded to the appeals on August 13, 2009, finding the grievance to be without merit. Dkt. No. 83–1 at 93. Brown's affirmation of the denial of the grievance is insufficient to establish his personal involvement as to the July 1, 2009 and July 14, 2009 incidents. *See Joyner,* 195 F.Supp.2d at 506. Plaintiff also alleges that he sent a letter of complaint regarding Friedman's actions on October 8, 2009 to Brown. Amended Compl. at 21–22. Brown acknowledges that he received the letter and "forwarded Plaintiff's complaint to appropriate subordinate staff for investigation." Brown Decl. ¶ 15, Exh. E. Because Brown only forwarded the complaint letter to subordinate staff for investigation, plaintiff has also failed to establish personal involvement for the October 8, 2009 incident. *See Vega,* 610 F.Supp.2d at 198.

**\*19** As to the October 20, 2009 incident with Leifeld, plaintiff claims that he sent a letter to Brown, and that Brown assigned Captain Pingotti, a non-party, to investigate the complaint. Amended Compl. at 25. Plaintiff also argues that defendant Brown has not responded to the complaint; however, this does not establish personal involvement. Brown cannot be found personally involved in the October 20, 2009 incident because he delegated investigation of that incident to

a subordinate, as stated in plaintiff's complaint. *See Vega,* 610 F.Supp.2d at 198.

As to the December 5, 2009 incident with defendant Filkins, plaintiff claims that he sent a grievance letter to Brown on December 6, 2009. Amended Compl. at 34. As discussed, Brown's personal involvement cannot be found from plaintiff's sending of a letter, without more. *See Smart,* 441 F.Supp.2d at 643.

Finally, as to the December 27, 2009 incident regarding defendants Leifeld and Geisler, plaintiff argues that he sent a grievance letter to Brown on December 29, 2009 and has not yet received a response. Brown produced, as an exhibit to his declaration, his response to plaintiff's appeal, which accused Leifeld of making false statements on the misbehavior report dated December 27, 2009. *See* Dkt. No. 66–18 at 1, 5–6. The response is dated January 7, 2010. *Id.* at 1. As stated previously, Brown cannot be found personally involved solely by his affirming a grievance determination, without more. *See Joyner,* 195 F.Supp.2d at 506.

Plaintiff also states in his supplemental response that he spoke to Brown in February of 2010 "regarding the grievances filed in his office." Dkt. No. 83 at 37. Plaintiff also claims that Brown told plaintiff that he had spoken to defendant Fischer about "the retaliatory treatment" plaintiff was receiving and that plaintiff would be transferred to a new facility. *Id.* This conversation is also insufficient to establish personal involvement. *See Rosales,* 677 F.Supp.2d at 651–52 (finding no personal involvement where the plaintiff had a conversation with a superintendent regarding alleged constitutional violations and the superintendent stated that he would "look into the matter" but did nothing further).

Accordingly, because Brown was not personally involved in any of the alleged constitutional violations, the defendants' motion on this ground should be granted.

### 2. Fischer

Plaintiff alleges that he sent Fischer multiple letters regarding incidents with defendants Friedman, Leifeld, Geisler, and Filkins. Amended Compl. at 42–53, 55–57. Defendants argue that Fischer was not personally involved in any of the constitutional violations alleged by plaintiff. Dkt. No. 66–1 at 18–20.

As stated, sending letters or grievances to a prison official, without more, is insufficient to establish the personal involvement of the prison official. *Smart,* 441 F.Supp.2d at 643. Further, where an inmate alleges that he sent a letter to a prison official, and the prison official failed to investigate allegations of staff misconduct, the inmate must show more than merely reciting the fact that they sent a letter. *See Colon,* 58 F.3d at 873 (finding that an allegation that an inmate sent a letter to a superintendent is "insufficient to create a triable issue of fact[ ]" where plaintiff fails to specify the contents of the letter). "The bare fact that [the Commissioner] occupies a high position in the New York prison hierarchy is insufficient to sustain [a claim of supervisory liability]." *Id.* at 874.

**\*20** Plaintiff claims that he sent multiple letters to Fischer, and alleges that Fischer responded to those letters. Specifically, plaintiff alleges that Fischer responded to the letters on September 23, 2009, February 17, 2010, and March 3, 2010. Amended Compl. at 44, 46, 56. Plaintiff fails to detail the contents of these letters. Defendant Fischer claims that, as Commissioner, he received thousands of letters each year, and relied upon secretaries to determine the particular division or bureau to which each letter should be forwarded. Declaration of Brian Fischer ("Fischer Decl.") ¶ 3. Fischer states that he received copies of letters plaintiff sent to defendant Brown, Superintendent of Eastern, on July 17, 2009 and November 3, 2009. *Id.* ¶ 6, 8, Exh. A, B. Deputy Commissioner Lucien Leclaire responded to each letter, on August 24, 2009 and November 12, 2009, advising plaintiff that he must participate in the grievance process at Eastern in order to resolve his complaints. *Id.* The only contact between plaintiff and Fischer are the letters plaintiff wrote to defendant Brown on which Fischer was copied, and the responses plaintiff received from Fischer's office. These contacts are insufficient to establish Fischer's personal involvement. *See Garvin v. Goord,* 212 F.Supp.2d 123, 126 (W.D.N.Y.2002) (finding that the Commissioner was not personally involved where all letters sent by the plaintiff were reviewed by staff and forwarded to a subordinate staff member for investigation and response).

Accordingly, because Fischer was not personally involved in any of the alleged constitutional violations, defendants' motion on this ground should be granted.

### E. Qualified Immunity

Defendants contend that they are all entitled to qualified immunity. Dkt. No. 66–1 at 22. The doctrine of qualified immunity is an affirmative defense which "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan,* 555 U.S. 223, 244, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Even if a disciplinary disposition is not supported by "some evidence," prison officials are entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Luna,* 356 F.3d at 490 (quoting *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)) (internal quotation marks omitted). This assessment is made " 'in light of the legal rules that were clearly established at the time [the official's action] was taken.' " *Wilson,* 526 U.S. at 614 (quoting *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotation marks omitted); *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991). To determine whether a state official is entitled to qualified immunity for acts taken during the course of his or her employment, a reviewing court is to determine: "(1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the [official] to believe the conduct at issue was lawful." *Phillips v. Wright,* 553 F. App'x 16, 17 (2d Cir.2014) (citing *Gonzalez v. City of Schenectady,* 728 F.3d 149, 154 (2d Cir.2013)).

**\*21** Here, plaintiff has failed to demonstrate a constitutional violation as to any defendant, and, therefore, has failed to meet the first prong. *Phillips,* 553 F. App'x at 17. As to the second prong, inmates possess a clearly-established right to engage in the grievance process without fear of retaliation from prison officials. *Baskerville v. Blot,* 224 F.Supp.2d 723, 738 (S.D.N.Y.2002) (citing *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988)). However, for the reasons established in the sections above, it was objectively reasonable for defendants to act as they did in disciplining plaintiff, confiscating contraband, and searching his cell. *See* sections B–D, *supra.* The misbehavior reports that plaintiff received were issued because defendants observed plaintiff

violating one or more Standards of Inmate Behavior Rules. Similarly, the cell searches and subsequent confiscations were performed because defendants observed contraband in plaintiff's cell. For the reasons stated in the previous sections, defendants Friedman, Leifeld, Filkins, Geisler, Brown and Fischer are entitled to qualified immunity because they have shown that it was objectively reasonable to believe that they did not violate plaintiff's rights. *See Hathaway v. Coughlin,* 37 F.3d 63, 69 (2d Cir.1994).

Accordingly, defendants Friedman, Leifeld, Geisler, Filkins, Brown, and Fischer are entitled to qualified immunity, and it is alternatively recommended that defendants' motion on this ground be granted.

### IV. Conclusion

For the reasons stated above, it is hereby:

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 66) be **GRANTED** in all respects as to all claims and defendants; and it is further **ORDERED** that plaintiff's requests to preclude evidence of (1) any statement by defendant Friedman alleging that plaintiff disobeyed a direct order to turn his radio off, and (2) any contraband receipt issued to plaintiff by defendant Leifeld on December 5, 2009 for the seizure of headphones are **DENIED;** and it is further **ORDERED** that the Clerk serve a copy of this Report–Recommendation and Order on the parties in accordance with Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), 6(e).

Filed Aug. 13, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5603433

### Footnotes

1   *See also Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir.2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected *and why,* and unsupported by legal authority, was not sufficient to preserve the Title VII claim.") (emphasis added).

2   *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the

increasing congestion of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

3    See *Mario,* 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006) (Sharpe, J.).

4    *See also Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

5    The Court notes that, on file in the correctional facility in which Plaintiff was incarcerated when he drafted his Objection are copies of the District's Local Rules of Practice and *Pro Se* Handbook, both of which explain this requirement. Furthermore, even if Plaintiff had a valid excuse for not reading those documents, a litigant's *pro se* status does not excuse him having to comply with a court's procedural rules. *Cusamano v. Sobek,* 604 F. Supp .2d 416, 42627 & n. 4 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases).

6    See *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir.2005) ("[I]n the rare circumstances where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether ... there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account.... In the circumstances presented in the instant case-where (1) the District Court found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and (2) the District Court, even after drawing all inferences in the light most favorable to the plaintiff, determined that no reasonable person could believe Jeffreys' testimony, ... we hold that the District Court did not err by awarding summary judgment. Because no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in the complaint, ... conclude that summary judgment was appropriate.") [internal quotation marks and citations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 42–46 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line [1] was "unsupported by documentary or other concrete evidence," and indeed was contradicted by the other record evidence, and [2] was "conclusory" and "inconsistent" with plaintiffs' present representations); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612–15 (S.D.N.Y.2004) (finding that plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony [1] recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign," and [2] were inconsistent with plaintiff's other statements and claims), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

7    *See, e.g., Manon v. Pons,* 12–CV–7360, 2015 WL 5507759, at *8 (S.D.N.Y. Sept.18, 2015) ("Even if every incident allegedly ascribable to Pons is not enough, in itself, to constitute an 'adverse action,' taken together the troubling harassment that Manon alleges would dissuade a person of reasonable firmness from voicing her complaints."); *Dabnet v. Maddock,* 10–CV–0519, 2011 WL 7429164, at *4 (N.D.N.Y. Nov. 29, 2011) 2011 WL 7429164, at *4 (N.D.N.Y. Nov. 29, 2011) (Peebles, M.J.) ("[W]hile in isolation potentially none of those allegations rises to a level sufficient to support a finding of adverse action, collectively they could suffice to constitute adverse action.").

1    This matter was referred to the undersigned for report and recommendation pursuant to 📖 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    This Court denied plaintiff's motion to amend his complaint to add claims against Officer Jamil, by Decision and Order dated January 17, 2014. Dkt. No. 37. Accordingly, Officer Jamil is not a defendant in this action.

3    Plaintiff also requests that the Court preclude any evidence that Friedman had issued a prior direct order to plaintiff regarding the use of his radio when not in his cell. Dkt. Nos. 83 at 12, 83–1 at 19. He bases this request on the fact that the charge against him for violating Standard of Inmate Behavior 106.10 (Direct Order) was dismissed, yet Friedman states in her declaration that she had previously counseled plaintiff several times regarding proper radio use. *See* Dkt. No. 83–1 at 19; Friedman Decl. ¶ 18. Whether the charges were dismissed following a disciplinary hearing is not dispositive of whether or not Friedman's act of issuing the misbehavior report was retaliatory in nature. Moreover, the Court understands Friedman's reference to prior counseling to refer to previous instances, other than the events of July 14, 2009. Thus, the dismissal of the failure to obey a direct order charge from the July 14, 2009 misbehavior report, and the charge contained within that report, was not based upon earlier instances of radio misuse and resultant counseling. Accordingly, plaintiff's request is denied.

4    Insofar as plaintiff's amended complaint may be read as raising a claim for the confiscated property, in violation of his due process rights, the Fourteenth Amendment does not afford the prisoner a remedy. ❓ *Daniels v. Williams,* 474 U.S. 327, 335 (1986). Further, it is well-settled that even where deprivation is intentional, there is no remedy available in federal court if there exists an adequate state court remedy. *See* 📖 *Hudson,* 468 U.S. at 533. As "New York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of Claims action pursuant to N.Y. Comp.Codes R. & Regs. tit. 7, § 1700.3(b)(4) [,]" there is no remedy in federal court for plaintiff's property damage. *Davis v. New York,* 311 F. App'x 397, 400 (2d Cir.2009) (citation omitted).

5    Plaintiff requests that the Court preclude the defendants from offering any evidence regarding a contraband receipt issued by Leifeld on October 20, 2009. Dkt. No. 83 at 21. The Court has reviewed defendants' motion papers in detail and defendants do not contend that Leifeld issued a contraband receipt on this date, nor is a contraband receipt referenced anywhere in defendants' motion for summary judgment. As such, plaintiff's request is denied.

---

**End of Document**                                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5792467
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Gabriel GILMORE, Plaintiff,

v.

BLAIR, Defendant.

9:18-CV-463 (GLS/DJS)
|
Signed 06/30/2020

**Attorneys and Law Firms**

GABRIEL GILMORE, 04-B-387, Plaintiff, Pro Se, Attica
Correctional Facility, Box 149, Attica, New York 14011.

OF COUNSEL: NICHOLAS L. ZAPP, ESQ., Assistant
Attorney General, HON. LETITIA JAMES, Attorney
General of the State of New York, Attorney for Defendants,
The Capitol, Albany, New York 12224.

### REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

 **\*1** Plaintiff, presently an inmate in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS"), brings this *pro se* action pursuant
to 42 U.S.C. § 1983, alleging the violation of his
constitutional rights. Dkt. No. 1, Compl. Defendant has now
filed a Motion for Summary Judgment seeking dismissal of
the Complaint. Dkt. Nos. 102 & 103. Plaintiff opposes the
Motion. Dkt. No. 115. For the reasons which follow, the Court
recommends that the Motion be granted.

### I. BACKGROUND

The Complaint originally named multiple Defendants. *See
generally* Compl. In a June 5, 2018 Decision and Order,
the District Court dismissed all claims other than a First
Amendment retaliation claim against Defendant Blair. Dkt.
No. 13. The gravamen of the retaliation claim is that
Defendant issued a misbehavior report to Plaintiff falsely
accusing him of abusing facility health services procedures
and then played a role in tampering with Plaintiff's food. *Id.*
at p. 18.

During the time period relevant to Plaintiff's allegations,
roughly September 2016 through January 2017, Plaintiff was
housed at Coxsackie Correctional Facility. Dkt. No. 102-3,
Blair Decl. at ¶ 3; Dkt. No. 115-3 at ¶¶ 2-3. [1]  During this
time, Defendant Blair was employed as a Registered Nurse at
Coxsackie. Blair Decl. at ¶ 1. Though the parties dispute their
frequency and legitimacy, the record establishes that during
this period Plaintiff had a documented history of numerous
medical complaints. Blair Decl. at ¶¶ 13-15; Dkt. No. 103,
Pl.'s Med. Records; Dkt. No. 115-4 at ¶¶ 8 & 13. This included
requesting emergency sick call on numerous occasions that
medical staff at Coxsackie deemed unwarranted. Blair Decl.
at ¶ 15.

On November 29, 2016, Plaintiff again requested emergency
sick call and according to Nurse Blair raised issues other
than those made in the sick call request. *Id.* at ¶ 16; Pl.'s
Med. Records at p. 14. As a result, Defendant issued Plaintiff
an inmate misbehavior report. Blair Decl. at ¶ 17 & Ex. B.
Following a hearing, Plaintiff was found not guilty of the
charges lodged in the misbehavior report. Dkt. No. 102-6,
Pl.'s Dep. at p. 33.

Plaintiff also alleges that his food was tampered with on
January 23, 2017. Specifically, he claims that he was given
a food tray by a corrections officer who he cannot name and
that a medication to which he had previously had an adverse
reaction had been placed in the food. Pl.'s Dep. at pp. 35-41.
Defendant denies any role in tampering with Plaintiff's food.
Blair Decl. at ¶¶ 20-21.

Defendant has offered evidence from two DOCCS officials
that Plaintiff filed no grievance regarding the two incidents of
alleged retaliation at issue in this case. *See generally* Dkt. No.
102-4, Hale Decl.; Dkt. No. 102-5, Seguin Decl.

### II. LEGAL STANDARD FOR
### SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56(a), summary judgment is
appropriate only where "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law." The moving party bears the burden to demonstrate
through "pleadings, depositions, answers to interrogatories,
and admissions on file, together with [ ] affidavits, if any,"
that there is no genuine issue of material fact. *F.D.I.C. v.*

*Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

**\*2** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case.");

*Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution."

*Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

Defendant seeks summary judgment on three grounds: (1) Plaintiff's alleged failure to exhaust available administrative remedies; (2) on the merits of Plaintiff's retaliation claim; and (3) on the ground of qualified immunity. The Court considers each argument in turn.

### A. Exhaustion under the Prison Litigation Reform Act

#### 1. The Grievance Process

The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at \*3 (E.D.N.Y. Dec. 28, 1999).

**\*3** In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. 7 N.Y.C.R.R. § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). An inmate may

request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia,* *Porter v. Nussle*, 534 U.S. at 524); *see also* *Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by* *Porter v. Nussle*, 534 U.S. 516.

An expedited procedure exists for grievances regarding alleged harassment; this procedure also requires that the grievant receive a response from CORC in order to exhaust. 7 N.Y.C.R.R. § 701.8. Pursuant to this expedited procedure, the inmate may first report the incident to the employee's immediate supervisor. *Id.* at § 701.8(a). The inmate's allegations are then given a grievance number and the superintendent (or his designee) must promptly decide whether the grievance, if true, would represent a *bona fide* case of harassment. *Id.* at §§ 701.8(b) & (c). If the superintendent determines the grievance to be a case of harassment, he must render a decision within 25 days; the grievant may then appeal that determination to CORC. *Id.* at §§ 701.8 (d)-(h).

### 2. Plaintiff's Failure to Fully Exhaust his Claims

Here the record before the Court establishes that no timely grievance was filed regarding either Defendant's alleged retaliation in November 2016 or alleged involvement in food tampering in January 2017. The records of Coxsackie Correctional Facility indicate that no grievance was filed regarding either claim. Hale Decl. at ¶ 12.[2] Records from CORC further demonstrate that no appeal to CORC was ever taken of any grievance related to these two claims. Seguin Decl. at ¶¶ 13-18. This evidence is sufficient to establish that no grievance was filed regarding these claims. *Powell v. Schriro*, 2015 WL 7017516, at *7 (S.D.N.Y. Nov. 12, 2015).

Apart from claims that his efforts to file a grievance may have been interfered with, a claim that will be discussed

below, Plaintiff's opposition papers do not offer evidence that a timely grievance regarding either the November 2016 or January 2017 incidents was filed. As noted above, DOCCS regulations require a grievance be filed within 21 days of the event giving rise to the grievance. *Williams v. Priatno*, 829 F.3d 118, 119 (2d Cir. 2016) (citing 7 N.Y.C.R.R. § 701.5(a)(1)). At his deposition, Plaintiff testified that he only "started trying to make complaints" on January 23, 2017. Pl.'s Dep. at p. 33. He offered no specifics about the nature of those complaints, however. *Id.* The earliest date offered by Plaintiff as to any written action regarding the events at issue here appears to be a May 2, 2017 letter to the New York State Office of the Inspector General. *See* Dkt. No. 115-1 at p. 10. Plaintiff's extensive opposition papers show no earlier attempt by him to make DOCCS officials aware of these alleged incidents. In fact, the earliest date offered by Plaintiff regarding written communication with DOCCS appears to be Plaintiff's June 2017 grievance regarding medical care which mentions neither of these incidents nor Defendant Blair. Hale Decl. at Ex. A. There is, therefore, simply no evidence of a timely grievance regarding these incidents as required to exhaust remedies under the PLRA. *Reeder v. Uhler*, 2019 WL 4686351, at *3 (N.D.N.Y. Sept. 26, 2019) (citing Woodford v. Ngo, 548 U.S. at 83).

**\*4** Plaintiff's opposition does establish that he wrote numerous complaints to prison officials and others outside of DOCCS. Dkt. No. 115-1 at pp. 9, 10, 14, & 15. "Generally, 'the law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA.' " *Berman v. Durkin*, 2017 WL 1215814, at *7 (N.D.N.Y. Mar. 10, 2017), *report and recommendation adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017) (quoting *Timmons v. Schriro*, 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015)) (citing cases); *Salmon v. Bellinger*, 2016 WL 4411338, at *4 (N.D.N.Y. July 5, 2016), *report and recommendation adopted*, 2016 WL 4275733 (N.D.N.Y. Aug. 12, 2016) ("Letters sent outside of the grievance process ... are insufficient to satisfy the exhaustion requirement"); *see also* *Macias v. Zenk*, 495 F.3d 37, 44 (2d Cir. 2007) ("Alerting the prison officials as to the nature of the wrong for which redress is sought, does not constitute 'proper exhaustion.' ") (internal quotations, citations, and alterations omitted). Those letters, therefore, did not exhaust Plaintiff's administrative remedies.

The exhaustion requirement is designed to permit prison officials to address inmate concerns before the

commencement of litigation. *Jones v. Bock*, 549 U.S. 199, 204 (2007). An inmate must exhaust the entire DOCCS three-step process to exhaust a claim under the PLRA. *Seuffert v. Donovan*, 2016 WL 859815, at *4 (N.D.N.Y. Feb. 5, 2016), *report and recommendation adopted*, 2016 WL 796090 (N.D.N.Y. Feb. 26, 2016). Here, the facts establish that Plaintiff proceeded to this Court before fully exhausting the available DOCCS procedures. He thus failed to fully exhaust.

### 3. Whether Plaintiff's Failure to Exhaust Administrative Remedies May be Excused

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court stated in *Ross*, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60. Plaintiff bears the burden of establishing that the grievance procedures were unavailable within the meaning of *Ross*. *Martin v. Wyckoff*, 2018 WL 7356771, at *5 (N.D.N.Y. Oct. 16, 2018), *report and recommendation adopted*, 2019 WL 689081 (N.D.N.Y. Feb. 19, 2019).

Plaintiff clearly argues that he should be excused from the exhaustion requirement. *See generally* Dkt. No. 115-1. Plaintiff has filed many grievances while an inmate in DOCCS' custody. *See* Sequin Decl. at Ex. A. "This shows that Plaintiff did not view the filing of grievances as a dead end. It also demonstrates that he clearly understood DOCCS' inmate grievance policy and could navigate it when he wished to pursue a grievance. As such, the first two exceptions identified under *Ross* are not applicable here." *Walker v. Ball*, 2018 WL 1415212, at *5 (N.D.N.Y. Feb. 16, 2018), *report and recommendation adopted*, 2018 WL 1406632 (N.D.N.Y. Mar. 20, 2018); *see also Gonzalez v. Coburn*, 2017 WL 6512859, at *6 (W.D.N.Y. Dec. 20, 2017) ("Plaintiff's

decision to affirmatively participate at all three levels in the inmate grievance program demonstrates that the program was neither a dead-end nor so opaque that Plaintiff could not avail himself of it.").

**\*5** Plaintiff's opposition does raise an allegation that his attempts to file grievances were somehow thwarted by DOCCS personnel. Dkt. No. 115-1. His conclusory allegations in this regard, however, are insufficient to raise a question of fact. *Richard v. Leclaire*, 2019 WL 4233184, at *3 (N.D.N.Y. Sept. 6, 2019); *Aviles v. Tucker*, 2016 WL 4619120, at *4 (S.D.N.Y. Sept. 1, 2016). Plaintiff alleges, for example, that he attempted to send an appeal by certified mail to Karen Bellamy, then a DOCCS official at CORC, but that facility staff refused to process his mail. *Id.* at p. 9. This accusation, made in a memo addressed to Ms. Bellamy, makes no reference to having filed a grievance at the facility level, however. *Id.* The Court also notes that while Plaintiff has a copy of this memo and many other correspondence dated well after the incidents at issue here, *id.* at pp. 7-14, he has not provided the Court with a copy of any grievance, grievance decision, or grievance appeal related to those issues. *See, e.g., Gibbs v. Gadway*, 2019 WL 5191506, at *5 (N.D.N.Y. Oct. 15, 2019), *report and recommendation adopted*, 2020 WL 1227156 (N.D.N.Y. Mar. 13, 2020) (conclusory claim unsupported by copies of grievances allegedly filed subject to dismissal) (citing cases); *Blake v. Porlier*, 2019 WL 7484052, at *5 (N.D.N.Y. Oct. 4, 2019), *report and recommendation adopted*, 2020 WL 58613 (N.D.N.Y. Jan. 6, 2020) (same). Nor does Plaintiff identify the date any grievance was filed or anything else about the process that would render his claims less conclusory.

For these reasons, the Court recommends that the Motion for Summary Judgment be granted based on Plaintiff's failure to exhaust his administrative remedies. The Court will, however, also address the remaining grounds for Defendant's Motion.

### B. Merits of Plaintiff's Retaliation Claim

"To prevail on a First Amendment retaliation claim, an inmate must establish '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action.' " *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d

Cir. 2009)). The plaintiff must establish that "the protected conduct was a substantial or motivating factor" behind the retaliatory action. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). The Second Circuit has warned that "courts must approach prisoner claims of retaliation with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)). This is true because given the nature of a retaliation claim they are "easily fabricated" and as a result "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d at 491.

Plaintiff claims Defendant took two retaliatory actions against him: the issuance of a misbehavior report and having something placed in his food to make him ill. Under the applicable standards neither claim survives summary judgment.

### 1. Misbehavior Report

Defendant issued a Misbehavior Report to Plaintiff on November 26, 2016, related to Plaintiff's abuse of facility emergency sick call procedures. Blair Decl. at ¶ 17 & Ex. B. Plaintiff was found not guilty of the three charges set forth in the Misbehavior Report. *See* Compl. at pp. 18 & 67; Pl.'s Dep. at p. 33. Plaintiff claims the report was issued to retaliate against him for his frequent requests for medical attention. Dkt. No. 115-4 at ¶ 17. Defendant denies any retaliatory motivation in issuing the report. Blair Decl. at ¶ 18. As to this claim, Plaintiff cannot establish either that he engaged in protected activity or that Defendant took adverse action against him. Accordingly, summary judgment is appropriate as to this claim.

Courts have not recognized a freestanding right to request medical attention as a protected activity sufficient to support a retaliation claim. *Ross v. Koenigsmann*, 2016 WL 11480164, at *17 (N.D.N.Y. Sept. 8, 2016), *report and recommendation adopted*, 2016 WL 5408163 (N.D.N.Y. Sept. 28, 2016) (citing cases); *see also Brown v. White*, 2010 WL 985184, at *12 (N.D.N.Y. Mar. 15, 2010). Plaintiff's claim in this regard thus is insufficient to establish the first element of his retaliation claim.

*6 Nor can Plaintiff establish an adverse action related to the issuance of the misbehavior report. In the context of inmate retaliation claims, adverse action is viewed objectively and requires the Court to ask whether the action taken with respect to the inmate "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). Courts have long recognized that if the alleged retaliation is not something that would deter an individual from exercising their rights, the alleged conduct is *de minimis* and "outside the ambit of constitutional protection." *McFadden v. Friedman*, 2015 WL 5603433, at *9 (N.D.N.Y. Sept. 23, 2015).

The filing of a false misbehavior report that results in some form of punishment that cannot be labelled *de minimis* has been found sufficient to constitute adverse actions. *See, e.g., Reed v. Doe No. 1*, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (finding that the "filing of a false misbehavior report can qualify as an adverse action for the purposes of a First Amendment retaliation" where the report resulted in a fourteen-day term in keeplock confinement), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 373 (N.D.N.Y. 2010) (finding that a misbehavior report that resulted in SHU confinement constituted an adverse action). However, the mere filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action. *Bartley v. Collins*, 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding misbehavior report that resulted in plaintiff's temporary loss of privileges did not amount to adverse action but misbehavior report that resulted in keeplock confinement for ten days did). "Typically, courts require a showing of additional punishment above the filing of a misbehavior report to find an adverse action." *Vidal v. Valentin*, 2019 WL 3219442, at *8 (S.D.N.Y. July 17, 2019); *see also Flynn v. Ward*, 2018 WL 3195095, at *10-11 (N.D.N.Y. June 7, 2018), *report and recommendation adopted*, 2018 WL 3193201 (N.D.N.Y. June 28, 2018) (same). In this case, Plaintiff was found not guilty of the charges. Pl.'s Dep. at p. 33. There is no evidence he suffered any adverse consequence in the form of lost privileges or restricted confinement as a result of the report. He, therefore, cannot show and indeed has not alleged an adverse action from the issuance of the misbehavior report.

### 2. Food Tampering Claim

As already discussed, Plaintiff has failed to adequately allege that he was engaged in protected activity. *See* Point III(B)(1) *supra*.[3] This retaliation claim also fails because he cannot establish a causal connection to Defendant.[4]

**\*7** A retaliation plaintiff must establish a causal connection between a protected activity and an adverse action. *Holland v. Goord*, 758 F.3d at 22. But to survive dismissal Plaintiff "must advance non-conclusory allegations." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 106 (2d Cir. 2001). In a summary judgment motion, this requires the non-movant to proffer "some tangible proof" of a causal connection and Plaintiff "may not rely on conclusory assertions of retaliatory motive." *Washington v. Cty. of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004). Defendant Blair denies the allegation that he had any role in tampering with Plaintiff's food. Blair Decl. at ¶¶ 20-21. In the face of express denials on the part of Defendant of any role in the allegedly retaliatory events, the opposition to the Motion for Summary Judgment does not rise above such conclusory allegations and is insufficient to defeat the Motion.

Plaintiff states that his food was tampered with on January 23, 2017, by placing H.I.V. medication in his food. Pl.'s Dep. at pp. 34 & 40-42. The record, however, fails to raise a triable issue about Defendant's role in this alleged incident. Plaintiff has no specific evidence that any medication was in fact placed in his food on the day in question. His claim is based largely on the supposition that the unnamed officer, who Plaintiff says is a "bad" officer would not have given him a food tray absent some nefarious purpose. *See id.* at pp. 35, 36, & 44. He did not see anyone place anything in his food. *Id.* at p. 44. In fact, Plaintiff's deposition testimony could not specifically identify whether it was a corrections officer, Defendant, or another nurse at the facility who allegedly placed the medication in the food. *Id.* at pp. 40-41. He alleges, without specific evidence, only that the three were "working as a team." *Id.* at p. 45.

As previously discussed, inmate retaliation claims can be "easily fabricated." *Dawes v. Walker*, 239 F.3d at 491. Courts, therefore, require more than conclusory allegations to support such a claim. Here, Plaintiff fails to offer evidence

beyond speculation and theories of his own design. Plaintiff's "conclusory statements alone ... fail to adequately provide this Court any factual specifics by which we could evaluate the plausibility of his claims." *Melecio v. Fischer*, 2011 WL 6987299, at \*8 (N.D.N.Y. Sept. 27, 2011), *report and recommendation adopted*, 2012 WL 92846 (N.D.N.Y. Jan. 11, 2012).

For these reasons, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

### C. Qualified Immunity

Qualified immunity provides a "shield[ ] ... from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.... To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citations omitted). Qualified immunity attaches if " 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In other words, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. at 341. Although it is not the case that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful ... it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

**\*8** While the general right to be free from retaliation is well established, this Court has previously recognized that "there is no 'clearly established right' under the First Amendment for inmates to request medical attention." *Ross v. Koenigsmann*, 2016 WL 11480164, at \*18 (N.D.N.Y. Sept. 8, 2016), *report and recommendation adopted*, 2016 WL 5408163 (N.D.N.Y. Sept. 28, 2016). Other courts have more recently continued to recognize that no such right is clearly established. *James v. Gage*, 2019 WL 6251364, at \*7 (S.D.N.Y. Nov. 21, 2019) ("a constitutional right to request medical attention is not clearly established") (citing cases). Given the lack of a clearly established right Defendant could not have known that acting

against Plaintiff, if he in fact did so, would constitute unlawful retaliation. As a result, the lack of clearly established law finding a right to request medical treatment is an additional basis for granting summary judgment.

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion for Summary Judgment (Dkt. No. 102) be **GRANTED** and that the Complaint be **DISMISSED**; and it is

**ORDERED**, that Plaintiff's letter requests to submit additional documents in opposition to the Motion and for a conference (Dkt. Nos. 127 & 132) are **DENIED as moot**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Slip Copy, 2020 WL 5792467

### Footnotes

1   Plaintiff has submitted numerous documents in opposition to the Motion which are referred to throughout this opinion by reference to their docket number.

2   Plaintiff's opposition makes much of a claim that Hale's Declaration is untrue because he did not work at Coxsackie Correctional Facility at the time of the events in question. *See* Dkt. No. 115-2 at ¶¶ 2-4. The Court notes that Hale's Declaration does not claim that he worked at Coxsackie at this time and is explicitly offered based on his knowledge of DOCCS procedure and a review of records. Hale Decl. at ¶¶ 1-2.

3   To the extent Plaintiff's claim here alleges that the retaliation was motivated by his being found not guilty of the misbehavior report, that too fails to establish a protected activity that can serve as the basis for a retaliation claim. "Being found not guilty, however, is not protected activity, or for that matter, 'activity' at all, on plaintiff's part." *Taylor v. Fischer*, 841 F. Supp. 2d 734, 737 (W.D.N.Y. 2012); *see also Davis v. Jackson*, 2018 WL 358089 at *10-11 (S.D.N.Y. Jan. 8, 2018) (same).

4   The Court assumes without deciding that tampering with an inmate's food would satisfy the adverse action requirement. *Compare Santos v. Keenan*, 2020 WL 2859202, at *14 (W.D.N.Y. Feb. 6, 2020), *report and recommendation adopted*, 2020 WL 1025189 (W.D.N.Y. Mar. 3, 2020) (food tampering "may be adverse action[]" *with James v. Mosko*, 2016 WL 8671478, at *6 (W.D.N.Y. July 22, 2016), *report and recommendation adopted*, 2017 WL 397474 (W.D.N.Y. Jan. 30, 2017) (conclusory allegation of food tampering insufficient to establish adverse action)).

**End of Document**                                  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Salvatierra v. Connolly,   S.D.N.Y.,   February 29, 2012

2006 WL 1289256
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Mark BARTLEY, Plaintiff,
v.
Todd COLLINS; Christopher Pecore;
and Timothy Bates, Defendants.

No. 95 Civ. 10161(RJH).
|
May 10, 2006.

**Attorneys and Law Firms**

Mark Bartley, Stormville, NY, pro se.

Reid Anthony Muoio, Hughes Hubbard & Reed LLP, New
York, NY, for Plaintiff.

Bruce A. Brown, Assistant Attorney General, New York, NY,
for Defendants.

*MEMORANDUM OPINION AND ORDER*

RICHARD J. HOLWELL, District Judge.

**\*1** Plaintiff Mark Bartley ("Bartley") brought claims
pursuant to 42 U.S.C. § 1983 in his third amended
complaint against several defendants employed by the New
York State Department of Corrections ("DOCS"), alleging
violations of his First and Fourteenth Amendment rights not
to be retaliated against for the exercise of his right of access
to the courts. Defendants now move for summary judgment
on all claims. For the reasons set forth below, the Court grants
defendants' motion.

**BACKGROUND**

Unless otherwise indicated, the following facts are
undisputed.[1] Plaintiff Bartley was at all relevant times
a DOCS inmate at Green Haven Correctional Facility
("Green Haven") in New York. (Defs.' 56.1 ¶ 3.) Defendants

Todd Collins ("Collins"), Timothy Bates ("Bates"), and
Christopher Pecore ("Pecore") were at all relevant times
correctional officers at Green Haven. (*Id.* ¶¶ 8-10.)

At about 2:45 a.m. on April 16, 1995, Scott Turrisi, a mentally
ill inmate at Green Haven, set a fire in his cell in an apparent
suicide attempt. (Defs.' 56.1 ¶ 12.) Bartley and several other
inmates were injured, one of whom died three days later. *(Id.*
at ¶¶ 12, 15; Pl.'s 56.1 ¶¶ 12, 15.) Shortly after the fire, Bartley,
together with another inmate, Felix Diaz ("Diaz"), began to
prepare lawsuits against DOCS employees for their alleged
failure to properly care for inmates in the events leading up to
and after the fire. (Defs.' 56.1 ¶ 42.)

Bartley, who was known as a jailhouse lawyer, asserts that
prior to the fire, he had a "relatively clean" disciplinary
record. (Pl .'s 56.1 ¶ 60; Bartley Dep. at 99-100.) On the
morning of April 16, 1995, the day of the fire, Bartley
and Diaz circulated a petition among inmates at the prison
clinic in preparation for a lawsuit. (Defs.' 56.1 ¶¶ 42-43.) In
his complaint, Bartley alleged that following that action, he
was retaliated against by defendants. (Third Am. Compl. ¶¶
41-49.)

A. *Alleged Retaliation by Collins*
Bartley testified that in the days following the fire, Collins
made false charges against him on two occasions for minor
infractions. (Bartley Dep. at 98-99.) Those misbehavior
reports resulted in Bartley being put in "keeplock"
confinement,[2] thereby denying him access to the law library
for approximately ten days. (*Id.;* Schulman Decl. Ex. M at
247.) Bartley asserts that this was done to prevent him from
seeking legal redress for injuries resulting from the prison fire.
(Bartley Dep. at 100).

Prior to April 18, Collins had counseled Bartley for not
locking up properly, but had not, to his recollection, written a
misbehavior report against him. (Defs.' 56.1 ¶ 45.) On April
18, Collins wrote a misbehavior report against Bartley for
allegedly ignoring repeated orders to lock in for a count.
(Defs.' 56.1 ¶ 46; Pl.'s 56.1 ¶ 46.) Collins claims that when
ordered to return to his cell, Bartley stopped at two cells
to talk to people, thereby delaying the count. (Defs.' 56.1 ¶
47.) Bartley maintains that the charges were false and that
any delay was the result of Bartley being in a wheelchair
(Schulman Decl. Ex. Q at 5). Collins put Bartley on keeplock
status pending a disciplinary hearing on the charges. (Defs.'
56.1 ¶ 47.) After an April 20 hearing that Bartley did not

attend, Bartley was found guilty of two of three charges against him and was given a fifteen-day loss of package, commissary, and phone privileges. (Defs.' 56.1 ¶ 46.)

**\*2** On April 19, after Bartley was informed that he was on keeplock, he and Collins had a heated exchange. According to Collins, plaintiff called him a "cocksucker" and a "punk faggot bitch" and threatened to "kick Collins' ass and make problems for him." (Schulman Decl. Ex. Q at 2.) Collins wrote another misbehavior report, and at an April 24th hearing, Bartley admitted to using a hostile tone and calling Collins names, including "cocksucker." *(Id.* at 5.) However, Bartley denied making any threats and alleged that Collins told him he had a "big mouth" because Bartley had told Diaz to bring a lawsuit about the fire. *(Id.* at 6.) Ultimately, Bartley plead guilty to harassment, was found guilty of creating a disturbance, and was declared not guilty of charges of threats and violent conduct. *(Id.* at 3, 8; Schulman Decl. Ex. M at 247.) For the two infractions, Bartley was given 10 days of keeplock. (Schulman Decl. Ex. Q at 8; Schulman Decl. Ex. M at 247.)

In his complaint, Bartley alleges that, in addition to having him placed in keeplock, Collins threatened him by saying that Bartley "better drop" his lawsuit. (Third Am. Compl. ¶ 48.) However, Bartley offers no evidence to support the allegation of a threat except for testimony that "all of these defendants ... [were] bothering me, saying little snide remarks, saying we going to get you, you better drop the suit, and all this other stuff," and that "they told me you better drop the lawsuit, Bartley," where Collins apparently was among the "they" to whom Bartley was referring. (Bartley Dep. at 104-07.)

### B. *Alleged Retaliation by Bates*

In his complaint, Bartley alleges that in the days following the fire, Bates filed false charges of littering and other minor infractions against him to "punish and deter" him from filing a lawsuit. (Third Am. Compl. ¶ 46.) On April 19, Bates wrote a misbehavior report against Bartley for littering and for obstructing the view inside his cell with a sheet. (Defs.' 56.1 ¶ 57.) Bartley denies the charges but did not attend the resultant disciplinary hearing, where he was found guilty of three of the four charges against him and given a thirty-day loss of privileges. *(Id.;* Pl.'s 56.1 ¶ 57.)

### C. *Alleged Retaliation by Pecore*

Also in his complaint, Bartley alleges that Pecore retaliated against him by telling him, after Bartley and Diaz began

preparing lawsuits, "Pataki will have to foot the bill anyway, so he doesn't care what I do" and "you better drop the lawsuit Bartley." (Third Am. Compl. ¶ 47.) Bartley further alleges that Pecore threatened him with serious bodily harm, including death, if Bartley did not discontinue the lawsuit. *(Id.)* However, Bartley provides no evidence of the time, date, place, circumstances, or words employed in the alleged threats of physical violence, save for testimony that "two of the defendants in the present action," who Bartley does not identify, "approached me, accosted me and threatened me physically and verbally of what they would do." (Bartley Dep. at 104.) Pecore affirmatively denies having had any discussions with Bartley after the fire. (Defs.' 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.)

## DISCUSSION

### A. *The Summary Judgment Standard*

**\*3** Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may also be granted when the opposing party fails to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 321 (1986); Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61 (2d Cir.1998) (summary judgment is "mandated" when "the evidence is insufficient to support the non-moving party's case")

In reviewing the record, the district court must assess the evidence in "the light most favorable to the non-moving party," resolve all ambiguities, and "draw all reasonable inferences" in its favor. Am. Cas. Co. v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir.1994); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). But an alleged factual dispute between the parties will not by itself defeat a motion for summary judgment because "the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original). "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Mitchell v. Shane, 350 F.3d 39, 47 (2d Cir.2003) (quoting Anderson, 477 U.S. at

248). "A fact is 'material' if it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson,* 477 U.S. at 248).

Moreover, to survive summary judgment, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *Anderson,* 477 U .S. at 256-57; *Gross v. Nat'l Broad. Co., Inc.,* 232 F.Supp.2d 58, 67 (S.D.N.Y.2002). Where, as here, a plaintiff's case depends in part on his own statements and observations, such statements must " 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.' " *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (quoting Fed.R.Civ.P. 56(e)).

Thus, hearsay statements that would be inadmissible at trial, conclusory assertions, and mere denials contained in those affidavits are insufficient to create a genuine issue of material fact. *Id.* (internal citations omitted); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 269 F.3d 114, 123-24 (2d Cir.2001); *Quinn v. Syracuse Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980). Neither will "unsubstantiated speculation" suffice. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citation omitted). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). With these principles in mind, the Court turns to the merits of the defendants' motion.

B. *Bartley's Retaliation Claims*

**\*4** Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right. *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (prisoner stated a valid claim under § 1983 by alleging that a prison official filed false disciplinary charges against him in retaliation for his exercise of a constitutional right to file a grievance); *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("[F]iling of a grievance and attempt to find inmates to represent the grievants ... is constitutionally protected."); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)

(citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)) ("[P]risoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."); *Ciaprazi v. Goord,* No. Civ. 9:02CV00915, 2005 WL 3531464, at \*7 (N.D.N.Y. Dec. 22, 2005) ("[P]laintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity.").

However, courts are to "approach prisoner claims of retaliation with skepticism and particular care" because such claims are easily fabricated and may cause unwarranted judicial interference with prison administration. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official ... can be characterized as a constitutionally proscribed retaliatory act."); *see also Gill v. Pidlypchack,* 389 F.3d 379, 385 (2d Cir.2004) (Scullin, C.J ., concurring).

In order to sustain a First Amendment retaliation claim, "a prisoner must demonstrate the following: '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gill,* 389 F.3d at 380 (quoting *Dawes,* 239 F.3d at 492). If each of the three elements of a *prima facie* case of retaliation is established, the burden shifts to the defendants "to show that the plaintiff would have received the same punishment even absent the retaliatory motivation," in which case the plaintiff's claim must fail. *Gayle,* 313 F.3d at 682 (2d Cir.2002); *Freeman v. Goord,* 2005 WL 3333465, at \*4 (S.D.N.Y. Dec. 10, 2005) ("Even if an inmate plaintiff meets his burden under this three-pronged test, defendants are entitled to summary judgment ... if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone," as courts "employ a presumption that a prison official's acts to maintain order are done for a proper purpose.") (citations and quotations omitted).

1. *Constitutionally Protected Conduct*

**\*5** Plaintiff asserts that he was retaliated against for engaging in the constitutionally protected activity of

circulating a petition in preparation for legal proceedings. Defendants counter that under the Second Circuit's decision in *Duamutef v. O'Keefe,* 98 F.3d 22, 24 (2d Cir.1996), circulating a petition is not protected conduct.

The circulation of a petition by a prisoner is generally protected by the First Amendment. *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976), *cert. denied,* 431 U.S. 967 (1977). However, that right "must be weighed against legitimate safety interests of the prison." *Duamutef,* 98 F.3d at 24 (reiterating the multi-factor test to determine the validity of a regulation that impinges on inmates' constitutional rights as set forth in *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987).). The *Duamutef* court held that where there was an official grievance procedure available to prisoners and a plaintiff did not claim that his petition contained requests that could not be addressed through that procedure, it was "permissible for prison officials to bar the circulation of petitions." *Id.* at 24 (citing *Nickens v. White,* 622 F.2d 967, 971 (8th Cir.1980), *cert. denied,* 449 U.S. 1018 (1980); *Edwards v. White,* 501 F.Supp. 8, 11-13 (M.D.Pa.1979), *af'd,* 633 F.2d 209, 212 (3d Cir.1980). The *Nickens* court ruled similarly, relying on the affidavit of a prison superintendent who explained that petitions were banned for security concerns and that alternative means were available for communicating grievances. 622 F.2d at 970.

Courts have noted that even though *Duamutef* held that petitions *could* be banned, the ruling did not forbid petitions. *Farid v. Goord,* 200 F.Supp.2d 220, 236 (W.D.N.Y.2002). Where the defendant asserted that the plaintiff "does not have a right to circulate a petition" but did not reference a rule or regulation that prohibited petitioning, the *Farid* court held that the plaintiff, in circulating a petition, had engaged in protected conduct. *Id.* Defendants here similarly do not identify a prison regulation prohibiting petitioning by prisoners that justifies a limitation of plaintiff's First Amendment rights. In the absence of penitentiary rules proscribing petitioning, plaintiff's activity was constitutionally protected and as such, plaintiff satisfies the first element of his prima facie case of retaliation with respect to all three defendants.

*2. Adverse Action*

Plaintiff alleges that all three defendants took adverse action against him: Collins by verbally pressuring him to not bring legal action and filing misbehavior reports that put him in keeplock and caused him to lose privileges, Bates by filing false charges that cost him privileges, and Pecore by threatening him with physical violence. Defendants maintain that plaintiff's claims are conclusory and do not rise to the level of severity required for the actions to be characterized as adverse.

**\*6** In evaluating what constitutes adverse action, a court should be mindful that " 'Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse.' " *Dawes,* 239 F.3d at 493 (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999) (en banc) (per curiam)).

In the prison context, adverse action is defined objectively as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill,* 389 F.3d at 381, 383 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). A subjective definition is not adopted because "it would be unfair in the extreme to rule that plaintiff's bringing of the subsequent claim in itself defeated his claim of retaliation." *Id.* If the retaliatory conduct would not deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights, it " 'is simply *de minimis* and therefore outside the ambit of constitutional protection.' " *Davis,* 320 F.3d at 353 (quoting *Dawes,* 239 F.3d at 493).

With respect to his claims that Collins and Pecore issued verbal threats against him, plaintiff does not survive summary judgment. His deposition testimony that multiple defendants threatened him and encouraged him to abandon his lawsuit is conclusory because it is insufficiently specific with regard to the identification of any one defendant, and does not adequately provide the time, date, place, or circumstances of the alleged remarks. *See, e.g., Gaines v. Artus,* No. 9:04-CV-76, 2006 WL 721618, at \*5 (N.D.N.Y. Mar. 20, 2006) (prisoner's § 1983 claim for denial of proper medical care dismissed on summary judgment in part because "[d]uring plaintiff's deposition, he ... could never be specific regarding the individuals allegedly responsible for this substandard care" and therefore "makes only conclusory

claims"); *Jasmin v. New York State Dept. of Labor,* No. 98 Civ. 7569, 2000 WL 194774, at *2 (S.D .N.Y. Feb. 17, 2000) (plaintiff's "conclusory deposition testimony that co-worker 'has constantly been harassing me until last week' is utterly insufficient to create an issue of fact for the jury");

*Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1995) (plaintiff "cannot defeat [a summary judgment] motion by relying on the allegations in his pleading, ... or on conclusory statements") (citations omitted).

Even if plaintiff's deposition testimony were deemed sufficiently specific, verbal threats such as "we going to get you, you better drop the suit,"[3] do not rise to the level of adverse action. *See* *Dawes,* 239 F.3d at 493 (2d. Cir.2001) ("Not every unnecessary statement of a prison guard regarding an inmate's exercise of free speech violates the First Amendment"); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim."); *Williams v. Muller,* No. 98 Civ. 5204, 2001 WL 936297, at *4 (S.D.N.Y. Aug. 17, 2001) (defendant's "alleged spreading of rumors [that] plaintiff claims ... were intended to incite the inmates to harm plaintiff ... do not give rise to a retaliation claim"); *Cruz v. Hillman,* No. 01 Civ. 4169, 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that corrections counselor expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said 'Green Haven is an open battlefield, so be careful' insufficient to state a retaliation claim).

**\*7** Plaintiff's complaint, although more particular than his testimony with regard to what each defendant allegedly said, does not defeat defendants' motion for summary judgment. Not only does the complaint, like plaintiff's testimony, inadequately plead the time, date, place, or circumstances of the alleged remarks, but because it is unverified, it cannot be relied on as evidence in opposing a summary judgment motion. *Trinidad v. New York City Dept. of Correction,* ---F.Supp.2d ----, 2006 WL 704163, at *6 (S.D.N.Y. Mar. 21, 2006) (Unsworn materials are "an insufficient basis for opposing a motion for summary judgment"); *Dukes v. City of New York,* 879 F.Supp. 335, 343 (S.D.N.Y.1995) ("Unsworn statements are not admissible to controvert a

summary judgment motion."); *Kelly v. United States,* 924 F.2d 355, 357 (1st Cir.1991) (to survive summary judgment, "the nonmovant may not rest upon mere allegations in, say, an unverified complaint or lawyer's brief, but must produce evidence which would be admissible at trial to make out the requisite issue of material fact") (citing Fed.R.Civ.P. 56(e)); *Solo Serve Corp. v. Westowne Assoc.,* 929 F.2d 160, 165 (5th Cir.1991) ("Given that [defendant] has filed a properly supported motion for summary judgment, [plaintiff] cannot rely on the facts in its unverified complaint, but must point to evidence in the record sufficient to establish the alleged facts to avoid summary judgment.")

Bates' misbehavior report against plaintiff and Collins's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the commissary, likewise do not constitute adverse action because they were *de minimis:* they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights. *Compare* *Pledger v. Hudson,* No. 99 Civ. 2167, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) (correction officer's issuance of an unfavorable evaluation of prisoner and threat to place him in a Special Housing Unit did not meet the standard of adverse action), *with* *Gill,* 389 F.3d at 384 (plaintiff's allegation that defendants filed false misbehavior reports against him, resulting in his being sentenced to three weeks of keeplock, constituted a claim of adverse action), *and Wheeler v.. Beard,* No. Civ. A.03-4826, 2005 WL 1840159, at *3 (E.D.Pa. Aug. 3, 2005) (prisoner plaintiffs alleged adverse action in retaliation claim by claiming that defendants, among other things, denying medical treatment and prison-issued undergarments, destroying legal mail and other legal materials, planting contraband in cell to serve as basis for bogus misconduct report, and caused one plaintiff to lose his job).

However, Collins's second misbehavior report against plaintiff did constitute adverse action because it caused plaintiff to be placed in keeplock confinement for ten days. *Auleta v. LaFrance,* 233 F.Supp.2d 396, 402 (N.D.N.Y.2002) ( "Plaintiff's claim that he was placed in keeplock for 7 1/2 days is properly construed as alleging an adverse action"); *Lashley v. Wakefield,* 367 F.Supp.2d 461, 467 (W.D.N.Y.2005) (noting holdings in other cases that nine days' keeplock confinement does not necessarily as a matter of law constitute *de minimis* alleged retaliation).

*3. Causal Connection*

**\*8** Plaintiff alleges that the actions taken by defendants were in retaliation against his engagement in the protected conduct of circulating a petition, while defendants assert that the events were unrelated. To show a causal connection between his protected act and the adverse action, a plaintiff must make more than merely conclusory allegations. *See Dawes,* 239 F.3d at 491 ("bald allegations of retaliation" will not suffice; the causal connection must be "sufficient to support the inference that the speech played a substantial part in the adverse action"). Evidence of improper motive may be circumstantial and can include "(1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the plaintiff's prior good disciplinary record; (3) the plaintiff's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline." *Chavis v. Kienert,* No. 9:03-CV-0039, 2005 WL 2452150, at \*16 (N .D.N.Y. Sept. 30, 2005) (citing *Colon,* 58 F.3d at 872-73).

In *Gayle,* the Second Circuit overruled a district court's grant of summary judgment for defendants in a case in which the plaintiff proffered sufficient evidence to "create a genuine issue of material fact as to whether retaliation was a substantial factor in the DOCS officials' decision to charge and punish" him. 313 F.3d at 683. The *Gayle* court came to its conclusion based on circumstances involving, *inter alia,* the prisoner's receipt of a misbehavior report shortly after filing a grievance; the report's relationship to a discussion the prisoner and a guard held regarding the grievance, the fact that the prisoner and a guard offered conflicting testimony at a disciplinary hearing regarding what prompted the report; a guard's lack of credibility when testifying at the hearing, and the fact that the hearing (at which the prisoner was found guilty of violating a rule) was administratively reversed. *Id.* at 683-84.

Plaintiff's allegation of a causal connection between his protected act and Collins' second misbehavior report is sufficient, although weaker than that in *Gayle.* The report, which caused plaintiff to be placed in keeplock, came just three days after the date of the prison fire and plaintiff's circulation of a petition, a temporal proximity that may suggest causality. *Colon,* 58 F.3d at 872 ("[T]emporal proximity between an inmate's lawsuit and disciplinary action may serve as circumstantial evidence of retaliation.") (citations omitted). Plaintiff's assertion that he had a relatively

clean disciplinary record prior to the fire also suggests the possibility of improper motive. *Id.* ("[E]vidence of prior good behavior also may be circumstantial evidence of retaliation.") (citation omitted). However, at the disciplinary hearing regarding the second report, plaintiff was not only found guilty of two of the charges against him but also pled guilty to one of them. In *Pledger,* the court granted a defendant's motion for summary judgment where a plaintiff did not deny the factual foundation of the criticisms made in an allegedly retaliatory negative evaluation by a prison official. 2005 WL 736228, at \*4. Here, plaintiff's acknowledgement of the factual basis of one of the charges made in Collins's second report weakens his claim that the report was retaliatory, but plaintiff did contest the other three charges in the report and was found not guilty of two of them. On balance, the Court concludes that a material issue of fact has been created on the issue of causation.

*4. Defendants' Justifications for Their Actions*

**\*9** Defendants claim that even if plaintiff satisfies the three elements of a prima facie case of retaliation, as plaintiff does with respect to Collins's second misbehavior report, their actions were not unlawful because they would have engaged in them even absent the plaintiff's protected conduct.

Summary judgment should be granted for the defendants if they can show that there is no genuine issue that they would have taken the same action-here, writing a misbehavior report that caused plaintiff to be put in keeplock for ten days-even without retaliatory motivation. *See, e.g., Gayle,* 313 F.3d at 682; *Graham,* 89 F.3d at 79. In making this determination, the court should employ a " 'presumption that a prison official's acts to maintain order are done for a proper purpose.' " *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998) (quoting *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995), *cert. denied,* 525 U.S. 907 (1998)). "The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff 'committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.' " *Gayle,* 313 F.3d at 682 (quoting *Hynes,* 143 F.3d at 657).

Collins wrote his second misbehavior report against plaintiff after plaintiff called him various epithets, which plaintiff later admitted to at a disciplinary hearing. Although Bartley was found not guilty of charges of threats and violent conduct,

those charges stemmed from the same behavior for which Bartley was found guilty on two other charges. Between the presumption that Collins acted with a proper purpose and the fact that plaintiff acknowledged engaging in the conduct underlying the charges, Collins satisfies his burden of showing that he would have written the report even if plaintiff had not earlier circulated a petition.

C. *Qualified Immunity*

Because the claims against defendants are otherwise dismissed, the Court need not address defendants' assertion of qualified immunity.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1289256

## Footnotes

1    The facts as herein recited are drawn from defendants' Rule 56.1 Statement ("Defs.' 56.1 ¶ ___"), plaintiff's response to defendants' Rule 56.1 Statement ("Pl.'s 56.1 ¶ ___"), Bartley's deposition ("Bartley Dep."), and records of disciplinary hearings stemming from Todd Collins's April 19, 1995 misbehavior report against Bartley ("Schulman Decl. Ex. M" and "Schulman Decl. Ex. Q").

2    When under keeplock confinement, an inmate is confined to his cell for 23 hours a day and loses various privileges. 7 N.Y. Comp.Codes R. & Regs. tit. 7, §§ 301.1-301.6.

3    Because plaintiff did not testify to it in his deposition, the Court excludes from consideration the allegation made only in plaintiff's unverified complaint that Pecore "on at least one occasion, threatened to kill [Bartley] if he did not discontinue this lawsuit." (Third Am. Cmpl. ¶¶ 47.) *See* discussion *infra.*

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 59 of 94

2019 WL 3219442
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Joseph VIDAL, Plaintiff,
v.
Jackeline VALENTIN, Defendant.

16-CV-5745 (CS)
|
Signed 07/02/2019
|
Filed 07/17/2019

**Attorneys and Law Firms**

Benjamin J.A. Sauter, Sara Gribbon, Kobre & Kim LLP, New York, New York, Counsel for Plaintiff. [1]

Neil Shevlin, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, Counsel for Defendant.

**OPINION & ORDER**

Seibel, District Judge

**\*1** Before the Court is Defendant's motion for summary judgment. (Doc. 61.)

**I. BACKGROUND**

The following facts are based on the parties' Local Civil Rule 56.1 statements, replies, and supporting materials, and are undisputed except as noted.

New York State Department of Corrections and Community Supervision ("DOCCS") Directive 4422 ("Offender Correspondence Program") contains the following relevant provisions:

- "The sending and receiving of mail by offenders will be restricted only to the extent necessary to prevent a threat to the safety, security, and good order of the facility or the safety or well being of any person, and to prevent unsolicited and unwanted mail." (Doc. 65 ("Russo Decl.") Ex. A ¶ II(C).)

- "Except for oversize envelopes and parcels, offender-to-offender correspondence and correspondence specified in ... [Directive 4421], ... outgoing correspondence may be sealed by the offender." (*Id.* ¶ III(B)(7).)

- "Oversize correspondence, defined as mail which cannot be enclosed in a standard business envelope, shall be inspected in the presence of the offender by a designated security staff person for the presence of contraband." (*Id.* ¶ (B)(8).)

- [O]utgoing mail purporting to be privileged correspondence will not be considered to be privileged correspondence until it has been placed in the control of the administration [2] for processing. (*Id.* ¶ III(A).)

**\*2** Further, DOCCS Directive 4421 ("Privileged Correspondence") provides that once outgoing privileged correspondence has been sealed by an inmate, it "shall not be opened, inspected, or read without express written authorization from the facility Superintendent." (*Id.* Ex. B ¶ 721.3(A)(2).)

Plaintiff Joseph Vidal is an inmate currently incarcerated by DOCCS at the Elmira Correctional Facility. (P's 56.1 Resp. ¶ 1.) From October 2014 to March 2015, Plaintiff was incarcerated at Green Haven. (*Id.*) Defendant Jackeline Valentin has been employed as a Correction Officer ("CO") by DOCCS since January 7, 2013. (*Id.* ¶ 2.) Defendant was assigned to Green Haven in April or May 2013, but she is no longer working there because she has been "out on medical" leave as of September 2017. (*Id.*; Valentin Tr. at 8:14-21.)

On October 12, 2014, Defendant worked at Green Haven as the A officer on E Block during the 7:00 a.m. to 3:00 p.m. shift. (P's 56.1 Resp. ¶ 3.) That day, Plaintiff approached Defendant and asked her to sign a disbursement form for a sealed 8.5″ × 11″ envelope marked "legal mail" that Plaintiff stated he wanted to send to his attorney. (P's 56.1 Resp. ¶ 4; Sauter Decl. Ex. B ("Vidal Decl.") ¶ 7.) Because a standard business envelope is approximately 9″ × 4″, Plaintiff's envelope was oversized under the applicable regulation, and thus subject to inspection. (*See* Russo Decl. Ex. A ¶ III(B)(7)-(8).) Defendant advised Plaintiff that she could not sign the disbursement form unless he agreed to open the envelope to allow Defendant to inspect the contents. (P's 56.1 Resp. ¶ 5.) Defendant claims that she told Plaintiff she needed to inspect his envelope for contraband and gang paraphernalia, (Doc. 66 ("Valentin Decl.") ¶ 4), but Plaintiff

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-00177-DNH-TWD   Document 32   Filed 04/22/21   Page 60 of 94

disputes that Defendant told him why she needed to inspect the envelope, (Vidal Decl. ¶ 4; P's 56.1 Resp. ¶ 5). Plaintiff refused to open his envelope and left. (P's 56.1 Resp. ¶ 6.)

That same day, Plaintiff submitted a letter to the facility Superintendent. (*Id.* ¶ 7; Valentin Decl. Ex. A (the "Letter").) [3] On October 14, 2014, Plaintiff filed a grievance with Green Haven. (P's 56.1 Resp. ¶ 8; Valentin Decl. Ex. B (the "Grievance").) In both his Letter and Grievance, Plaintiff complained that Defendant had acted improperly on October 12, 2014, when she informed Plaintiff she would not sign the disbursement form unless he opened the envelope so that she could review its contents. (P's 56.1 Resp. ¶ 9.) The Letter also asserted that Defendant had acted improperly by sharing her personal information with inmates. (*Id.* ¶ 10.) Specifically, Plaintiff alleged:

> [T]he fact that [Defendant] has problems with her black [A]merican husband, has either a cousin or cousin-in-law, if not in the block, in the facility, and that she shares her business or that she is from 190th Street, Washington Height[s], should not be affairs she should discuss. Employee Rule Manual, section 7.18, if I am not mistaken states that an officer should not display any familiarity with offenders.

(Letter at 2; *see* P's 56.1 Resp. ¶ 10.) Plaintiff testified that he included Defendant's personal information in his Letter to the Superintendent

> [b]ecause [Defendant] feels that she knows all the rules and regulations. Obviously, she doesn't because if somebody else knew her address on the block, she had to share it with somebody if somebody knows her and she hasn't told the superintendent that there's somebody here that knows her. That's why I did that. I have a right to do that. If an officer is acting – is out of place and not following his own

rules and employee manual, I have a right to complain. That's what 139 says, Correctional 139. Find me guilty.

**\*3** (Doc. 64 ("Shevlin Decl.") Ex. A at 113:14-114:2; P's 56.1 Resp. ¶ 11.) Defendant does not have a black American husband or a relative in the facility. (Valentin Decl. ¶ 11.) She does not live on 190th Street [Redacted]. (*Id.* ¶¶ 11-12.)

A supervisor shared copies of Plaintiff's Letter and Grievance with Defendant "[a]t some point in time following" the October 12 mail-related interaction between Plaintiff and Defendant. (*Id.* ¶ 7.) Defendant does not remember when she received the documents, whether she received them at the same or different times, the identity of the supervisor who gave the Letter to her, or whether she was interviewed by a supervisor about them. (*Id.*) Defendant testified that she would have received the October 14 Grievance by the time she discussed the matter with another officer (Sergeant Malark), although she does not remember precisely when that discussion occurred either. (*Id.*; Valentin Tr. at 117:13-118:24, 133:25-134:25.)

Defendant testified that the filing of Plaintiff's October 14 Grievance did not bother her because inmate complaints are part of her job. (Doc. 71 Ex. A at 121:23-122:8.) [4] But she did testify that she became "upset" that Plaintiff [Redacted] because she perceived Plaintiff's allegations to be an "attack on [her] character" insofar as they accused her of improperly "fraternizing with inmates" and made "a false statement about [her] sharing [her] personal information with other people." (Valentin Tr. at 122:5-8, 151:7-153:5, 200:13-22.) She also stated that she was [Redacted] (*Id.* at 123:8-12, 162:5-11.)

On October 20, 2014, Plaintiff sent a note to civilian employee Alfia Alioto concerning her October 16, 2014 review of Plaintiff's inmate chart. (P's 56.1 Resp. ¶ 18.) In the note, Plaintiff commented, "I must admit you are a pretty down to Earth lady. Thank you. P.S. Keep it simple. I will try." (*Id.*) The note contained a written smiley face. (*Id.*) The next day (October 21), Sergeant Dragoon issued Plaintiff an Inmate Misbehavior Report charging him with violating Rule 107.11 ("Inmates shall not communicate messages of a personal nature to any employee."). (*Id.* ¶ 17.) That same day, Plaintiff was placed on keeplock status in his cell on E Block pending resolution of the charge against him. (*Id.* ¶ 19.) [5] The paperwork relating to Sergeant Dragoon's Report asks,

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-00177-DNH-TWD   Document 32   Filed 04/22/21   Page 61 of 94

"Inmate confined/restricted for this report?" and the option "Yes" is selected, with the date "10/20/14" specified. (Russo Decl. Ex. C at 9.)[6] On October 29, 2014, Captain Carey conducted a disciplinary hearing in connection with Sergeant Dragoon's Report and Plaintiff's punishment was keeplock status for thirty days (with a start date of October 20) and loss of privileges. (*Id.* Ex. C at 1.) Plaintiff describes the punishment he received as "disproportionate" – although he provides no facts as to the typical punishment for such an offense by an inmate with his history – and claims it is disputed whether there were other factors that led to his keeplock status aside from Sergeant Dragoon's Inmate Misbehavior Report. (P's 56.1 Resp. ¶ 19.) Plaintiff also disputes whether he actually violated Rule 107.11 and claims the issuance of the Inmate Misbehavior Report was part of a retaliatory scheme. (*Id.* ¶¶ 17-19.)

**\*4** On October 23, 2014, Plaintiff was issued two additional Inmate Misbehavior Reports for his alleged continuing improper interactions with Alioto. (P's 56.1 Resp. ¶ 20.) The first Report, issued by Alioto for an incident occurring on October 23, 2014, at approximately 9:15 a.m., charged Plaintiff with violating Rules 101.22 ("stalking") and 107.11 ("harassment"). (*Id.* ¶ 21.) According to the Report, that morning Alioto had received a thank-you note from Plaintiff attached to Plaintiff's yellow copy of the October 21, 2014 Inmate Misbehavior Report written by Sergeant Dragoon. (*Id.*) Alioto said she feared for her safety. (*Id.*) Plaintiff disputes that he violated Rules 101.22 and 107.11 and whether the alleged thank you note was the true or sole reason for the cited Inmate Misbehavior Report. (*Id.*)

Later that day, at approximately 5:00 p.m., Sergeant Kutz issued an additional Inmate Misbehavior Report to Plaintiff for allegedly having sent inappropriate correspondence to Alioto. (*Id.* ¶ 22.) That ticket charged Plaintiff with violating Rules 107.11 ("harassment") and 180.11 ("Facility Correspondence Guidelines"). (*Id.*) Plaintiff again disputes that he violated those rules and whether the alleged correspondence was the true or sole reason for the cited Inmate Misbehavior Report. (*Id.*)

On October 23, 2014, Defendant issued an Inmate Misbehavior Report, stating that Plaintiff's "grievance/complaint" "discussed my personal information and stated my address (cross street) and town. I have never; nor will I ever discuss or provide my personal/physical address or information with any inmate." (Russo Decl. Ex. E at 5 ("Defendant's Report").) Defendant's Report cites Plaintiff for

violating Rule 113.26 ("Personal information of a current or former employee"), which provides:

> An inmate shall not, without written authorization of the superintendent, solicit, possess or exchange personal identifying information (*e.g.* social security number, home address, private e-mail address or home telephone number) belonging to a person who is a present or former employee of the department or presently or formerly employed in a department facility, or to any member of the person's household, unless the inmate is an immediate family member of such person.

(P's 56.1 Resp. ¶¶ 23-24.) Defendant's Report says that Plaintiff's housing location at the time was "SHU 1," (Defendant's Report), which I understand to be the Special Housing Unit.

Plaintiff disputes that he violated Rule 113.26 and disputes that the alleged Rule violation was the true or sole reason for Valentin's Inmate Misbehavior Report. (P's 56.1 Resp. ¶ 23.) Specifically, the parties dispute whether "190th Street, Washington Height[s]" amounts to "personal identifying information" as contemplated by Rule 113.26, and whether the mere "possession" of such information is sufficient to violate Rule 113.26. (*Id.*; Doc. 69 ("P's Opp.") at 17-19.) On October 27, 2014, Defendant provided a memorandum to Sergeant Malark responding to Plaintiff's Grievance and denying any wrongdoing. (Valentin Decl. Ex. E.)

On October 23, 2014, Plaintiff was sent to SHU where he stayed until March 3, 2015. (Vidal Decl. ¶ 16.) Plaintiff claims that before he was sent to SHU, Defendant stopped by Plaintiff's cell and said, "You are going to SHU." (*Id.* ¶ 17.)[7] The day after Plaintiff was sent to SHU, Plaintiff says Defendant appeared in SHU and said, "Look at you now" and "Pendejo yo no soy de 190th y Washington Heights," (*id.*), which I understand to mean, "Idiot, I'm not from 190th and Washington Heights." Plaintiff also attests that on March 6, three days after he was released from SHU, he was beaten by COs and sent back to SHU. (*Id.* ¶ 18.) Plaintiff says that on the

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 62 of 94

same day, Defendant visited Plaintiff in SHU and "mock[ed] and taunt[ed]" him. (*Id.*)

**\*5** On December 31, 2014, Captain Carey conducted two disciplinary hearings involving Plaintiff. (P's 56.1 Resp. ¶ 27.) One concerned the October 23, 2014 Inmate Misbehavior Report issued by Defendant, and the other concerned the two October 23, 2014 Inmate Misbehavior Reports issued to Plaintiff in connection with his interactions with staff member Alioto. (*Id.*) Following the first hearing Defendant's Inmate Misbehavior Report was dismissed. (*Id.* ¶ 28; Russo Decl. Ex. E at 1.)

Following the hearing on the two Alioto-related Reports, Plaintiff was found guilty of the two charges of harassment (Rule 107.11) and the charge of a facility correspondence violation (Rule 180.11), and the allegation of stalking (Rule 101.22) was dismissed. (P's 56.1 Resp. ¶ 29; Russo Decl. Ex. D at 1.) Plaintiff's punishment was "six months (with two months suspended) in SHU (commencing October 23, 2014 to February 23, 2015), and six months loss of packages, phones, and commissary (commencing October 23, 2014 to April 23, 2015)." (P's 56.1 Resp. ¶ 30.)

On June 17, November 26, and September 28, 2013, pursuant to a practice whereby staff are to notify a supervisor if the staff member knows an inmate from the outside, (*see* Russo Decl. ¶ 29), Defendant submitted a total of four memoranda (submitting two on June 17) to the Deputy Superintendent of Security for Green Haven informing him that she recognized certain inmates from her life outside of DOCCS. (*Id.* ¶ 31; Sauter Decl. Ex. O.) In addition, Defendant learned that Plaintiff had obtained the personal information in the Letter from an inmate in J-block, nicknamed "Monstro," and tracked down his real name, Jose Padilla. (Valentin Tr. at 168:6-17.) Valentin testified that, having learned that Padilla, who she knew [Redacted] (*id.* at 164:12), was in the facility, she submitted a "to/from," which is a memo, "explain[ing] the situation," (*id.* at 169:20-24), *i.e.*, that Padilla knew Defendant from her life outside of DOCCS, (*id.* at 164:12-15). DOCCS has no record of it, (P's 56.1 Resp. ¶ 31), but Defendant notes that Padilla was transferred to another jail, and there would be no other reason to move him except that she had submitted a to/from stating she knew him, (Valentin Tr. at 169:24-170:12).

On July 19, 2016, Plaintiff initiated this action. (Doc. 2.) He filed an amended complaint on March 23, 2017. (AC.)

Following discovery, Defendant filed the instant motion for summary judgment. (Doc. 61.)

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

**\*6** "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials...." Fed. R. Civ. P. 56(c)(1). Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated." *Id.* 56(c)(4); *see*

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 63 of 94

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

## III. **DISCUSSION**

### A. **First Amendment Retaliation**

Plaintiff's Amended Complaint alleges that Defendant, in her individual capacity,[8] retaliated against him in violation of 42 U.S.C. § 1983 for exercising his right under the First Amendment to submit grievances and complaints. (AC ¶¶ 1-2.)[9] The Second Circuit has instructed district courts to "approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (internal quotation marks omitted); *see* *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.") (internal quotation marks omitted); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (skepticism warranted by "near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated").

To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a prisoner must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) (summary order) (alteration and internal quotation marks omitted). Once a plaintiff has "carrie[d] that burden, the defendants must show by a preponderance of the evidence that they would have [taken the allegedly retaliatory action] even in the absence of the protected conduct." *Graham*, 89 F.3d at 79 (internal quotation marks omitted). If the defendant

meets this burden, summary judgment is appropriate. *See* *Davidson v. Chestnut*, 193 F.3d 144, 149 (2d Cir. 1999). In other words, "[r]egardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see* *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994) (affirming dismissal on summary judgment because correction officer's actions were of mixed motives and "would have been issued on proper grounds alone"); *see also* *Sher v. Coughlin*, 739 F.2d 77, 81-82 (2d Cir. 1984) (affirming summary judgment dismissal of prisoner's retaliation claim where dual motivation existed for prisoner's transfer to another facility).

**\*7** For purposes of this motion, Defendant does not contest that Plaintiff's Letter and Grievance constitute protected activity. (Doc. 63 "D's Mem.") at 17 n.2.) That concession is well supported by case law. *See* *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004) ("[Plaintiff] has sufficiently alleged ... participation in protected activity: the use of the prison grievance system...."); *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("[I]ntentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alterations and internal quotation marks omitted); *Morgan v. Dzurenda*, No. 14-CV-966, 2017 WL 1217092, at *12 (D. Conn. Mar. 31, 2017) ("The filing of grievances is a constitutionally protected activity....") (internal quotation marks omitted); *Pledger v. Hudson*, No. 99-CV-2167, 2005 WL 736228, at *4 (S.D.N.Y. Mar. 31, 2005) ("A prisoner's filing of an internal prison complaint against an officer is protected by the First Amendment...."). Thus, Plaintiff has satisfied the first element of his First Amendment retaliation claim.

Additionally, Defendant does not contest that Plaintiff meets the causation prong of the First Amendment retaliation standard, because Defendant concedes that she issued the Inmate Misbehavior Report to Plaintiff in response to the Letter to the Superintendent. (D's Mem. at 17 n.2.)

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-00177-DNH-TWD   Document 32   Filed 04/22/21   Page 64 of 94

Accordingly, the only hurdle Plaintiff must clear to establish his *prima facie* case of retaliation is whether he suffered an adverse action. The Second Circuit "define[s] adverse action objectively, as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising constitutional rights." *Gill*, 389 F.3d at 381 (alterations, internal quotation marks, emphasis omitted). If the retaliatory conduct does not rise to that level, "the retaliatory act is simply *de minimis*, and therefore outside the ambit of constitutional protection." *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (internal quotation marks omitted). Defendant argues that Plaintiff's stay in SHU cannot satisfy the adverse action element, because Plaintiff was transferred to SHU because of the Inmate Misbehavior Reports issued by Sergeant Kutz and Alioto, and not Defendant's Report. (D's Mem. at 17-18.)

In response, Plaintiff argues that Defendant's filing of an Inmate Misbehavior Report constituted an adverse action in itself. (P's Opp. at 15.) Plaintiff is correct that "a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation," *Ward v. Lee*, No. 16-CV-1224, 2018 WL 4610682, at *6 (N.D.N.Y. July 3, 2018), *report and recommendation adopted*, 2018 WL 3574872 (N.D.N.Y. July 25, 2018); *see Franco*, 854 F.2d at 589 (false disciplinary charges as adverse actions); *Reed v. Doe No. 1*, No. 11-CV-250, 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (same), *report and recommendation adopted*, 2012 WL 4486085 (N.D.N.Y. Sept. 27, 2012). But Plaintiff offers no evidence that Defendant's Report was actually false. Defendant's Report cites Plaintiff for violating Rule 113.26 and states that Plaintiff's Grievance "discussed my personal information and stated my address (cross street) and town" and wrongly accused her of sharing that information with an inmate. (Defendant's Report.) Plaintiff does not dispute that Defendant in her Report accurately described his Letter. [10] Plaintiff now disputes that the information regarding 190th Street constituted "personal information," but he plainly and concededly included it in his Letter to accuse Defendant of sharing personal information with inmates. (P's 56.1 Resp. ¶ 11; Letter at 2.) This hardly amounts to Defendant's Report being "false." Because Plaintiff offers no evidence that Defendant's misbehavior report was actually false and does not otherwise contest the accuracy of Defendant's Report's contents, Defendant's motion for summary judgment is granted to the extent Plaintiff's theory is that the adverse action was a false

misbehavior report. *See Bilal v. White*, 494 F. App'x 143, 147 (2d Cir. 2012) (summary order) ("[Plaintiff's] failure to adduce any evidence that the disciplinary charges were in fact false supports summary judgment for defendant on the merits of that claim."); *Charles v. Rockland Cty. Office of the Sheriff*, No. 16-CV-166, 2019 WL 1299804, at *5 (S.D.N.Y. Mar. 21, 2019) ("[A]lthough the filing of false misbehavior reports can constitute an adverse action, plaintiff offers no evidence these misbehavior reports were actually false.") (emphasis omitted), *appeal docketed*, No. 19-1041 (2d Cir. Apr. 22, 2019); *Pledger* 2005 WL 736228, at *5 (declining to find adverse action where plaintiff "admitted to the content of the [misbehavior] report and plead guilty to one of the charges in it").

**\*8** Plaintiff next argues that Defendant's Report constituted an adverse action regardless of its truthfulness and "regardless of the actual penalty imposed." (P's Opp. at 16-17.) But Plaintiff points to no cases – and I know of none – in which a court found that the filing of a non-falsified misbehavior report alone, without evidence of other repercussions, amounted to an adverse action. In fact, courts have held that misbehavior reports do not constitute adverse actions because they are "*de minimis*: they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights." *Bartley v. Collins*, No. 95-CV-10161, 2006 WL 1289256, at *7 (S.D.N.Y. May 10, 2006) (finding misbehavior report that resulted in plaintiff's temporary loss of privileges did not amount to adverse action but misbehavior report that resulted in keeplock confinement for ten days did). Typically, courts require a showing of additional punishment above the filing of a misbehavior report to find an adverse action. *Gill*, 389 F.3d at 383 ("[A] plaintiff asserting First Amendment retaliation must allege some sort of harm...."); *see Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *10 (S.D.N.Y. Mar. 30, 2015) ("The filing of the misbehavior report and the disciplinary sanction of 65 days in the S.H.U. constitute adverse actions that satisfy the second element of a retaliation claim."); *cf. Bilal*, 494 F. App'x at 147 (in standing context, fabricated misbehavior report insufficient to show adverse action because "the petitioning prisoner must adduce evidence of some other harm"); *McFadden v. Friedman*, No. 12-CV-685, 2015 WL 5603433, at *13 (N.D.N.Y. Sept. 23, 2015) ("even if plaintiff were issued a false contraband receipt, the injury is *de minimis* and insufficient to show that he suffered an adverse action" where "plaintiff fail[ed] to allege that he received any punishment or reprimand arising

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-00177-DNH-TWD   Document 32   Filed 04/22/21   Page 65 of 94

out of the seizure of contraband"); *Pledger*, 2005 WL 736228, at \*5 (correction officer's issuance of unfavorable evaluation of prisoner and threat to place him in SHU was not an adverse action).

Plaintiff argues that "[a] retaliatory misbehavior report would deter an inmate's use of the grievance system irrespective of the punishment that is eventually meted out." (P's Opp. at 16.) But the only case Plaintiff cites in support of this argument is *Brown v. Crowley*, 312 F.3d 782 (6th Cir. 2002). There, fact issues precluded a finding that the issuance of a "major misconduct charge," by itself, was not an adverse action because "the risk of such severe sanctions for raising a legitimate complaint would deter a person of ordinary firmness from continuing to engage in that [protected] conduct." *Id.* at 789 (internal quotation marks omitted) (alteration in original). But there the charge of misconduct was plainly unjustified. *See id.* at 783-84 (prisoner charged with filing false report that prison officials embezzled his funds when they docked his inmate account for a debt he did not owe). In any event, the Sixth Circuit's decision is not binding here, and as discussed, no cases in this Circuit hold that the filing of a misbehavior report is, without additional punishment, sufficient to find an adverse action. Further, were an accurate misbehavior report alone a proper basis for a retaliation claim, one can readily imagine the interference with legitimate prison administration. *See Graham*, 89 F.3d at 79 ("A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority."). Accordingly, I reject Plaintiff's theory that the filing of a misbehavior report alone is sufficient to establish an adverse action. [11]

Confinement in the SHU is an adverse action. *See, e.g.*, *Smith v. Hash*, No. 904-CV-74, 2006 WL 2806464, at \*6 (N.D.N.Y. Sept. 28, 2006). But the paperwork associated with the three Inmate Misbehavior Reports Plaintiff received on October 23, 2014, makes clear that Plaintiff was transferred to SHU as a result of Inmate Misbehavior Reports associated with Plaintiff's inappropriate communication with Alioto, not Defendant's Report. (Russo Decl. Ex. D at 1.) [12] In fact, when Defendant filled out the Inmate Misbehavior Report, Plaintiff's housing location was listed as "SHU 1," indicating that Plaintiff was already in SHU at the time she filed her Report. And the record is equally clear that

Plaintiff's continued stay in SHU occurred because of the Alioto-related Reports. On December 31, 2014, following the hearing, Defendant's Report was dismissed. (P's 56.1 Resp. ¶ 28; Russo Decl. Ex. E at 1.) But following the hearing on the two Alioto-related Reports, Plaintiff was found guilty of two counts of harassment (Rule 107.11) and one count of facility correspondence violation (Rule 180.11), but not guilty of stalking (Rule 101.22). (P's 56.1 Resp. ¶ 29; Russo Decl. Ex. D at 1.) Plaintiff's punishment was six months (with two months suspended) in SHU (commencing October 23, 2014, to February 23, 2015), and six months loss of packages, phones, and commissary (commencing October 23, 2014, to April 23, 2015). (P's 56.1 Resp. ¶ 30; Russo Decl. Ex. D at 1.) Thus, the evidence shows that Plaintiff's stay in SHU was because of the two incidents related to his inappropriate communication with Alioto, not because of Defendant's Report. Without a showing of facts from which a jury could conclude that Plaintiff was sent to SHU because of Defendant's actions, Plaintiff has not satisfied the adverse action element of his *prima facie* case, and Defendant's motion for summary judgment must be granted.

**\*9** Even if Plaintiff had established his *prima facie* First Amendment retaliation claim, Defendant would still be entitled to summary judgment. Once a plaintiff carries his *prima facie* burden, the burden shifts to the defendant to show by a preponderance of the evidence on the undisputed facts that the plaintiff "would have been disciplined even in the absence of the protected conduct." *Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 414 (D. Conn. 2016), *aff'd*, 720 F. App'x 79 (2d Cir. 2018) (summary order); *see Graham*, 89 F.3d at 81. To satisfy her burden, "it is not enough that [Defendant] allege[s] that the allegedly retaliatory actions could have been taken absent a retaliatory animus – *i.e.*, that there was a possible legitimate basis for the challenged actions. Rather, [Defendant] must establish that the actions would have been taken, even absent impermissible motives." *Davis v. Rhoomes*, No. 07-CV-6592, 2010 WL 3825728, at \*7 (S.D.N.Y. Sept. 30, 2010) (emphasis omitted).

Here, there is ample undisputed evidence that Plaintiff was sentenced to the SHU because of his inappropriate communications with Alioto. (*See* pages 17-18 above.) Defendant played no part in issuing the Inmate Misbehavior Reports related to these communications or at the disciplinary hearing as a result of which Plaintiff was punished with six months in SHU. In other words, even absent Defendant's retaliatory motive, Plaintiff would have served the time in

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 66 of 94

the SHU anyway. *See* Osborne v. Grussing, 477 F.3d 1002, 1006 (8th Cir. 2007) ("[W]e have repeatedly held that a prisoner fails to state a claim for retaliatory discipline when the alleged retaliation arose from discipline imparted for acts that a prisoner was not entitled to perform, *i.e.*, for violations of prison rules.") (internal quotation marks omitted); Henderson v. Baird, 29 F.3d 464, 469 (8th Cir. 1994) ("[I]f the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory in nature must fail.") (internal quotation marks omitted). And Plaintiff has provided no evidence of a broader retaliatory scheme such that any other prison employees had retaliatory intent toward Plaintiff. [13]

Plaintiff spends much time arguing that Defendant had a retaliatory motive for writing her Report. But even if she did, that does not undermine the showing that the adverse action Plaintiff experienced was based on the Alioto misbehavior reports. So "the actions would have been taken, even absent the impermissible motives." *Davis*, 2010 WL 3825728, at *7 (emphasis added). Plaintiff also spends much time arguing that he did not violate Rule 113.26. Again, even if true, Defendant has still shown that Plaintiff would have been sent to SHU anyway. Further, even if Plaintiff's interpretation of Rule 113.26 is correct, Defendant's interpretation was not unreasonable, as discussed in the next section.

Accordingly, Defendant has established by a preponderance of the undisputed evidence that Plaintiff would have been disciplined even in the absence of any retaliatory motive, entitling her to summary judgment. [14]

### B. Qualified Immunity

**\*10** Finally, Defendant argues that at the very least she is entitled to qualified immunity. Government officials exercising discretionary functions are entitled to qualified immunity shielding them from damages in a § 1983 suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), or insofar as it was objectively reasonable for them to believe that their conduct did not violate such rights, *see* Anderson v. Creighton, 483 U.S. 635, 638-39 (1987). " ' 'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,'

and 'protects all but the plainly incompetent or those who knowingly violate the law.' " Stanton v. Sims, 571 U.S. 3, 6 (2013) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)). A government official sued in his individual capacity is entitled to qualified immunity

> (1) if the conduct attributed to him was not prohibited by federal law; or (2) where that conduct was so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred; or (3) if the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken.

Munafo v. Metro. Transp. Auth., 285 F.3d 201, 210 (2d Cir. 2002) (internal quotation marks, citations, and alterations omitted); *see* Creighton, 483 U.S. at 639 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken.") (internal quotation marks and citation omitted). Summary judgment should be granted where "the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the [p]laintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Husain v. Springer, 494 F.3d 108, 131 (2d Cir. 2007) (internal quotation marks omitted).

Had Plaintiff's claims survived, Defendant would be entitled to qualified immunity. While case law establishes that retaliation for the exercise of the right to petition prison officials is improper, *see* Farid v. Goord, 200 F. Supp. 2d 220, 245 (W.D.N.Y. 2002), "[e]ven if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context," Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007). No case reads Rule 113.26 as

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 67 of 94

Plaintiff claims it ought to be read. Plaintiff argues that he did not violate Rule 113.26 because the information about Defendant that he possessed was not "personal identifying information" within the meaning of the Rule and because mere possession of information should not constitute a violation. But Defendant's interpretation was objectively reasonable: [Redacted], or at least reasonable minds could differ on the point, and whether Plaintiff finds it fair or not, the regulation penalizes mere possession.[15] At the very least, there was no clearly established law stating that what Plaintiff did – which Defendant accurately described in her Report – was *not* a violation of Rule 113.26.

Claims of retaliatory arrest and prosecution provide useful comparisons. The Supreme Court recently declared that a "plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019). A similar rule applies in the context of retaliatory prosecutions. *See Reichle v. Howards*, 566 U.S. 658, 666 (2012) ("[A] plaintiff cannot state a claim of retaliatory prosecution in violation of the First Amendment if the charges were supported by probable cause."). Although the retaliatory act here is not an arrest or prosecution, the import of the rules is that where retaliation is alleged, if the allegedly retaliatory actor can show probable cause, the retaliation claim cannot stand, or if "arguable probable cause" is shown, the defendant is entitled to

qualified immunity. *See, e.g., Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) ("Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest."). Here, in the absence of clearly established law that Plaintiff's conduct did not violate Rule 113.26, Plaintiff cannot show the equivalent of the absence of probable cause, or at least arguable probable cause, for Defendant's Report. Defendant would thus be entitled to qualified immunity had summary judgment otherwise been denied. *See Rodriguez v. Phillips*, 66 F.3d 470, 479 (2d Cir. 1995) (reversing denial of summary judgment where plaintiff had no clearly established First Amendment right to speak to officer).

## IV. CONCLUSION

**\*11** For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 61), enter judgment for Defendant, and close the case.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3219442

---

## Footnotes

1    The Court thanks Plaintiff's counsel for taking on Plaintiff's representation *pro bono.*

2    The term "administration" is not defined in DOCCS Directive 4422. Anthony Russo, currently employed by DOCCS as the Deputy Superintendent for Security at the Green Haven Correctional Facility ("Green Haven"), averred that the term "administration" refers to mail room staff. (Russo Decl. ¶ 8.) Plaintiff disputes this fact, pointing to Defendant's deposition testimony during which she explained that the term "administration" refers to "civilian employees," which means "somebody who's not in uniform." (Doc. 67 ("Sauter Decl.") Ex. A ("Valentin Tr.") at 102:19-25.) But the testimony continues in a vein consistent with Russo's position:

    Q: So your interpretation of [DOCCS Directive 4422 ¶ III(A) ] is that outgoing mail is not privileged until it's in the control of those persons in that building?

    A (Valentin): The mailroom personnel, yes.

(*Id.* at 103:15-19.) Plaintiff also points to Defendant's October 27, 2014 memorandum where she wrote: "[P]er directive, legal mail (oversized) is not considered privileged until it reaches the facility administrator." (Sauter Decl. Ex. T.) Plaintiff claims that the "facility administrator" does not refer only to mail room personnel. (Doc. 68 ("P's 56.1 Resp.") ¶ 15.) (Citations to Plaintiff's 56.1 Response refer to the paragraphs under the heading

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 68 of 94

"Plaintiff's Responses to Defendant's Statements of Material Facts," which begins on page two of Document 68.)

Neither side explains why the definition of the term "administration" affects the outcome of the instant motion, and I do not consider the term's definition material to this case. *See* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (fact is material when it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment).

3    The Letter is incorrectly dated October 12, 2012.

4    Doc. 71 Ex. A contains transcript excerpts from the same deposition as the Valentin Tr.

5    An inmate on keeplock status is confined to his cell for twenty-three hours per day, and is allowed one hour of recreation per day. (P's 56.1 Resp. ¶ 19.)

6    All page citations to exhibits attached to the Russo Declaration refer to the pagination generated by the Court's Electronic Case Filing System.

7    Plaintiff's Amended Complaint says that Defendant told Plaintiff "You are going to SHU" at 9:55 a.m., (Doc. 26 ("AC") ¶ 29), but there is no evidence in the record – including Plaintiff's Declaration – as to what time this occurred, and I cannot consider Plaintiff's unsworn, unverified complaint on a motion for summary judgment.

See *Trinidad v. N.Y.C. Dep't of Corr.*, 423 F. Supp. 2d 151, 161 (S.D.N.Y. 2006) (unsworn materials are "an insufficient basis for opposing a motion for summary judgment") (internal quotation marks omitted);

*Dukes v. City of N.Y.*, 879 F. Supp. 335, 343 (S.D.N.Y. 1995) ("[U]nsworn statements are not admissible to controvert a summary judgment motion."). The time of the remark is not material in any event.

8    Plaintiff's AC alleges that Defendant was acting "in her individual and/or official capacity." (AC ¶ 62.) Plaintiff's counsel clarified that Plaintiff's AC – which Plaintiff drafted before he acquired *pro bono* counsel – intended to assert a claim for damages against Defendant in her individual capacity and not her official capacity. (P's Opp. at 24.) Complaints made by *pro se* plaintiffs are to be examined with "special solicitude," interpreted "to raise the strongest arguments that they suggest," *Shibeshi v. City of N.Y.*, 475 F. App'x 807, 808 (2d Cir. 2012) (summary order) (emphasis and internal quotation marks omitted), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (internal quotation marks omitted). Accordingly, I interpret Plaintiff's Amended Complaint to allege a claim against Defendant in her individual capacity.

9    Plaintiff's Amended Complaint also alleges violations under the Ninth and Fourteenth Amendments. (AC ¶ 1.) Plaintiff has offered no evidence to support this claim except to say that the First Amendment is incorporated against the States by the Fourteenth Amendment. (P's Opp. at 22.) Accordingly, to the extent Plaintiff alleges independent causes of action under the Ninth and Fourteenth Amendments, those claims are dismissed.

10   Plaintiff admits that he heard from another inmate that Defendant lived on 190th Street in Washington Heights and does not purport to have been present when that inmate obtained the information. (Vidal Decl. ¶ 11.)

11   Nor do the alleged inappropriate comments by Defendant rise to the level of adverse action. *See* *Roseboro*, 791 F. Supp. 2d at 375 (collecting cases).

12   Alioto's report indicates that Plaintiff was moved from keeplock status to the SHU due to the incident. (Russo Decl. Ex. D at 6.) The records of the disciplinary hearing confirm the same. (*Id.* Ex. D at 2.) Defendant's Report indicates that Plaintiff was not restricted as a result of the incident, (*id.* Ex. E at 5), and the hearing records confirm the same, (*id.* Ex. E at 1).

13   Indeed, had such a scheme existed, it is highly unlikely that Defendant's Report would have been dismissed. Defendant's comment to Plaintiff, "You are going to SHU," shows that Defendant knew that Plaintiff was going to SHU, but reflects nothing about why. Likewise, her alleged comments "Look at you now" and "Pendejo yo no soy de 190th y Washington Heights," while unprofessional, do not constitute evidence that Defendant had Plaintiff sent to the SHU.

Vidal v. Valentin, Not Reported in Fed. Supp. (2019)

Case 9:20-cv-00177-DNH-TWD   Document 32   Filed 04/22/21   Page 69 of 94

14   Plaintiff argues in part that the Court should deny summary judgment because Defendant's inconsistent testimony regarding the scope of Rule 113.26 "undermines her credibility and stated basis for filing the [Inmate Misbehavior Report]." (P's Opp. at 20-21.) I do not regard Defendant's testimony about the Rule to be necessarily inconsistent, but I will assume for the sake of argument that it is. Plaintiff cites to no cases in which a court used a defendant's shifting explanations as evidence of retaliatory conduct in the prison context. *Cf.* *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846-47 (2d Cir. 2013) (reversing denial of summary judgment on plaintiff's Title VII retaliation claim, finding that the defendant's shifting explanations for why it fired plaintiff, combined with other evidence, precluded summary judgment). But even if inconsistent testimony about the scope of the Rule showed retaliatory animus, for reasons already discussed, Plaintiff would have been sent to SHU anyway. *See* *Coughlin*, 344 F.3d at 287-88.

15   Further, Plaintiff did not merely possess the information. He used it to make false accusations of misconduct against a court officer. (P's 56.1 Resp. ¶ 11; Letter at 2.)

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 70 of 94

2018 WL 3195095
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bruce FLYNN, Plaintiff,

v.

Joe WARD and Lief Wellenstein, Defendants.

No. 15-CV-1028 (TJM/CFH)
|
Signed 06/06/2018
|
Filed 06/07/2018

**Attorneys and Law Firms**

Bruce Flynn, 10-A-1558, Elmira Correctional Facility, P.O. Box 500, Elmira, NY 14902, pro se.

Attorney General for the State of New York, OF COUNSEL: BRIAN W. MATULA, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224-0341, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Bruce Flynn ("Flynn" or "Plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 against Defendants Acting Superintendent Joe Ward ("Defendant" or "Ward") and C.O. Lief Wellenstein ("Defendant" or "Wellenstein") for violations of his rights under the First Amendment. Dkt. No. 20 ("Am. Compl."). Additional defendants were named, but the claims against them have since been dismissed. Dkt. No. 22. Presently before the undersigned is Defendants' motion for summary judgment and dismissal of the Amended Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 64. Flynn did not oppose the motion. For the following reasons, it is recommended that Defendants' motion be granted in part and denied in part.

**I. Failure to Respond**

Flynn failed to submit any opposition papers to Defendants' motion for summary judgment. Flynn was notified of the consequences of failing to respond to a summary judgment motion by Defendants and the Court. Dkt. Nos. 64-1 and 65. However, "[t]he fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996). Even in the absence of a response, Defendants are entitled to judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. Id.; FED. R. CIV. P. 56(c). While "[a] verified complaint is to be treated as an affidavit ... and [may] be considered in determining whether material issues of fact exist[,]" see Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted), Flynn's Amended Complaint is not verified. [2] Thus, the Amended Complaint does not have the "force and effect of an affidavit." See Tafari v. Brown, No. 9:10-CV-1065 (GTS/DRH), 2012 WL 1098447, at \*7, n. 8 (N.D.N.Y. Mar. 30, 2012) (collecting cases). Despite this fact, the Court may consider the exhibits attached to the Amended Complaint. See Dawkins v. Williams, 511 F. Supp. 2d 248, 255 (N.D.N.Y. 2007) (considering the exhibits annexed to the pro se plaintiff's amended complaint when deciding the defendant's motion for summary judgment even though that pleading was not verified). Defendants do not dispute the authenticity of the exhibits and, in fact, utilized the exhibits during Flynn's deposition and cite to the exhibits in support of the motion. Dkt. No. 64-2 ¶¶ 46-48; Dkt. No. 64-4; Dkt. No. 64-7 at 1-2. [3] Additionally, a copy of Flynn's deposition transcript is annexed as an exhibit to Defendants' motion. Dkt. No. 64-4. Consequently, the facts set forth in Defendants' Rule 7.1 Statement of Material Facts [4] are accepted as true, but only as to those facts that are not disputed by Flynn's sworn testimony or the exhibits annexed to the Amended Complaint. See N.D.N.Y. L.R. 7.1(a)(3) ("The Court shall deem admitted any properly supported facts set forth in the Statement of Facts that the opposing party does not specifically controvert.") (emphasis omitted).

**II. Background**

### A. Facts

**\*2**  The facts are related herein in the light most favorable to Flynn as the nonmoving party. <u>See</u> subsection III(A) <u>infra</u>. The facts recited are for the relevant time period as referenced in the Amended Complaint.

At the time of the incidents described in the Amended Complaint, Flynn was confined in the Long Term Protective Custody Unit ("LTPC") at Mid-State Correctional Facility ("Mid-State C.F."). <u>See generally</u> Am. Compl. Wellenstein was a law library officer at Mid-State C.F. Dkt. No. 64-4 at 35-36. Ward was the Superintendent at Mid-State C.F. <u>Id.</u> at 10. From December 2014 through June 2015, Flynn filed numerous requests for legal materials/legal assistance. Dkt. No. 20-2.

From October 2011 until March 5, 2015, inmates in the LTPC had physical access to the law library from 4:30 p.m. until 5:45 p.m. Dkt. No. 20-1 at 2; Dkt. No. 64-4 at 35-36. On March 5, 2015, Captain Goppert issued a memorandum advising the LTPC Population that their law library services would be "modified." Dkt. No. 20-1 at 1. In accordance with Facility Operations Manual 21.04 [5] and Directive #4833, [6] LTPC inmate requests for legal assistance from the law library must be made in writing and forwarded to the law library officer through the facility mail. Dkt. No. 20-1 at 3. Inmates were permitted two requests each day. Dkt. No. 64-4 at 36; Dkt. No. 64-2 ¶ 34.

### 1. Grievances

On January 6, 2015; February 14, 2015; and February 17, 2015, Flynn filed grievances claiming that Wellenstein refused to make copies of his legal work or perform "word" and "key number searches" on the computer. Dkt. No. 64-5 at 4-7. The grievances were consolidated (MS-28194-15) and on March 11, 2015, the Superintendent responded that Flynn was being properly assisted. [7] <u>Id.</u> at 8. Flynn appealed the decision to the Central Office Review Committee ("CORC"), and, on January 20, 2016, CORC upheld the Superintendent's determination. <u>Id.</u> at 3.

On March 10, 2015, Flynn filed a grievance claiming that Wellenstein refused to accept his March 8, 2015 request and overcharged him for copies. Dkt. No. 20-3 at 12.

**\*3**  On April 5, 2015, Flynn filed a grievance alleging that Wellenstein (1) denied him access to the courts; (2) fraud; (3) destruction of property; (4) refused to provide legal materials or assistance; and (5) refused to respond to weekend requests (MS-21943-15). Dkt. No. 64-5 at 10-16. On May 6, 2015, the Superintendent responded that Flynn's concerns were being properly addressed. [8] <u>Id.</u> at 17. Flynn appealed the decision to CORC and on October 21, 2015, CORC upheld the Superintendent's determination. <u>Id.</u> at 9.

On April 17, 2015, Flynn filed a grievance claiming that Wellenstein unlawfully ordered him to remain out of his cell while he made rounds. Dkt. No. 20-3 at 33.

On April 28, 2015, Flynn filed a grievance claiming that Wellenstein was deliberately harassing him and destroying his documents. Dkt. No. 20-3 at 34.

On April 30, 2015, Flynn filed a grievance charging Wellenstein with repeated verbal harassment. Dkt. No. 20-3 at 42. Flynn claimed that Wellenstein came to his cell, accused Flynn of smoking, entered the cell, and pushed Flynn aside. <u>Id.</u> Flynn alleged that Wellenstein made "a couple of smart remarks" and was "angry" over the numerous grievances Flynn filed. <u>Id.</u>

On May 6, 2015; May 8, 2015; and May 11, 2015, Flynn filed grievances accusing Wellenstein of destroying copies, harassment, and threatening behavior. Dkt. No. 64-5 at 19-21. The grievances were consolidated (MS-21970-15), and, on July 14, 2015, after an investigation, the Superintendent issued a decision denying the grievances. [9] <u>Id.</u> at 22-23. Flynn appealed the decision to CORC and on September 21, 2015, the Superintendent's decision was affirmed. <u>Id.</u> at 18.

On May 14, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide books. Dkt. No. 20-3 at 46.

On July 21, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide envelopes and deliberately amended his documents. Dkt. No. 20-6 at 2.

On August 1, 2015, August 7, 2015, and August 10, 2015, Flynn filed grievances against Wellenstein claiming that he refused to make copies of documents "in retaliation for the 2 most recent grievances against him." Dkt. No. 64-5 at 26-28. The grievances were consolidated (MS-22079-15) and on August 27, 2015, after an investigation, the Superintendent

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 72 of 94

denied the grievances.[10] Id. at 29. Flynn appealed the decision to CORC and on October 21, 2015, CORC affirmed the Superintendent's decision. Id. at 24.

On August 20, 2015, Flynn filed a grievance (MS-22105-15) claiming that Wellenstein threatened him and told him, "if I did not stop with my grievances that he, C.O.'s Jordan and Miller were going to set me up again like they have done numerous times in the past." Dkt. No. 20-6 at 10.

On October 23, 2015, Flynn filed a grievance claiming that Wellenstein refused to provide copies and purposefully delayed his access to the courts (MS-22183-15). Dkt. No. 64-5 at 31. On November 10, 2015, after an investigation, the Superintendent determined that Flynn was being provided with Law Library services pursuant to Directive #4483.[11] Id. at 33. Flynn appealed to CORC, and on February 17, 2016, CORC upheld the determination. Id. at 30.

On November 6, 2015, Flynn filed a grievance (MS-22200-15) claiming that Wellenstein's behavior prohibited him from conducting meaningful research. Dkt. No. 64-5 at 37. On December 15, 2015, after an investigation, the Superintendent denied the grievance.[12] Id. at 38. Flynn appealed the decision to CORC, and on March 23, 2016, CORC affirmed the determination. Id. at 36.

 **\*4** On January 14, 2016, Flynn filed a grievance claiming that the photocopier was not functioning properly because Wellenstein manipulated the memory function. Dkt. No. 20-6 at 61.

### 2. Misbehavior Reports

On April 30, 2015, Wellenstein issued a misbehavior report charging Flynn with smoking.[13] Dkt. No. 20-6 at 70. After a Tier II disciplinary hearing, Flynn was sentenced to eighteen days in keeplock confinement. Id. Flynn served his sentence from April 30, 2015 until May 18, 2015. Id.

On August 1, 2015, Officer Koscielniak issued Flynn a misbehavior report charging him with violating facility rules related to smoking. Dkt. No. 20-6 at 6. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges. Id. at 70. On August 1, 2015, Wellenstein issued a second misbehavior report charging Flynn with

disobeying a direct order. Dkt. No. 20-6 at 5. After a Tier II disciplinary hearing, the hearing officer sentenced Flynn to a thirty day loss of recreation, commissary, and phone/package privileges for thirty days, but the sentence was suspended until November 16, 2015. Id. at 70.

On August 17, 2015, Officer Alsante issued Flynn a misbehavior report charging him with placing a three-way call in violation of facility rules. Dkt. No. 20-6 at 8. Alsante noted that, on August 17, 2015, "[a]t approx. 9:05 p.m., at the request of C.O. J. Jordan, I began monitoring 10-2 SHU phone[.]" Id. As a result of the report, Flynn was placed in keeplock for eighteen days from August 17, 2015 until September 4, 2015. Id. at 8, 70. Flynn appealed the decision to Ward claiming that Jordan asked Alsante to monitor his telephone call "as part of a campaign of harassment that CO Wellenstein has launched against those inmates in 10-2 who are trying to access the law library and [c]ourts." Id. at 9. Flynn further noted:

> CO W has written 4 misbehavior reports against me & encourages other CO's to do the same, as well as monitor our alleged activities, and in this incident no 3-way call was made & this is retaliation for my litigation.

Dkt. No. 20-6 at 9.

On August 24, 2015, Wellenstein issued a misbehavior report charging Flynn with threats and harassment. Dkt. No. 20-6 at 12. Wellenstein reported that Flynn told him, "[o]ne day when I get out, I am going to see you selling flowers on the corner and then I will take care of you the way I want to." Id. After a Tier II disciplinary hearing, Flynn was sentenced to thirty days in keeplock confinement. Id. at 70. The sentence was suspended until December 8, 2015. Id.

On November 12, 2015, Officer U. Upshaw issued Flynn a misbehavior report charging him with smoking, arson, false statements, and possessing flammable material. Dkt. No. 20-6 at 24. After a disciplinary hearing, the charges were dismissed. Id. at 25.

On November 18, 2015, Wellenstein issued a misbehavior report charging Flynn with harassment. Dkt. No. 20-6 at 16.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD   Document 32   Filed 04/22/21   Page 73 of 94

The misbehavior report was dismissed by the hearing officer. Am. Compl. ¶ 125.

On December 11, 2015, Wellenstein issued a misbehavior report charging Flynn disobeying a direct order and harassment. Dkt. No. 20-6 at 26. The ticket was dismissed by the hearing officer. Am. Compl. at ¶ 130.

### 3. Legal Work

\*5   In 2013, Flynn filed a Habeas Corpus petition in this Court. See Flynn v. J. Colvin, No. 9:13-CV-1247 (JKS) (N.D.N.Y. 2013). On October 19, 2015, Flynn filed an action in the Court of Claims against Wellenstein charging him with deliberately destroying legal documents. Dkt. No. 20-6 at 27-28. In 2014 and 2015, Flynn was researching and gathering exhibits in support of a writ of error coram nobis to vacate his conviction. Dkt. No. 64-4 at 17. In 2014 and 2015, Flynn was also working on a petition for the Department of Veterans' Affairs to increase his disability benefits, Article 78 petitions, a foreclosure action, and commenced litigation in the Court of Claims. Dkt. No. 64-4 at 18, 21, 25, 29. On August 24, 2015, Flynn commenced the within action. Dkt. No. 1.

During his deposition, Flynn testified that did not know the procedural posture of any of his actions or petitions, could not recall whether deadlines were in place in any litigation, and could not remember the details of each petition and action. Dkt. No. 64-4 at 17-31. Flynn testified that his legal work was lost and therefore, without being able to refer to his legal records, he could not state whether he suffered any negative consequences in any legal matter. Id. at 31-32, 44, 107.

In June 2016, Flynn was transferred out of Mid-State C.F. Dkt. No. 25.

### B. Procedural History

On August 24, 2015, Flynn filed the Complaint in this action. Dkt. No. 1. In a Decision and Order filed December 4, 2015 ("December Order"), the Court reviewed the Complaint in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A, and determined that the Complaint failed to state a claim upon which relief could be granted and, therefore, was subject to dismissal. Dkt. No. 11. In light of his pro se status,

Flynn was afforded an opportunity to submit an amended complaint. Dkt. No. 11 at 18. On February 25, 2016, Flynn filed an Amended Complaint. Dkt. No. 20. Upon review of the Amended Complaint, the Court directed Wellenstein and Ward to respond to the First Amendment claims related to access to the courts and retaliation. Dkt. No. 22 at 14, 26, 29.

### III. Discussion [14]

In the Amended Complaint, Flynn alleges that his First Amendment right to access the courts was violated and further, that Wellenstein retaliated against him for filing grievances. See generally Am. Compl. Defendants move for summary judgment arguing that (1) Flynn failed to allege any "actual injury" to sustain a First Amendment claim; (2) Flynn cannot establish a retaliation claim against Wellenstein; (3) Flynn's supervisory claims against Ward must be dismissed; and (4) Flynn failed to exhaust his administrative remedies with respect to retaliatory conduct. See generally Dkt. No. 64.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. See FED R. CIV. P. 56(a). The moving party has the burden to show the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. See FED R. CIV. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences drawn in favor of the non-moving party. See Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

\*6   The party opposing the motion must set forth facts showing that there is a genuine issue for trial, and must do more than show that there is some doubt or speculation as to the true nature of the facts. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. See Gallo v. Prudential Residential

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD   Document 32   Filed 04/22/21   Page 74 of 94

Servs., Ltd. P'ship., 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1998).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.

See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," ... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law,"...

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

### B. First Amendment

### 1. Access to Courts

Flynn claims that Wellenstein deliberately "mixed up" and destroyed legal exhibits, refused to accept legal requests, and failed to provide legal materials, assistance, and copies. See generally, Am. Compl. As a result, Flynn claims that he was prevented from filing a writ of coram nobis, a petition for habeas relief, a petition with the Department of Veterans' Affairs, an Article 78 petition, and an appeal with the New York State Retirement System and missed deadlines in pending litigation. See id. Defendants argue, even assuming that Flynn had demonstrated a material issue of fact as to whether Defendants acted deliberately and maliciously in failing to provide him with legal assistance and materials, the record does not support Flynn's conclusory claim that he suffered an actual injury caused by the Defendants. Dkt. No. 64-6 at 4.

Undoubtedly, prisoners have a constitutional right to meaningful access to the courts. See Bounds v. Smith, 430 U.S. 817, 824 (1977); Lewis v. Casey, 518 U.S. 343, 350 (1996) ("The right that Bounds acknowledged was the (already well-established) right of access to the courts."). This right is implicated when prison officials "actively interfer[e] with inmates' attempts to prepare legal documents[ ] or file them[.]" Lewis, 518 U.S. at 350 (internal citations omitted). To establish a denial of access to the courts claim, a plaintiff must satisfy two prongs. First, a plaintiff must show that the defendant acted deliberately and maliciously. See Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003). Second, the plaintiff must demonstrate that he suffered an actual injury, "i.e., [the defendant] took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (internal citations, quotation marks, and alterations omitted) (quoting Lewis, 518 U.S. at 329); Davis, 320 F.3d at 351 (internal quotation marks omitted). "[A] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." Benjamin v. Kerik, 102 F. Supp. 2d 157, 164 (S.D.N.Y. 2000) (citation omitted), aff'd sub nom. Benjamin v. Fraser, 264 F.3d 175 (2d Cir. 2001).

**\*7** Here, while Flynn made several claims in his Amended Complaint related to pending legal matters, Flynn testified at his deposition that he could not recall what litigation he was working on in 2015, the procedural posture of any pending litigation, or whether he was subject to any Court imposed deadlines. Dkt. No. 64-4 at 12-31. Flynn testified that he filed actions in the Court of Claims against Wellenstein related to the destruction of his legal work, and that the actions were dismissed, but he could not attribute that dismissal to Wellenstein's actions or inactions. Id. at 25-26, 29, 30. Flynn explained that he could not provide any specific information related to Court deadlines or legal matters because he was compelled to send his legal work home and it was lost. Dkt. No. 64-4 at 18-19, 25, 31, 45. Flynn testified:

> ... Most of my legal work was shipped —sent home. They forced me to send most of my legal work home, so—and I haven't been able to get my legal

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 75 of 94

work sent to me. Then they lost a box
of legal work, so.

Dkt. No. 64-4 at 18.

The record however, lacks any facts related to who directed Flynn to send his legal work home, when or what portion of his work was misplaced or lost, and who was responsible for his missing legal work.

Even if the undersigned accepts Flynn's explanation, the docket reports for cases pending in this Court, as well as Flynn's litigation history, belie his First Amendment claims. In October 2013, Flynn filed a Petition for Habeas Corpus relief. See Flynn v. Colvin, No. 9:13-CV-1247 (JKS), Dkt. No. 1 (N.D.N.Y. Oct. 7, 2013). From February 2014 until June 2016, Flynn filed several submissions in that case including various motions, an application for counsel, a reply to his petition, and objections to Court Orders. Id.; Dkt. Nos. 20, 22, 24, 26, 27, 29, 31, 33, 34, 35, 36, 38. In December 2016, the Petition was denied and Judgment was entered. Id.; Dkt. Nos. 47, 48. Nothing in the record suggests that the Petition was denied for failure to comply with deadlines, prosecute, or purse the action.

In August 2015, Flynn commenced the within action by filing an eighteen page complaint with over two hundred pages of exhibits, together with a motion to proceed IFP, an inmate authorization form, a motion to appoint counsel, and a motion for preliminary injunctive relief. Dkt. Nos. 1, 2, 3, 4, 5. From August 2015 until June 2016, Flynn filed letters, motions, and a fifty-four page Amended Complaint. Dkt. Nos. 6, 8, 10, 12, 16, 18, 20, 23. Flynn has clearly been able to proceed in his litigation of this case, despite his claims otherwise.

In December 2017 and March 2018, the Appellate Division issued Orders dismissing two such petitions. See Flynn v. Annucci, 156 A.D.3d 1105 (3d Dep't 2017); Flynn v. Annucci, 159 A.D.3d 1181, 1182 (3d Dep't 2018). In the 2018 Order, the Court affirmed the disciplinary determination after considering the documentary evidence, hearing testimony, and misbehavior report. Flynn, 159 A.D.3d at 1182. The record lacks facts establishing that these cases were dismissed due to Flynn's inability to prosecute or purse the matters or Defendants' behavior. See Davis, 320 F.3d at 352 (holding that a plaintiff must show that there is "a causal connection between the protected speech and the adverse action.") (citation omitted).

To summarize, Flynn has failed to show that Defendants' actions hindered his efforts to pursue a legal claim. Flynn was able to file several submissions in this Court, demonstrating that Defendants' alleged conduct did not prevent him from litigating actions. Flynn has failed to provide evidence of any type of actual injury which occurred as a result of Defendants' actions. Flynn has failed to identify which legal claims were frustrated, if they were meritorious, and how his access to legal materials, supplies, or the law library would have supported the viability of such claims. In the absence of any evidence that Flynn suffered any actual injury precluding him from pursuing any judicial action, it is recommended that Defendants' motion for summary judgment on this ground should be granted.

## 2. Retaliation

**\*8** To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. See Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F.Supp.2d 317, 347 (N.D.N.Y. 2010). Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. See Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 214-15 (N.D.N.Y. 2008). Therefore, conclusory allegations alone are insufficient. See id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed factual allegations ... ought usually to be pursued with full discovery.") ). If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his engaging in the protected conduct. See Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 76 of 94

ordinary firmness from exercising ... constitutional rights." 🔖 Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson, 549 F. Supp. 2d at 215.

The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." 🔖 Gayle, 313 F.3d at 682. A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]' " 🔖 Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting 🔖 Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) ). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good disciplinary record, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." 🔖 Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted). Temporal proximity between the protected activity and the adverse action "must be very close." Meyer v. Shulkin, —— F. App'x ——, 2018 WL 480478, at *2 (2d Cir. Jan. 19, 2018) (citation omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

🔖 Burton v. Lynch, 664 F.Supp.2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Flynn claims that Wellenstein assaulted him, threatened him, denied him access to the court, and filed misbehavior reports in retaliation for Flynn's grievances against Wellenstein. See generally Am. Compl. It is well-settled that the filing

of a grievance constitutes protected speech under the First Amendment. See 🔖 Graham, 89 F.3d at 80; 🔖 Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that 🔖 section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also 🔖 Roseboro, 791 F. Supp. 2d at 367 (finding that the filing of a grievance is a protected activity); 🔖 Mateo v. Fischer, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (same). Thus, for each allegation, Flynn has satisfied the first prong of First Amendment retaliation analysis. Thus, the Court turns to whether Flynn has established that he suffered an adverse action and a causal connection between the protected conduct and the adverse action.

### a. Assault

**\*9** Flynn alleges that Wellenstein assaulted him on April 30, 2015 in retaliation for filing grievances. See Am. Compl. ¶ 54. With respect to the second prong of the analysis, Defendants claim that the alleged action, i.e., pushing, was de minimis and thus, not an adverse action. The undersigned agrees. Although an alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis, Flynn's allegations that Wellenstein "push[ed] him around," see Am. Compl. ¶ 54, are de minimis. See 🔖 Rivera v. Goord, 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) ("[E]ven though [the plaintiff] has alleged that the actions of [the defendants] were motivated by [the plaintiff's] filing of grievances, the alleged acts of retaliation, even if assumed to be true, are de minimis; [the plaintiff] states only that [the defendants] 'shoved' him while taking him to the 'box' (i.e., Green Haven's Special Housing Unit, or "SHU"). Such actions, even if proven at trial, would not chill a person of ordinary firmness from continuing to engage in First Amendment activity."); 🔖 Sloane v. Mazzuca, No. 04 CV 8266(KMK), 2006 WL 3096031, at *13-14 (S.D.N.Y. Oct. 31, 2006) (concluding that the defendant's conduct of throwing a food tray at plaintiff did not amount to adverse action); cf. Williams v. Hesse, No. 9:16-CV-01343 (GTS/ TWD), 2018 WL 1363759, at *7-8 (N.D.N.Y. Feb. 2, 2018) (concluding that the defendants' threats coupled with spitting chewing tobacco in the plaintiff's face that resulted in "severe burning, pain, and a temporary loss of vision in his right

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD   Document 32   Filed 04/22/21   Page 77 of 94

eye for nearly six hours, and a severe headache for days" constituted adverse action) Moreover, there is no indication that plaintiff sought medical treatment or experienced severe pain or suffering as a consequence of the alleged assault. See Williams, 2018 WL 1363759, at *7-8. Therefore, because the undersigned finds that Wellenstein's alleged assault does not amount to adverse action, it is recommended that Defendants' motion on this ground be granted.

**b. Access to Courts**

Flynn alleges that Wellenstein denied him access to the law library and to the courts in retaliation for filing grievances. Dkt. No. 20 ¶¶ 57, 59, 118, 119, 120, 122. Although a defendant's underlying action may not amount to a violation of a constitutionally protected right, this does not preclude such action from consideration as an adverse action. See Shariff v. Poole, 689 F. Supp. 2d 470, 478-79 (W.D.N.Y. 2010). " 'An act in retaliation for the exercise of a constitutional right is actionable under § 1983 even if the act when taken for different reasons would have been proper.' " Id. (quoting Franco, 854 F.2d at 588); see Nei v. Dooley, 372 F.3d 1003, 1007 (8th Cir. 2004) (rejecting the defendants' argument that "[a]s for the inmates' claim that they were retaliated against for filing their lawsuit by being denied access to the prison law library, the officials contend the district court should have construed the claim as one of denied access to the courts, requiring proof of actual injury, rather than one of retaliation) (citation omitted)." Thus, even though the undersigned has recommended dismissal of plaintiff's access to the courts claim, Wellenstein's underlying conduct may still be assessed as adverse action.

It is well-settled that the denying an inmate access to the law library or destroying legal material constitutes adverse action. See Guillory v. Haywood, No. 9:13-CV-01564 (MAD), 2015 WL 268933, at *17 (N.D.N.Y. Jan. 21, 2015) ("Furthermore, refusing to allow Plaintiff to go to the law library knowing that it would prevent an inmate from filing papers in a pending lawsuit in a timely manner would arguably deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.") (internal quotation marks and citation omitted); see also Jean-Laurent v. Lane, No. 9:11-CV-186 (NAM/TWD), 2013 WL 600213, at *10 (N.D.N.Y. Jan. 24, 2013), report and recommendation adopted, 2013 WL 599893 (N.D.N.Y. Feb. 15, 2013) ("Destruction of Plaintiff's legal material and documents for his Second Circuit appeal

constitutes an adverse action for purposes of the retaliation analysis."). Thus, Flynn has established the second prong of the retaliation analysis.

With respect to the third prong, Flynn must establish a causal connection "sufficient to support the inference 'that the speech played a substantial part' in the [ ] adverse [ ] action." Diesel v. Town of Lewisboro, 232 F.3d 92, 107 (2d Cir. 2000) (quoting Ezekwo v. NYC Health & Hosps. Corp., 940 F.2d 775, 780-81 (2d Cir. 1991) ). As to temporal proximity, the record indicates that on March 10, 2015; April 5, 2015; April 30, 2015; May 6, 2015; May 8, 2015; May 11, 2015; May 14, 2015; July 21, 2015; August 7, 2015; October 23, 2015; and November 6, 2015, Flynn filed grievances against Wellenstein. See Dkt. N. 64-7. Although there is no "bright line" establishing the time frame appropriate for establishing temporal proximity, the short gap between the protected conduct and adverse action appears sufficiently close to support an indication of a causal connection. See Espinal, 558 F.3d at 129 (holding that passage of six months between protected conduct and adverse action sufficiently supported an inference of a causal connection); see, e.g., Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002) (concluding that the short time frame between grievance and retaliatory action, along with allegation of the defendant's involvement, sufficed to support an inference of a retaliatory motive), abrogated on other grounds, Porter v. Nussle, 534 U.S. 516 (2002).

**\*10** However, "temporal proximity alone cannot create a genuine issue of material as to whether the motivation behind [the defendant's] actions was retaliation." Parks v. Blanchette, 144 F.Supp.3d 282, 336-37 (D. Conn. 2015). Additional circumstantial evidence supports the conclusion that Wellenstein's conduct may have been motivated by Flynn's complaints. On May 8, 2015, Flynn contends that Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. On May 11, 2015, Wellenstein stated "don't [you] dare request anything or I will write you up. I will set you up for grieving me all the time." Id. ¶ 58. Assessing these statements in the light most favorable to Flynn as the non-moving party, the statements are sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged denial of legal materials and/or the law library.

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD   Document 32   Filed 04/22/21   Page 78 of 94

Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Moreover, Wellenstein has not provided an affidavit or other evidence to refute Flynn's testimony. Therefore, there is a genuine triable issue of fact for a jury to consider. See Ramos v. O'Connell, 28 F. Supp. 2d 796, 803 (W.D.N.Y. 1998) (denying summary judgment where the defendants failed to submit affidavits or documents to contradict the plaintiff's account). Therefore, affording plaintiff special solicitude, it is recommended that Defendants' motion on this ground be denied.

### c. Threats

Verbal harassment and threats are generally not considered conduct "that would deter a similarly situation individual of ordinary firmness of exercising constitutional rights." Cabassa v. Smith, No. 9:08-CV-0480 (LEK/DEP), 2009 WL 1212495, at *7 (N.D.N.Y. Apr. 30, 2009) (citing Gill, 389 F.3d at 380) (additional citation omitted). Verbal threats however, may constitute adverse action for purpose of a First Amendment retaliation if the threats are sufficiently specific. Barrington v. New York, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011); see also Ford v. Palmer, 539 F. App'x 5, 6 (2d Cir. 2013) (summary order) (finding that a verbal threat constituted adverse action where corrections officer threatened to poison the plaintiff in retaliation for filing his grievances).

Here, Flynn testified that Wellenstein threatened him and told him not to go to the law library. Dkt. No. 64-4 at 93-94. Upon further questioning, Flynn testified:

Q. Okay. When did he make threats about not going to the law library?

A. I don't recall.

Q. What about threats in writing you up, when did he say that?

A. I don't recall.

Q. Do you recall the sum and substance of any of the conversations about not going to the law library or about writing you up?

A. I don't recall right now.

Dkt. No. 64-4 at 94.

Flynn did not document or report the threats. Dkt. No. 64-4 at 96. Based upon the record, the Court concludes that Wellenstein's alleged threats are not sufficiently specific to constitute adverse action. See Bartley v. Collins, No. 95 Civ. 10161, 2006 WL 1289256, at *2-4 (S.D.N.Y. May 10, 2006) (finding no adverse action where a corrections officer tells a plaintiff that he is going to "get [him]" for filing a lawsuit); Alicea v. Howell, 387 F. Supp. 2d 227, 237 (W.D.N.Y. 2005) (finding no adverse action where a prison official told an inmate that he would "have to pay the consequences" for filing a grievance against her).

Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims on this ground be granted. [15]

### d. Misbehavior Reports

Flynn alleges that Wellenstein filed misbehavior reports, and directed other officers to file misbehavior reports, in retaliation for grievances. Am. Compl. ¶¶ 55, 70, 71, 73, 79. A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action). Courts in this Circuit have held that a temporary loss of privileges does not constitute adverse action. See Smith v. City of New York, No. 14 CIV. 5927, 2017 WL 2172318, at *6 (S.D.N.Y. May 16, 2017); see also Monko v. Cusack, No. 9:11-CV-1218 (GTS/TWD), 2013 WL 5441724, at *11 (N.D.N.Y. Sept. 27, 2013) ("... the temporary loss of privileges such as the post-adjustment privileges lost by Plaintiff for thirty-six days are de minimis and do not constitute adverse action for purposes of a retaliation claim.") (citation omitted); Bartley, 2006 WL 1289256 at *7 (holding that a misbehavior report which resulted in the temporary loss of commissary privileges does not constitute adverse action because the penalty was de minimis).

*11 As a result of the misbehavior reports issued by Koscielniak and Wellenstein on August 1, 2015, Flynn suffered a temporary loss of privileges. Dkt. No. 20-6 at 70. Flynn was not sentenced to any disciplinary confinement or penalized as a result of the November 12, 2015, November

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 79 of 94

18, 2015 and December 11, 2015 misbehavior reports. Dkt. No. 20-6 at 25; Am. Compl. ¶¶ 125, 130. Therefore, because Flynn has failed to show that he suffered an adverse action as a result of the aforementioned tickets, the undersigned need not determine whether there is a causal connection between Flynn's protected conduct and these misbehavior reports. Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon the August 1, 2015; November 12, 2015; November 18, 2015; and December 11, 2015 reports be granted. [16]

The Court reaches a different conclusion however, with respect to the remaining misbehavior reports. As a result of the April 30, 2015 and August 18, 2015 tickets, Flynn was sentenced to eighteen days in keeplock. Dkt. No 20-6 at 70. As a result of the August 24, 2015 misbehavior report, Flynn received a thirty day keeplock sentence. [17] Id. Accordingly, Flynn has established the second prong of the retaliation analysis with respect to these misbehavior reports. Having found that Flynn satisfied the first and second prong of the retaliation analysis with respect to these tickets, the Court turns to whether the record establishes a causal connection between the protected conduct and the adverse action.

### i. April 30, 2015

On April 30, 2015, Wellenstein issued Flynn a misbehavior report for smoking. Am. Compl. ¶ 55; Dkt. No. 64-6 at 14. Flynn contends that this misbehavior is in retaliation for his April 16, 2015 and April 28, 2015 grievances. Am. Compl. ¶ 55. First, the undersigned notes that the April 16, 2015 grieves conduct by the "law library relief officer" and makes no mention of Wellenstein. See Dkt. No. 20-3 at 31. Absent evidence by plaintiff that Wellenstein either was the library relief officer or knew of the contents of said grievance, the April 16, 2015 grievance cannot be the basis for his retaliation claim. See Tafari, 714 F. Supp. 2d at 374 (concluding that the plaintiff failed to establish a causal connection where the defendant was not named in the original grievance). Second, as to the April 28, 2015 grievance, although the temporal proximity of two days sufficiently supports an inference of causal connection, temporal proximity "without more, is insufficient to survive summary judgment." Roseboro v. Gillespie, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citing inter alia Ayers v. Stewart, 101 F.3d 687, 1996 WL 346049 (Table), at *1 (2d Cir. 1996) ("[The plaintiff's] reliance on circumstantial evidence of retaliation-namely, the proximity of the disciplinary action to his complaint where no misbehavior reports were previously filed against him-does not suffice to defeat summary judgment.") ). As to statements regarding Wellenstein's motivations, the record indicates that on May 8, 2015, Wellenstein stated, "don't you dare file any more grievances or I will slap you silly and write misbehavior reports to stop you from requesting anything." Am. Compl. ¶ 56. Assessing this statement in the light most favorable to Flynn as the non-moving party, the undersigned finds it sufficient to support "an inference of a causal connection between" plaintiff's grievances and Wellenstein's alleged filing of misbehavior reports. Baskerville, 224 F. Supp. 2d at 732.

*12 Wellenstein argues that even assuming the evidence creates a material question of fact as to whether he had retaliatory intent, he would have issued the misbehavior report even in the absence of the protected conduct. "[T]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998). "Defendants [may meet] their burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct if 'it was undisputed that [the inmate plaintiff] had in fact committed the prohibited conduct' for which he had been cited in a misbehavior report." Id. (citing Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir. 1994) ).

In September 2013 and March 2015, Flynn was charged with smoking at Mid-State C.F. Dkt. No. 20-6 at 70. Flynn was found guilty of those charges. Id. During his deposition, Flynn admitted that he smoked in his cell in the past and conceded that he "had several disciplinary issues with smoking[.]" Dkt. No. 64-4 at 95-96. However, Flynn maintains that on April 30, 2015, he was not smoking in his cell. Id. As discussed supra, Wellenstein has not provided any sworn testimony in support of the motion, and, thus, has not met his burden of establishing that he would have filed the misbehavior report even in the absence of the protected conduct. Accordingly, there is a genuine dispute as to whether Flynn committed the charged conduct. See Gayle, 313 F.3d at 684 (denying summary judgment where it is disputed whether the plaintiff committed the prohibited conduct). Therefore, the undersigned recommends

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 80 of 94

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

that Defendants' motion for summary judgment, on this basis, be denied. [18]

### ii. August 17, 2015

The August 17, 2015 misbehavior report was written by Officer Alsante. Dkt. No. 20-6 at 8. To establish a retaliation claim, a plaintiff must show "a genuine issue of material fact that the protected conduct was a substantial or motivating factor in his discipline." Graham, 89 F.3d at 81. "[I]t is difficult to establish one defendant's retaliation for complaints against another defendant." Hare v. Hayden, No. 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) (citing Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009) ).

Here, Flynn did not file any grievances or complaints against Alsante. The record lacks any evidence establishing why Alsante would file a false misbehavior report against Flynn, on Wellenstein's behalf, beyond Flynn's conclusory allegations. Without more, the evidence does not present a genuine issue of material fact for a jury to resolve. See Ciaprazi v. Goord, No. 9:02-CV-915 (GLS/DEP), 2005 WL 3531464, at *9 (N.D.N.Y. Dec. 22, 2005) (entering summary judgment on retaliation claim where the plaintiff cited only past grievances filed against corrections officers other than the officer who disciplined the plaintiff); see also Alicea v. Maly, No. 9:12-CV-203 (MAD/TWD), 2015 WL 4326114, at *14 (N.D.N.Y. July 14, 2015); Guillory v. Ellis, No. 9:11-CV-600 (MAD/ATB), 2014 WL 4365274, at *18 (N.D.N.Y. Aug. 29, 2014). Accordingly, it is recommended that Defendants' motion for summary judgment and dismissal of retaliation claims based upon this misbehavior report be granted. [19]

### iii. August 24, 2015

On August 24, 2015, Wellenstein issued plaintiff a misbehavior report alleging that Flynn threatened and verbally harassed him. Dkt. No. 20-6 at 12. Plaintiff contends that this misbehavior report was in retaliation for his August 20, 2015 and August 22, 2015 grievances. Am. Compl. ¶ 79. However, as Defendants note, during his deposition, plaintiff admitted that he "made a smart remark about [Wellenstein] selling flowers for a living," but that Wellenstein "took that to a whole different level." Dkt. No. 64-4 at 91, 93, 95.

Thus, as plaintiff admitted to making the statement that is the basis for the August 24, 2015 misbehavior report, the evidence suggests that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." Gayle, 313 F.3d at 682. Therefore, Defendants have established a non-retaliatory reason for the filing of the August 24, 2015 misbehavior report. See Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) (concluding that plaintiff's admission of the underlying conduct established a "proper, non-retaliatory reason[ ] for filing the misbehavior report."). Accordingly, it is recommended that Defendants' motion on this ground be granted.

### C. Supervisory Liability

*13 Defendants argue that Flynn's claims against Ward must be dismissed because Ward was not personally involved in any constitutional violations. Dkt. No. 64-6 at 20-23. Flynn does not allege, nor does the record support the conclusion that Ward directly participated in any alleged constitutional violations. Construing the Amended Complaint liberally, Flynn contends that Ward was personally involved in the alleged constitutional violations by denying his grievances.

Supervisory officials may not be held liable merely because they held a position of authority. See Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if:

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir 1995) (citing Williams v. Smith, 781 F.2d 319, 323–24 (2d Cir. 1986) ).

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 81 of 94

Writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. Smart v. Goord, 441 F.Supp.2d 631, 643 (S.D.N.Y. 2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."). Also, it is within the purview of a superior officer to delegate responsibility to others. See Vega v. Artus, 610 F.Supp.2d 185, 198 (N.D.N.Y. 2009) (finding no personal involvement where "the only involvement of the supervisory official was to refer the inmate's complaint to the appropriate staff for investigation") (citing Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F.Supp.2d 342, 347 (W.D.N.Y. 2007) ).

"[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement." Perilla v. Fischer, No. 13-CV-398M, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) (citing inter alia Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citation omitted) ). "[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." Molano v. Bezio, No. 10-CV-6481, 2012 WL 1252630, at *5 (W.D.N.Y. Apr. 13, 2012) (citing Collins v. Ferguson, 804 F.Supp.2d 134, 140 (W.D.N.Y. 2011), Black v. Coughlin, 76 F.3d 72, 74–75 (2d Cir. 1996) ).

The record before the Court contains Superintendent responses related to six grievances. Dkt. No. 64-5 at 8, 17, 22-23, 29, 33, 38. As noted supra, the signature of the Superintendent who executed the response, in each instance, is illegible. See Part II(A)(1). In response to the May 6, 2015 grievance (MS-21970-15), the Superintendent concluded that, "[i]n this investigation, the grievant alleges that he is not being provided assistance with law library requests, his copies are purposely damaged and he is being retaliated against for filing complaints." Dkt. No. 64-5 at 22. Defendants argue that Ward was not involved in that grievance and attribute only two grievances to Ward: MS-22079-15 and MS 22200-15. Dkt. No. 64-6 at 22-23. While Defendants concede that additional grievances were appealed to the Superintendent, Defendants claim that the remaining grievance responses were not issued by Ward and thus, Ward was not involved in the decision-making process or investigation regarding these grievances. These arguments are asserted by counsel in the Memorandum of Law, but notably absent from the record is any affidavit or declaration from Ward. Without such evidence, a factual dispute exists as to whether Ward proactively participated in the decision-making process related to Flynn's grievances. As such, there is triable issue of material fact for a jury to resolve with respect to Ward's personal involvement in Wellenstein's alleged retaliatory conduct. See Celotex Corp., 477 U.S. at 323. Accordingly, Defendants' motion against Ward on this ground should be denied.

*14 A different conclusion is reached however, with respect to Flynn's First Amendment claims based upon access to the courts. Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability. Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because plaintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability"). As discussed supra, Flynn failed to raise an issue of material fact with respect to his First Amendment claim based upon access to courts. Accordingly, the undersigned recommends that Defendants' motion for summary judgment and dismissal of Flynn's First Amendment claims against Ward based upon access to the courts be granted.

**D. Exhaustion**

As an alternative ground for dismissal of the retaliation claims, Defendants contend that the motion for summary judgment must be granted because Flynn failed to exhaust his administrative remedies through available grievance procedures. See Dkt. No. 64-2 at 23-26. The PLRA requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). "The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " Johnson v. Testman, 380 F.3d 691, 697 (2d Cir 2004) (citing Porter, 534 U.S. at 524-25). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 82 of 94

particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 W L 2708434, at *4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as money damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

"The mere fact that an inmate plaintiff filed some grievance prior to filing suit is not enough. The grievance must also have related to the subject matter of the federal lawsuit." Allah v. Poole, 506 F. Supp. 2d 174, 180 (W.D.N.Y. 2007) (citation omitted). The scope of a plaintiff's federal claim may not exceed that of the grievance. Donahue v. Bennett, No. 02-CV-6430, 2004 WL 1875019, at *8 (W.D.N.Y. Aug. 17, 2004).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this district followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established by Hemphill, a plaintiff's failure to exhaust could be excused if the plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill, is no longer consistent with the statutory requirements of the PLRA. See Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

**\*15** Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion."

Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end —with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5 (2015). First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged action. Id. § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the full IGP committee must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

Flynn testified that he was familiar with the grievance process and filed "numerous" grievances in 2015. Dkt. No. 64-4 at 41-44. As discussed supra, the record contains copies of six (6) grievances that Flynn appealed to CORC and thus, Defendants concede, exhausted.[20] The record contains a

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 83 of 94

certification attesting to the veracity of the grievance records. Dkt. No. 64-5 at 2.

With respect to the exhausted grievances, Defendants argue that Flynn's retaliation claims were not properly exhausted because these grievances did not contain allegations that Wellenstein retaliated against Flynn when he assaulted him and issued misbehavior reports. Dkt. No. 64-6 at 25-26. Defendants have not provided an affidavit from any DOCCS' employee with personal knowledge to support Defendants' contention that there is no connection between Flynn's grievances and the matters raised in the federal court complaint. Once again, Defendants rely upon the unsupported statements by counsel without evidentiary support. Upon review of the record, the undersigned finds that has exhausted his remaining retaliation claims. In the May 6, 2015 grievance, Flynn claimed that Wellenstein provided distorted copies of court forms and asserted, "[t]his is the 3 rd time he has deliberately ruined copies to the point they are unusable. This is deliberate harassment and the denial of legal copies." Dkt. No. 64-5 at 21. In the May 8, 2015 grievance, Flynn claimed:

> **\*16** On 5/8/15 at 5:05 p.m. C.O Wellenstein came to my cell and started kicking the cell door and slaming [sic] feed up door, verbally harassing me and making numerous threats. For months C.O. Wellenstein has been harassing me. As a result of his harassment I am afraid to use the law library services and request legal material.

Dkt. No. 64-5 at 19.

On July 14, 2015, the Superintendent responded and categorized these claims as "retaliation" claims in response to filing prior complaints. Dkt. No. 64-5 at 22. The Superintendent conducted an investigation and interviewed Wellenstein. Id.

In the August 7, 2015 grievance, Flynn reiterated his harassment complaints claiming that, "Wellenstein has refused to make copies in retaliation for the 2 most recent grievances against him. His refusal to make copies is harassment[.]" Dkt. No. 64-5 at 26-28. On August 27, 2015,

the Superintendent issued a response finding that the grievant "has not substantiated his claim that he has been the victim of harassment by staff[.]" Id. at 29. The Superintendent noted that Wellenstein denied the allegations. Dkt. No. 64-5 at 29. In his Appeal Statement, Flynn argued that Wellenstein continues to deter him from using the law library "in retaliation for filing grievances[.]" Id. On October 21, 2015, CORC issued a decision quoting Directive #4040, Section 701.6(b) related to prohibited "reprisals" against an inmate who utilizes the grievance process. [21] Id. at 24.

Drawing all inferences in Flynn's favor, the Court finds that the facts alleged in Flynn's grievances encompass the facts set forth in the Amended Complaint. See Curry v. Fischer, No. 02 Civ.4477, 2004 WL 766433, at \*8 (S.D.N.Y. Apr. 12, 2004). Accordingly, it is recommended that Defendants' Motion for Summary Judgment, insofar as it raises the affirmative defense of nonexhaustion, be denied.

### IV. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt. No. 64) be **GRANTED IN PART**:

(1) Insofar as it seeks dismissal of Flynn's First Amendment access to the courts claims against Wellenstein and Ward;

(2) Insofar as it seeks dismissal of Flynn's retaliation claims against Wellenstein and Ward related to misbehavior reports issued on August 1, 2015, August 17, 2015, August, 24, 2015, November 12, 2015, November 18, 2015, and December 11, 2015;

(3) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for the April 30, 2015 assault; and

(4) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward for threats,

the motion be **GRANTED**; and it is further

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 64) be **DENIED IN PART**:

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD    Document 32    Filed 04/22/21    Page 84 of 94

(1) Insofar as it seeks dismissal of Flynn's First Amendment retaliation claims against Wellenstein and Ward based on access to courts and the misbehavior report issued on April 30, 2015; and

**\*17** (2) Insofar as it seeks dismissal of plaintiffs retaliation claims for access to the courts and the April 30, 2015 misbehavior report due to nonexhaustion, the motion be **DENIED**; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [22]

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3195095

## Footnotes

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2]    The Amended Complaint is not notarized and does not contain any statement from Flynn certifying the veracity of the document under the penalty of perjury.

[3]    Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

[4]    Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

Local Rule 7.1(a)(3).

[5]    Mid-State C.F. Facility Operations Manual No. 21.04 provided, in relevant part:

3. Inmates in SHU areas may request, in writing, legal assistance from the Law Library.

a. All requests for assistance must be sent to the Law Library Officer vi a facility mail and each request should document what kind of service is needed.

c. SHU inmates will only be allowed to have two (2) legal research resources in their possession at a time. Pick-up and delivery of legal materials will be made on a daily basis, Monday through Sunday.

Dkt. No. 20-1 at 17.

[6]    DOCCS Directive #4833 provided, in pertinent part:

Flynn v. Ward, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00177-DNH-TWD   Document 32   Filed 04/22/21   Page 85 of 94

Cell Study Services: Inmates prohibited by their confinement status from visiting the Law Library shall be allowed to study Law Library materials in their cells and obtain legal services normally available to general population inmates. Such inmates may request, in writing, a maximum of two items per day and these will be delivered, if available, within 24 hours of receipt of the request. Inmates may retain said legal materials for a period of not less than 16 hours nor more than 24 hours.

Dkt. No. 20-1 at 5.

7   The signature of the Superintendent is illegible.

8   See Footnote 8, supra.

9   See Footnote 7, supra.

10  See Footnote 7, supra.

11  See Footnote 7, supra.

12  See Footnote 7, supra.

13  The misbehavior report is not part of the record.

14  All unpublished opinions cited to by the undersigned in this Report-Recommendation are, unless otherwise noted, attached to this Report-Recommendation.

15  In light of my recommendation that Flynn's retaliation claim based upon threats be dismissed in its entirety based on the merits, I find it unnecessary to address the alternative failure to exhaust arguments related to this claim.

16  See Footnote 17, supra.

17  Defendants argue that a suspended sentence does not constitute an adverse action. Dkt. No. 64-6 at 18. Defendants claim, without evidentiary support, that Flynn did not serve keeplock or lose any privileges as a result of this misbehavior report. Id. The record before the Court establishes that the thirty day sentence was suspended until December 8, 2105. Dkt. No. 20-6 at 70. There is however, a genuine issue of fact regarding whether Flynn served the keeplock sentence. Construing the facts in a light most favorable to the pro se, non-moving party, the Court finds that Defendants have failed to meet their burden of proof with regard to this issue.

18  See Footnote 15, supra.

19  See Footnote 17, supra.

20  Flynn filed additional grievances, but the record does not contain proof that these grievances were exhausted. To wit, Flynn testified that "at least two or three" of his grievances "made it to Albany." Dkt. No. 64-4 at 46. Flynn could not recall which grievances were appealed and testified that while nothing prevented him from exhausting all his grievances, he did not appeal certain grievances because they were "repetitive." Id.

21  Section 701.6(b) provides:

Reprisals prohibited. No reprisals of any kind shall be taken against an inmate or employee for good faith utilization of this grievance procedure. An inmate may pursue a complaint that a reprisal occurred through the grievance mechanism. A grievant shall not receive a misbehavior report based solely upon an allegedly false statement made by the inmate to the grievance committee.

N.Y. COMP. CODES R. & REGS. tit. 7, § 701.6.

22  If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4486086
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Benji D. REED, Plaintiff,
v.
John DOE No. 1; John Doe No
2; and M. Soto, Defendants.

Civil Action No. 9:11–CV–0250 (TJM/DEP).
|
July 26, 2012.

**Attorneys and Law Firms**

Benji D. Reed, Elmira, NY, pro se. [1]

Hon. Eric T. Schneiderman, Attorney General of the State of New York, James Seaman, Esq., Assistant Attorney General, Albany, NY, for Defendant Soto.

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Benji D. Reed, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 against various prison officials, alleging deprivation of his civil rights. While the scope of his complaint has been winnowed, and it now raises only claims of cruel and unusual punishment and unlawful retaliation against one named and two unidentified "Doe" defendants, as originally filed that pleading asserted an array of claims stemming from incidents occurring at two separate correctional facilities.

In response to plaintiff's complaint the sole remaining named defendant has moved for dismissal of all claims against him for failure to state a plausible cause of action upon which relief may be granted. The plaintiff, in turn, has applied for leave to amend his complaint, and for appointment of counsel to represent him *pro bono.* For the reasons set forth below, I recommend that defendant's motion to dismiss be granted, and will deny plaintiff's application for leave to amend, on the basis of futility in light of my recommendation regarding the legal sufficiency of his existing claims, as well as his request for assignment of counsel.

I. *BACKGROUND* [2]

Plaintiff is a prison inmate entrusted to the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Complaint (Dkt. No. 1). At the times relevant to the claims remaining in the action, he was designated to Eastern, located in Napanoch, New York. *Id.* at ¶ 3.

The events giving rise to plaintiff's claims were set in motion on September 14, 2010, when Reed developed an illness he attributed to food consumed in the mess hall at Eastern. Complaint (Dkt. No. 1) ¶¶ 32–37. Plaintiff maintains that the food causing his intestinal issues was known by defendant John Doe No. 1 to have been contaminated, and should have been inspected by defendant John Doe No. 2 prior to being served to the inmates. Complaint (Dkt. No. 1) ¶¶ 41–42.

Plaintiff was initially treated on the following day at the facility's medical clinic, along with several other affected inmates, and given "dymotabs" to address the condition. Complaint (Dkt. No. 1) ¶ 38. The medication was subsequently discontinued on that same day, however, and plaintiff was confined to his cell and placed on a water diet for one day. *Id.* at ¶¶ 39–40.

While at Eastern, plaintiff was designated to undergo alcohol and substance abuse treatment in a program ("ASAT") overseen by defendant M. Soto, a counselor at the facility. *See* Complaint (Dkt. No. 1) ¶¶ 6, 31. Based approximately upon his absence from ASAT treatment while confined to his cell due to illness, plaintiff received a misbehavior report authored by defendant M. Soto accusing him of lying regarding his location on September 15, 2010, after being asked why he did not appear for ASAT treatment, and for failing to follow facility rules regarding attendance in the program. Complaint (Dkt. No. 1) ¶¶ 46–47. At a subsequent disciplinary hearing conducted to address the accusations set forth in the misbehavior report, however, the charges were dismissed. *Id.* at ¶ 49.

**\*2** Following plaintiff's return to the ASAT program he was called into defendant Soto's office and, after a conversation during which Reed refused to discuss the conviction that led to his incarceration, he was forced by Soto to sign a refusal to participate in ASAT training. *Id.* at ¶¶ 50–56. Plaintiff was then removed from the ASAT program and escorted to his cell, where he remained in keeplock pending a hearing

stemming from the issuance of a new misbehavior report alleging his refusal to participate in the ASAT program. [3] *Id.* at ¶¶ 57–61. At a subsequent hearing, conducted on October 12, 2010, Reed was exonerated of all charges and was permitted to return to the ASAT program. *Id. at* ¶¶ 64–65. As a result of issuance of the two misbehavior reports, while at Eastern plaintiff was keeplock-confined for a total of fourteen days. [4] *See* Plaintiff's Memorandum (Dkt. No. 18) p. 6 of 18.

Plaintiff was subsequently transferred out of Eastern and into the Southport Correctional Facility, located in Pine City, New York, in December 2010. Complaint (Dkt. No. 1) ¶ 71.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on March 8, 2011. Complaint (Dkt. No. 1). Plaintiff's complaint named the two Doe defendants, M. Soto, and seven corrections employees assigned to Southport as defendants, and asserted claims under the Eighth Amendment to the United States Constitution, the Americans With Disabilities Act, 42 U.S.C. § 12,101 *et seq.,* and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, additionally setting forth a pendent claim of negligence. By order issued on August 2, 2011, based upon an initial review of plaintiff's complaint and accompanying *in forma pauperis* application, Senior District Judge McAvoy ordered all claims arising from events occurring at Southport severed, and directed that those claims be transferred to the Western District of New York. Dkt. No. 4.

In lieu of answering plaintiff's complaint defendant Soto, the sole remaining named defendant in this action, moved on October 17, 2011 for dismissal of plaintiff's claims, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 11. In his motion defendant argues that plaintiff's complaint fails to allege a plausible claim upon which relief may be granted, and that in any event he is entitled to qualified immunity from suit. *Id.* Plaintiff has since submitted a response in opposition to defendant's motion. Dkt. No. 18.

Following the filing of defendant's dismissal motion, plaintiff moved on December 7, 2011 for leave to file an amended complaint, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Dkt. No. 14. In his motion Reed asserts that amendment is sought to permit elimination of the claims and references to the defendants affected by the transfer to the Western District of New York, and to clarify and expand upon facts set forth in his original complaint relating to events at

Eastern. *See* Motion for Leave to Amend (Dkt. No. 14) ¶¶ 1–2. Plaintiff has also requested appointment of counsel to represent him in the action, *pro bono.* Dkt. No. 15. Defendant Soto has since responded in opposition to those motions, by letter dated January 6, 2011 from his counsel, Megan A. Brown, Esq., arguing that the motion for leave to amend should be denied as futile for the same reasons as set forth in his dismissal motion, and taking no position with regard to plaintiff's request for appointment of counsel. Dkt. No. 17.

**\*3** Defendant's dismissal motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Rule 72.3(c). *See* Fed.R.Civ.P. 72(b). The remaining two motions brought by the plaintiff fall within my non-consensual jurisdiction, and therefore will be addressed in the form of an order from this court.

## III. *DISCUSSION*

### A. *Standard of Review*

Defendant's motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ——, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim that is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed,

"[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims." *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations and quotations omitted)).

**\*4** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

### B. *Plaintiff's Retaliation Claim*
Plaintiff alleges that defendant Soto, motivated by Reed's use of the medical facilities at Eastern, issued two false misbehavior reports to him in September 2010. In response, Soto argues that plaintiff's vague and conclusory allegations offered in support of this retaliation claim are insufficient to survive a motion to dismiss.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the provisions of the Eighth Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *See Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.2008). Claims by inmates that adverse actions taken by prison workers are, of course, easily incanted, and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Davis,* 320 F.3d at 352 (same).

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff succeeds in carrying this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*5** Affording plaintiff the deference which he is due as a *pro se* litigant and broadly construing his complaint, it appears that plaintiff is claiming the September misbehavior reports were issued in retaliation for his having sought medical treatment due to a sudden illness. [5] As defendant correctly argues, the mere allegation that a false misbehavior report

has been issued to an inmate, standing alone, does not rise to level of constitutional significance. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)). The further assertion that the false misbehavior report was prompted by the accused inmate having engaged in protected activity, however, can suffice to support a cognizable claim of unlawful retaliation. *Franco,* 854 F.2d at 589.

Having assumed plaintiff's ability to establish that he engaged in protected activity, the court's focus turns next to the question of whether he has sufficiently alleged that he experienced adverse action at the hands of the defendant. In the prison context, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes,* 239 F.3d at 493; *see also Davis,* 320 F.3d at 353. The adverse action inquiry is a contextual one. *Davis,* 320 F.3d at 353. Courts should bear in mind that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.*

The adverse action alleged by the plaintiff in support of his retaliation claim consists of the issuance of two false misbehavior reports. The filing of a false misbehavior report can qualify as an adverse action for purposes of a First Amendment retaliation. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004). The false misbehavior reports at issue led to plaintiff's keeplock cell confinement for a period of fourteen days. At this early procedural juncture, I am unable to conclude that this allegation is insufficient to support a plausible finding of adverse action. *See Edwards v. Horn,* No.2012 WL 76012, at * 16 (S.D.N.Y. Mar. 8, 2012) (citing *Gill,* 389 F.3d at 384) (false misbehavior report and placement in keeplock constitutes adverse action)).

The third requirement for pleading a cognizable retaliation claim involves linking the protected activity and adverse action alleged. It is in connection with this element that plaintiff's retaliation claim fails. In cases involving claims of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558

(N.D.N.Y.2007). When evaluating whether a misbehavior report is the product of retaliatory animus, an analysis most typically undertaken on a motion for summary judgment, courts generally look to several factors as bearing upon any potential nexus between the protected conduct and the misbehavior report, including "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

**\*6** In this instance, plaintiff's complaint is lacking in any factual allegations that would establish the requisite nexus between his visit to the prison infirmary and defendant Soto's issuance of misbehavior reports. Indeed, in his complaint Reed hypothesizes that Soto disbelieved his explanation concerning his whereabouts at the time of his absence from the ASAT program, prompting him to issue the misbehavior reports. *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 54, 65. This allegation by the plaintiff suggests a non-retaliatory motivation for defendant's issuance of the misbehavior reports at issue.

In light of the plaintiff's failure to state facts sufficient to satisfy this critical element of a retaliation claim, I recommend that the defendant's motion be granted, and that plaintiff's retaliation cause of action under the First Amendment be dismissed.

### C. *Verbal Harassment/False Misbehavior Report Claims*
Liberally construed, plaintiff's complaint could be interpreted as also asserting a claim, independent of retaliation, under the Eighth Amendment for harassment and for issuance of false misbehavior reports.

As was previously observed, the mere issuance of a false misbehavior report, standing alone, is insufficient to support a cognizable claim under the Eighth Amendment or otherwise on behalf of a prison inmate; a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988)). As such, plaintiff's claim related to the filing of a false misbehavior report, independent of his First Amendment retaliation cause of action, is subject to dismissal.

Defendant also interprets plaintiff's complaint as alleging that he was generally harassed by Soto, and that Soto stated to other inmates that Reed was a monster with whom they should not associate. These allegations appear to be calculated to state a violation of his Eighth Amendment's right to be free from cruel and unusual punishment. Reed's complaint, however, fails to allege any conduct that would warrant Eighth Amendment protection. As a general matter, mere verbal harassment, including that accompanied by the use of profanity, without any corresponding physical injury does not support a cognizable claim under section 1983, however boorish and unprofessional the alleged conduct may be. *See* Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir.1986); Gill v. Hoadley, 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); Aziz Zarif Shabazz v. Pico, 994 F.Supp. 460, 474 (S.D.N.Y.1998). Nor do threats amount to a constitutional violation. Malsh v. Austin, 901 F.Supp. 757, 763 (S.D.N.Y.1995). Because plaintiff's complaint lacks allegations that would plausibly support an Eighth Amendment violation claim, I recommend dismissal of that cause of action, to the extent that his complaint may properly be construed as raising such a claim.

### D. *Leave to Amend*

**\*7** Following the filing of plaintiff's dismissal motion, plaintiff sought leave to amend his complaint to flesh out certain factual allegations in support of his claims. *See* Dkt. No. 14. At this juncture the court must determine whether to permit the amendment now sought, and additionally whether the plaintiff should be granted leave to amend in any event in an effort to cure the deficiencies perceived with regard to his existing claims against defendant Soto.

#### 1. *Leave to Amend Generally*

Motions for leave to amend are governed by Rule 15(a) of the Federal Rules of Civil Procedure which provides, in pertinent part, that unless amendment as a matter of right is permitted-under circumstances not applicable here-a party may amend its pleading "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a). Under Rule 15(a), leave to amend ordinarily should be liberally granted absent undue delay, bad faith, dilatory tactics, undue prejudice in being served with the proposed pleading, or futility. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230,

9 L.Ed.2d 222 (1962); Elma RT v. Landesmann Int'l Mktg. Corp., No. 98–CIV.–662, 2000 WL 297197, at \*3 (S.D.N.Y. Mar. 22, 2000) (citing *Foman* ).

Notwithstanding the familiar and well-accepted precept that leave to amend should be granted freely and is typically permitted, if a claim contained in a proposed amended complaint would be vulnerable in the face of a Rule 12(b)(6) motion, then permitting amendment would be an act of futility that should not be sanctioned. *See, e.g.,* Saxholm AS v. Dynal, Inc., 938 F.Supp. 120, 124 (E.D.N.Y.1996); In re Boesky Sec. Litig., 882 F.Supp. 1371, 1379 (S.D.N.Y.1995). If, on the other hand, a proposed claim sets forth facts and circumstances that may entitle the pleader to relief, then futility is not a proper basis on which to deny the right to amend. Saxholm, 938 F.Supp. at 124 (citing Allstate Ins. v. Administratia Asigurarilor De Stat, 875 F.Supp. 1022, 1029 (S.D.N.Y.1995) and Mathon v. Marine Midland Bank, N.A., 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief)).

The court has reviewed plaintiff's proposed amended complaint, and finds that it suffers from the same deficiencies as are noted above with respect to his initial complaint. Accordingly, plaintiff's motion for leave to file the proposed amended complaint accompanying his motion will be denied on basis of futility.[6] Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir.1993) (citations omitted); *accord* Brown v. Peters, 95–CV–1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sep.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted).

#### 2. *Leave to Amend to Cure Perceived Deficiencies*

**\*8** Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once if there is any indication that a valid claim might be stated. Branum v. Clark, 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also* Mathon, 875 F.Supp. at 1003 (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). The court must next determine whether plaintiff is

entitled to the benefit of this general rule, given the procedural history of the case.

I am unable to conclude that if given the opportunity plaintiff nonetheless would be unable to set forth allegations sufficient to avoid dismissal of his claims at this early stage in the litigation. If he opts to amend, however, the plaintiff is advised that the law requires that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* No. 94–CV–1594, 1995 U.S. Dist. LEXIS 7136, at *24–25 (N.D.N.Y. May 22, 1995) (Pooler, D.J.) (citation omitted). Such an amended complaint will replace the existing second amended complaint, and therefore must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Harris v. City of N.Y.,* 186 F.3d 243, 249 (2d Cir.1999) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)); *see also* Fed.R.Civ.P. 10(a). The proposed amended complaint also specifically allege facts indicating the involvement of each of the named defendants in the constitutional deprivations alleged, providing sufficient detail to establish the they were tangibly connected to those deprivations. *See* *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

### E. *Appointment of Counsel*
In addition to seeking leave to amend, plaintiff has applied to the court for appointment of counsel. As a threshold matter, prior to requesting appointment of *pro bono* counsel, a party must first demonstrate that he or she has been unable to obtain counsel through the private sector or public interest firms. *Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 173–74 (2d Cir.1989) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986)). Given that plaintiff has not provided the court with information regarding any efforts by him to obtain counsel, his request is subject to denial on this basis alone.

Turning to the merits of his application, I find that Reed has not demonstrated entitlement to appointment of counsel under the applicable statute. 28 U.S.C. § 1915(e)(1) affords district courts broad—though not limitless—discretion in determining whether to appoint counsel to represent indigent civil litigants. *Hodge,* 802 F.2d at 60. In *Hodge,* the Second Circuit noted that when exercising that discretion the court

> **\*9** should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for crossexamination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in th[e] case why appointment of counsel would be more likely to lead to a just determination.

*Id.* at 61–62; *see also* *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (citing Hodge). As can be seen, of the criteria enunciated by the Second Circuit to be considered when determining whether assignment of pro bono counsel is appropriate, the most important is the merits —that is, "whether the indigent's position [is] likely to be of substance." *Cooper,* 877 F.2d at 172 (citations and internal quotations omitted). Where a plaintiff does not provide a court with evidence, as opposed to mere allegations, relating to his or her claims, that party does not meet this threshold requirement. *See* *Herman v. Runyon,* No. 96 CIV. 6080, 1997 WL 118379, at *1 (S.D.N.Y. Mar. 17, 1997).

Each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, J.) (citing *Hodge,* 802 F.2d at 61). Although the Constitution guarantees indigent litigants "meaningful access" to the courts, it does not entitle all such parties to receive the benefit of *pro bono* representation. *Hodge,* 802 F.2d at 60. While, as was previously indicated, the appointment of counsel to represent indigent parties in civil suits is authorized by statute, when that authority is exercised the court is required to call upon attorneys to donate their time *pro bono* to the benefit of indigent litigants and the court. Accordingly, in deference

to the limited resources available to the court to serve the interests of the many indigent litigants who pursue claims before it, and recognizing the "thankless burden" associated with such assignments, *Miller v. Pleasure,* 296 F.2d 283, 285 (2d Cir.1961), *cert. denied,* 370 U.S. 964, 82 S.Ct. 1592, 8 L.Ed.2d 830 (1962), courts should not grant such applications indiscriminately, but instead must exercise good judgment and restraint in doing so. *Cooper,* 877 F.2d at172.

In this instance, plaintiff has failed to make a sufficient showing to warrant appointment of counsel to represent him at this early stage in the litigation. Plaintiff's application for appointment of counsel will therefore be denied, without prejudice to renewal. [7]

IV. *SUMMARY AND RECOMMENDATION*

The claims now remaining before this court, following severance and transfer of a portion of plaintiff's original complaint to the Western District of New York, include causes of action against two John Doe defendants arising from plaintiff's alleged investigation of contaminated food, as well as claims of retaliation, harassment, and cruel and unusual punishment against defendant M. Soto. Because the Doe defendants in this case have not yet been identified and thus have not yet appeared in the action, the court has not been called upon to gauge the sufficiency of plaintiff's claims against those defendants. [8] Turning to plaintiff's claims against defendant Soto, based upon a review of the allegations set forth in plaintiff's complaint, I recommend that all claims against defendant Soto be dismissed, with leave to replead, and find it unnecessary to address his alternative argument, to the effect that he is entitled to qualified immunity from suit.

 **\*10** Turning to plaintiff's pending motions, I conclude that his motion for leave to amend should be denied, based upon futility, but that he nonetheless should be afforded an opportunity to further amend his complaint in an effort to cure the deficiencies cited in this report and recommendation in connection with his allegations against defendant Soto. I further find, however, that he has failed to establish a basis for appointment of counsel to represent him, *pro bono,* at this early procedural juncture in this litigation.

Based upon the foregoing it is hereby respectfully,

RECOMMENDED that the motion of defendant M. Soto to dismiss plaintiff's claims against him in this action (Dkt. No. 11) be GRANTED, and that all claims against that defendant be DISMISSED, with leave to file an amended complaint as directed above within thirty days from the date of the filing a decision and order acting upon my recommendation of dismissal; and it is further

ORDERED, that plaintiff's motions for leave to amend (Dkt. No. 14) and for appointment of counsel (Dkt. No. 15) be DENIED in all respects, without prejudice to renewal.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roland v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4486086

# Footnotes

1    The court's records list the plaintiff as being confined in the Southport Correctional Facility "Southport", based upon a change of address notice filed by Reed on February 22, 2012. *See* Dkt. No. 20. According to publically available information, however, Reed is now being held in the Elmira Correctional Facility. *See* http://nysdoccslookup.doccs.ny.gov. GCA00P00/WINQ130 (screenshot attached. Plaintiff is reminded of his

obligation under the court's rules to notify the court and defendants' counsel of any further address changes in order to facilitate communications with him. *See* N.Y.N.D.L.R. 10.1(c)(2).

2    The following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See* 🔖 *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing 🔖 *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555–56, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also* 🔖 *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). In light of the severance and transfer of plaintiff's claims arising out of his confinement at the Southport Correctional Facility to the Western District of New York, I have included only the facts relevant to his remaining claims, all of which involve events at the Eastern Correctional Facility ("Eastern").

3    Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving the inmate of participation in normal prison activities. 🔖 *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); 🔶 *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95–CV–1765, 1997 WL 160124, at *2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia,* 🔖 *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)) (Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.). Inmate conditions while keeplocked are substantially the same as in the general population, the primary exception being that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. 🔖 *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

4    Plaintiff's opposition memorandum also intimates that he lost good time credits as a result of the relevant events. *See* Plaintiff's Memorandum (Dkt. No. 18) at p. 6 of 18. There is no factual support for this statement, however, in either plaintiff's complaint or the attached exhibits.

5    In his motion defendant Soto has assumed, for the sake of argument, that plaintiff's resort to seeking medical treatment within the facility constituted protected activity sufficient to trigger the First Amendment's protection against retaliation, and I will do likewise.

6    In his proposed amended complaint plaintiff seeks to add a claim for denial of equal protection, alleging that because he was issued a misbehavior report for exercising his right to seek medical care while another inmate was permitted to attend the medical clinic, his right to equal protection was denied. *See* Proposed Amended Complaint (Dkt. No. 14–1) ¶ 60.

   The Equal Protection Clause directs state actors to treat similarly situated people alike. *See* 🔖 *City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See* 🔖 *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia,* 🔖 *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." 🔖 *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting 🔖 *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) (internal quotation marks omitted)). While plaintiff's complaint alleges that he was treated differently than another inmate, conspicuously absent from his proposed amended complaint is the allegation of any fact plausibly suggesting that the difference in treatment was the result of an intentional or purposeful discrimination directed at an identifiable or suspect class. For this reason, I find that the proposed amended complaint does not state a plausible equal protection claim.

7    In accordance with the customary practice of this court, once a case passes through the discovery and motion phases and becomes trial ready, *pro bono* counsel is usually appointed for an indigent *pro se* inmate litigant to assist in preparation for and during the trial, either as attorney of record or as standby counsel.

8    Because only "persons" may act under color of state law, a complaint seeking money damages pursuant to 🟨 § 1983 must name one or more individuals as defendants. *See Walker v. State of Connecticut,* No. 3:06CV165, 2006 WL 1981783, *2 (D.Conn.2006); Connor v. Hurley,* No. 00Civ.8354LTSAJP, 2004 WL 885828, at * 3 (S.D.N.Y.2004). It is not uncommon for a *pro se* plaintiff to include a "John Doe" or other unknown defendants, together with named defendants in a complaint. Generally, in such cases the complaint is served upon the named defendants, and the plaintiff is directed to pursue discovery to identify the John Doe(s) and to thereafter seek leave to amend the complaint to name them as defendants. In the event the plaintiff chooses to abandon his claims against defendant Soto, leaving only the two "Doe" defendants in the case, I recommend the court allow plaintiff to name the superintendent of Eastern as a defendant—even though there is no suggestion of his or her personal involvement in the alleged constitutional violations— solely for the purpose of effecting service and so that issue may be joined. In that event, once issue is joined, plaintiff may seek through discovery the identity of the John Doe defendant(s). *See Peralta v. Doe,* No. 04– CV–6559P, 2005 WL 357358, at * 2 (W.D.N.Y. Jan.24, 2005) (citing 🟨 *Valentin v. Dinkins,* 121 F.3d 72, 76 (2d Cir.1997)) (district court should assist *pro se* incarcerated litigants with their inquiry into the identities of unknown defendants and "may pursue any course that it deems appropriate to a further inquiry into the identity" of the unknown defendant); *Harvey v. Corrections Officer,* 9:09–CV–0517 (N.D.N.Y.) (LEK/GHL) (order filed 6/1/09 permitting plaintiff to name superintendent as a defendant for purposes of service and discovery).

---

**End of Document**                                      © 2021 Thomson Reuters. No claim to original U.S. Government Works.